# EXHIBIT 11

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4   DYNAMIC SPORTS NUTRITION, LLC §   CASE NO. 4:15-CV-02645
                                 §   HOUSTON, TEXAS
5   VERSUS                       §   TUESDAY,
                                 §   DECEMBER 22, 2015
6   HI-TECH PHARMACEUTICALS, INC. §  12:23 P.M. TO 2:22 P.M.

7

                       INITIAL CONFERENCE
8
              BEFORE THE HONORABLE NANCY F. ATLAS
9                 UNITED STATES DISTRICT JUDGE

10

                         APPEARANCES:
11
        FOR PLAINTIFF/DEFENDANT:    SEE NEXT PAGE
12
        COURT RECORDER:             ALISHA MALY-WATSON
13
        COURT CLERK:                W. BOSTIC
14

15

16

17

18

19

20             TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                  935 ELDRIDGE ROAD, #144
22                SUGAR LAND, TEXAS 77478
            Tel: 281-277-5325 ▼ Fax: 281-277-0946
23               www.judicialtranscribers.com

24

    Proceedings recorded by electronic sound recording;
25      transcript produced by transcription service.

1                        APPEARANCES:

2


3  FOR DYNAMIC
   SPORTS NUTRITION:            STEWART HOFFER, ESQ.
4                               GREG KOUSH, ESQ.
                                HICKS THOMAS, LLP
5                               700 LOUISIANA
                                SUITE 2000
6                               HOUSTON, TEXAS  77002
                                713-547-9138
7

8  FOR HI-TECH
   PHARMACEUTICALS:             ARTHUR W. LEACH, ESQ.
9                               ATTORNEY AT LAW
                                5780 WINDWARD PARKWAY
10                              SUITE 225
                                ALPHARETTA, GEORGIA  30005
11                              404-786-6443

12
                                KENT A. SCHAFFER, ESQ.
13                              BIRES SCHAFFER DEBORDE
                                712 MAIN STREET
14                              SUITE 2400
                                HOUSTON, TEXAS  77002
15                              713-228-8500

16

17

18

19

20

21

22

23

24

25

1      HOUSTON, TEXAS; TUESDAY, DECEMBER 22, 2015; 12:23 P.M.

2         (Recording begins in midsentence.)

3              MR. HOFFER:  ...Your Honor, I believe, unless

4    Mr. Schaffer is joining.

5              THE COURT:  Is Kent Schaffer coming?

6              MR. LEACH:  I honestly don't know, Judge.  He

7    emailed me just to know if I was coming and I told him I

8    was, but he didn't respond back to me whether he was coming.

9              THE COURT:  Okay.

10              MR. LEACH:  I've been admitted though.  I'm in

11    pro hac.

12              THE COURT:  Right.  So I can do that.

13              MR. LEACH:  We're good to go.

14              THE COURT:  I didn't realize he did criminal --

15    civil work.

16              MR. LEACH:  He doesn't.

17              THE COURT:  What?

18              MR. LEACH:  He does with me, Judge.

19              THE COURT:  Oh, okay.

20              MR. LEACH:  I have a criminal practice as well.

21    That's kind of our point of contact.

22              THE COURT:  Oh, that's interesting.  Okay.

23              Let's talk about this case.

24              MR. HOFFER:  Speak of the devil.

25              THE COURT:  Well, speak of the devil.

4

 1          MR. LEACH:  This would be the first time we're

 2   meeting.

 3       (Pause/voices off Record.)

 4          THE COURT:  Are you all ready or should I --

 5          MR. LEACH:  Yes.

 6          THE COURT:  Yes?

 7          MR. LEACH:  We're ready.

 8          THE COURT:  Okay.

 9          MR. LEACH:  Judge, I have a question:

10          Can I use the Elmo at some point?

11          THE COURT:  Yes.  You can all come forward.  We

12   you have so much paper, I guess you can stay wherever you

13   are.  Here's the point: I want you to keep your voices up.

14          I need to talk to you about what I'll call

15   "logistics."  I do have your Joint Discovery Case Management

16   Plan, but I'm aware of a second-filed case that is before

17   Judge Ellison.

18          And forgive me for my voice.  My kid got married

19   and I became very hoarse over the course of the weekend, I

20   just talked too much, and there was a live band, but anyway

21   I'll do the best I can.  If everybody can hear me, great.

22   If you can't, let me know.

23          MR. LEACH:  We can hear.

24          THE COURT:  Okay.  The point is:  There's another

25   case I see that is related and it's 15-CV-3401.  In that

1 │ case, I am aware that there is a RICO claim.  That case was

2 │ apparently filed in Georgia and then transferred here.

3 │          MR. LEACH:  Yes, ma'am, that is correct.

4 │          THE COURT:  And the parties are reversed in that

5 │ case --

6 │          MR. LEACH:  That is correct.

7 │          THE COURT:  -- from what we have.

8 │          MR. LEACH:  Yes, ma'am.

9 │          THE COURT:  I'm under the impression that the

10 │ parties want to consolidate or at least combine those cases

11 │ for pretrial purposes, maybe for all purposes, I'm not sure.

12 │          There's an issue because the other case has a RICO

13 │ claim in it.  I hadn't studied that case, but I'm aware that

14 │ there's such a claim there.  We need to talk about that

15 │ because of the fact that I don't handle RICO cases.  That's

16 │ one of my senior status luxuries.  So I've given you this

17 │ head's up even before you've stated your appearances so you

18 │ could be thinking about it.  Let's go through appearances.

19 │          Who do we have for the Plaintiff?

20 │          MR. HOFFER:  Your Honor, good afternoon.

21 │ Stewart Hoffer, on behalf of Plaintiff, Dynamic Sports

22 │ Nutrition, LLC, along with my associate, Greg Koush.

23 │          THE COURT:  How do you spell your name?

24 │          MR. KOUSH:  K-O-U-S-H is the last name,

25 │ Your Honor.

6

```
 1              THE COURT:  And your first name?

 2              MR. KOUSH:  Greg, G-R-E-G.

 3              THE COURT:  Okay.

 4              MR. LEACH:  Kent Schaffer, who you know,

 5  Your Honor, and Art Leach.  I am a lawyer from Atlanta,

 6  Georgia and I am the lawyer that signed the Complaint you're

 7  referring to.

 8              THE COURT:  From Alpharetta.

 9              MR. LEACH:  Yes, ma'am.

10              THE COURT:  Is that a suburb?

11              MR. LEACH:  A suburb of Alpharetta, yes, ma'am.

12              THE COURT:  Okay.  All right.  So I'm happy to

13  handle your case, no problem, but we have a sort of a

14  tactical issue to deal with.  I don't know how serious you

15  are about the RICO claim.

16              MR. LEACH:  Very serious, Judge.

17              THE COURT:  Okay.

18              MR. LEACH:  We're also asking that the Court send

19  it all back to Georgia.  And I had filed a motion for that

20  to be heard today on -- and we put it in the Plan as well

21  and we did not get a response from the Court.  That's why I

22  wanted to come so that we could perhaps get it on the road

23  to the Court considering whether this case should remain in

24  Texas.

25              THE COURT:  Okay.  Well, I'm happy to hear some
```

1  argument on that.

2          MR. LEACH:  Yes, ma'am.

3          THE COURT:  But I'm not going to be deciding it

4  today.

5          MR. LEACH:  Yes, ma'am.

6          THE COURT:  What I don't understand is: if it went

7  back to Georgia, what do you think is going to happen to the

8  counterclaim or to the other case I should say?

9          MR. LEACH:  It'll go to Georgia.

10          THE COURT:  That's the case that came from

11  Georgia, isn't it?

12          MR. LEACH:  Yes, ma'am, because the way the first

13  to file works is: this Court has to make the decision as to

14  whether this Court keeps it or it goes back to Georgia.  So

15  Judge Cohen, in Atlanta, entered an order along that line

16  stating that it is for this Court to make the determination.

17          THE COURT:  Right.  I'm trying to figure out when

18  that Motion was filed.

19          When was your Motion filed?

20          MR. LEACH:  It would have been either late last

21  week or early this week, Judge, and it was just a motion.

22  You're talking about --

23          THE COURT:  Well, today is only Tuesday.

24          MR. LEACH:  Okay.  So it would have been the end

25  of last week.  I'm sorry, Judge.

8

1          THE COURT:  The 19th.

2          MR. SCHAFFER:  The 19th.

3          THE COURT:  The 19th was Friday.

4          MR. SCHAFFER:  Oh.

5          THE COURT:  That a Saturday actually.  The 18th

6   maybe.

7          MR. SCHAFFER:  Yeah, 18th.

8          MR. LEACH:  It was a very simple motion, Judge,

9   just asking that it be considered at this hearing.

10         THE COURT:  Okay.  My Docket Sheet was printed

11  before that Motion was printed.

12     (Court confers with the Clerk.)

13         THE COURT:  Around here, motions can be expedited,

14  but instantaneous or weekend consideration on this kind of

15  motion would be inappropriate.

16         MR. LEACH:  Right.

17         THE COURT:  So I don't know what the other side

18  thinks.

19         Have you seen the Motion, are you prepared to

20  argue it?

21         MR. HOFFER:  Well, Your Honor, I think the Motion

22  that Mr. Leach is referring to is essentially just a request

23  that the Court hear it today.

24         The Motion to Dismiss, that is a substantive

25  motion, I am prepared to address today.

1          THE COURT:  Yeah, but the Motion -- he's asking

2    about the Motion for Transfer back to Georgia of the --

3    either the second-filed or maybe this case --

4          MR. LEACH:  Yes.

5          THE COURT:  -- be heard today.  I now have the

6    Motion in front of me and it's the Motion to Dismiss

7    Plaintiff's Amended Complaint.

8          MR. LEACH:  And/or transfer, Judge.

9          THE COURT:  Oh, you're trying try to strike or

10   transfer.

11         MR. LEACH:  Yes, ma'am.

12      (Voices off Record.)

13         THE COURT:  Okay.  That's the issue.  There's a

14   difference in practice.

15         MR. LEACH:  Yes, ma'am.

16         THE COURT:  Document 25 in our files is the Notice

17   that you are on.  I now have it.  My Docket Sheet was

18   printed on the 18th and it didn't have this Motion on it.

19   But the point is: it's reflected on the Docket as

20   "Document 25" and it's listed as a notice, not a motion.

21         MR. LEACH:  I see.

22         THE COURT:  And I used to practice in New York and

23   we used to do notices and motions separately also, but here

24   we don't do that.  And unless something is a motion, we

25   don't see it for the purposes of the preparation for the

1  hearing.

2          I'm perfectly happy -- since you both are ready,

3  I'm happy to have the -- some discussion today.  My next

4  conference settled so they don't care to have a hearing so

5  we don't have a time crunch.  What I am concerned about is

6  that I'm not very familiar with the Motion to Dismiss.  As I

7  told you, I was at a wedding this weekend.  So I am being

8  totally candid.  I'm here to learn, but you're not getting a

9  decision today, that's for sure.

10          The other thing is that the Motion to Dismiss was

11  filed a while ago and I guess it's Document 11.

12          MR. HOFFER:  Yes, Your Honor.  That's what I have

13  as well, October 30th, 2015.

14          THE COURT:  So it is technically ripe.

15          MR. HOFFER:  Ripe, yes, Your Honor.

16          THE COURT:  And I have not gotten to it.  I

17  apologize to all of you for this because usually I would be

18  ready for more effectively, but I'm happy to listen to you

19  all.  I'm quite concerned about the idea that you all think

20  this case is going back, but I do recognize I have to make

21  the decision.

22          MR. LEACH:  Yes, ma'am.

23          THE COURT:  I think the Motion to Dismiss is -- to

24  the extent that I'm aware of some of the issues somewhat,

25  I'd be happy to hear you, but I'm not sure that this case is

1  going back.

2          MR. LEACH:  I would expect the Court to start in

3  that position but --

4          THE COURT:  That's right.

5          MR. LEACH:  -- based on a long history of being in

6  Federal Court, I would hope that the Court will move as you

7  hear the facts.

8          THE COURT:  Okay.  So let's hear some argument on

9  it and then we'll -- I'll understand more about the case.

10  Go ahead.

11          MR. LEACH:  Can I come right here, Judge; is that

12  all right?

13          THE COURT:  Yes.

14          MR. LEACH:  Or do you want me at the lectern; how

15  do you prefer?

16          THE COURT:  I don't care, couldn't care less.

17          MR. HOFFER:  Your Honor, may we be seated while --

18          THE COURT:  Yes, while --

19          MR. HOFFER:  -- Mr. Leach presents?

20          THE COURT:  -- he's talking, you should.

21          MR. HOFFER:  Thank you.

22          MR. LEACH:  Judge, there's an old football saying

23  that the best defense is a good offense and DSN and

24  Mr. Clapp have taken that old saying to new heights in this

25  proceeding.  The only company in this case that is

1  defrauding Texas consumers is DSN and Mr. Clapp.

2          And what I'm asked to do -- and I honestly did not

3  expect the Court to be fully prepared today.  There's too

4  much to look at to be fully prepared today.  And I think the

5  attorneys have got to point the Court in the appropriate

6  direction in terms of what needs to be looked at.

7          And one of the things that I would like the Court

8  to look at and I'm going to talk a little bit about, I'm

9  going to just summarize it very briefly here, is the

10 Complaint in Georgia because the Complaint in Georgia --

11         THE COURT:  The one that's now before

12 Judge Ellison.

13         MR. LEACH:  Yes, ma'am.  That Complaint reveals

14 why we have had the kind of activity that we see in this

15 Court.  I'm going to characterize it as "subterfuge" and

16 "concealment" and "misdirection" and I think all of it fits

17 clearly into the category that requires that this case go

18 back to Georgia.

19         My hope in having this argument today and

20 requesting this argument was that I could open the Court's

21 eyes to what I believe the Court will eventually find in

22 this case and that is that this race to the courthouse, this

23 effort to get jurisdiction here in Houston was an effort to

24 gain a tactical advantage because Mr. Clapp particularly

25 knew how the CEO of Hi-Tech was going to react to the fact

1   that he was infringing on this very valuable trademark.  So

2   my effort here today is to bring all this to the Court's

3   attention so that we can nip the fraud in the bud and send

4   the case back to Atlanta to where it really belongs.

5           Now, one thing that I want the Court to know from

6   the outset because it is particularly bothersome to me is:

7   you have a dec action that is filed initially here, which is

8   the action before Your Honor.  And the Court probably

9   knows -- and if not, I'll tell you -- that there are lots of

10  cases that say that the dec action is something that you

11  can deny, refuse, decline, but also that dec actions

12  generally -- Texas case law is fairly unanimous in this

13  regard -- does not give any so you have -- and can I get the

14  Elmo to come on where I can show you something Judge?

15      (Pause/equipment being prepared.)

16          MR. LEACH:  Judge, the sequence of events here is

17  absolutely critical to the decision that you will make and

18  what I'm -- can you see it, Judge?

19          THE COURT:  Yeah.

20          MR. LEACH:  You can see it because I can't see it

21  on this screen right here.

22          THE COURT:  You can't?

23          MR. LEACH:  I cannot.  Is it going to warm up, I

24  imagine, this button?

25      (Pause/equipment being prepared.)

1          MR. LEACH:  So, Judge, what happened in this case
2  is: you have a fairly long relationship between Mr. Clapp
3  and Mr. Wheat, who's the CEO of Hi-Tech, in which Mr. Clapp
4  is ingratiating himself in Mr. Wheat.  He knows all about
5  this particular trademark.  They had discussed it
6  frequently.  Mr. Clapp even went so far as to tell Mr. Wheat
7  that his trademark was coming up for renewal.  Mr. Wheat had
8  already filed for that renewal.

9          But what occurs is: on September the 11th, 2012,
10  the first item on this, which is Page 3 of our Reply, which
11  is Document Number 19 -- but what happens is: Mr. Wheat
12  discovers that Mr. Clapp is actually infringing on the
13  Dianabol trademark and he sends Mr. Clapp a cease and
14  desist.  There's a series of emails.  It's all in the
15  documents that are before the Court.  But basically says,
16  "You got a week to get this product off the market."

17          And, Judge, what you'll see in our Complaint is:
18  this isn't like a close call on the trademark.  This is a
19  trademark that's been in existence for a long, long time.
20  Mr. Clapp filed with the U.S. Patent Trademark Office in an
21  effort to get his trademark approved.  They denied it citing
22  the Hi-Tech trademark.  He went to market anyway in spite of
23  that.  And he contacted Mr. Wheat and had a series of email
24  communications, telephone calls, basically very friendly
25  stuff only to have Mr. Wheat find out that he is infringing.

1  This conversation occurs on the 11th.  And the next day,

2  Judge, the next day being a Saturday, they filed a

3  complaint, the dec action here.

4         So in terms of all the cases that you'll read in

5  Texas on race to the courthouse, I think you're going to

6  have trouble finding anything that's quite like this.  I

7  mean, this is a genuine race to the courthouse.

8         Okay.  So we are -- we get served with the dec

9  action and we file the Georgia Complaint, which as the Court

10  has pointed out, has a RICO claim in it but it's a Georgia

11  state RICO so you will have conflict of law of issues that

12  you'll have to deal with.  But let me just tell, you as a

13  former Assistant United States Attorney and Chief of the

14  Organized Crime Unit in Atlanta, that a Georgia RICO is a

15  much simpler version of the federal RICO statute.  It

16  basically has to do with two or more criminal acts that

17  occur within the State of Georgia.  That's basically it for

18  the Georgia RICO, so it's not the complexity that you see in

19  a federal RICO, which I've tried many of those as well both

20  as an Assistant U.S. Attorney and outside of the Government.

21         So anyway, you have got our filing on September

22  the 28th.  And as we say in our briefing, Judge,

23  essentially, because of the claims made in there, we are

24  first to file, you've got a dec action in Texas and you've

25  got this Complaint filed in Atlanta.  That is served on

1  the 2nd.  That very day, Judge, that very day they filed

2  their Amended Complaint.

3          Now, a very important thing and the reason why I

4  want you to have our Complaint is because if you take our

5  Complaint and hold it up against their Amended Complaint,

6  you'll see they're mirror images.  And, basically, what

7  they're doing is: they're taking our allegations and they're

8  turning them against us and they're saying, for instance,

9  that we're -- false advertising is one of their claims,

10  where we are extraordinarily detailed in our Complaint about

11  their false advertising.  And I want to talk to you a little

12  about that in the course of this.

13          There is no who, what, where, when, why in their

14  Complaint.  It's just a list of a variety of our

15  advertisements and they say that they are false.  They also

16  rely on a statute that they cannot rely on.  And this takes

17  me to the whole idea of how carefully was this researched in

18  the whatever number of hours it was between them learning of

19  our Complaint and their filing of this Amended Complaint

20  because they cite a statute that I don't know if the Court

21  is aware of.  It's called "DASCA."  It has to do with

22  steroids.  And you may have gotten some of these cases but

23  there was a massive problem in the country with what's known

24  as "prohormones" where what people have done, scientists

25  have done is: they've tweaked the molecules, steroid

1 molecules, and they have the same physiological effect as
2 steroids but because they weren't on the schedule and
3 because they weren't a Schedule I drug where you have the
4 ability to take analogs, people were producing these things
5 and people were getting hurt.  I mean, as the Court is
6 probably aware, steroids are incredibly toxic to the liver
7 and people die.  I mean, it's really that simple.
8        So anyway, we made our allegations in great
9 particularity because the fraud that Mr. Clapp is
10 perpetrating in Texas and all around the country is: he is
11 basically saying that his products are steroids.
12        And it's really remarkable, Judge, when you go
13 into the Complaint, what you will see is: the name of
14 various steroids, the chemical name, is what he is using in
15 his advertisements but he'll interpose one letter that is
16 different in each one of them.
17        He also claims that he's got human growth hormone,
18 which is a highly regulated substance.  It is a natural
19 occurring substance, but because it is so incredibly
20 effective, it has to be done under the supervision of a
21 doctor and it generally is done for children who have growth
22 issues so that they can get a growth spurt and grow to, you
23 know, full maturity.
24        His allegations are genuine fraud.  And the Court
25 is probably aware of the Lanham Act and how it works.

1    Courts all around the country are getting barraged with
2    Lanham Act cases.  But, generally, what we see in Lanham Act
3    cases is: I have a product that I'm selling, let's just say
4    Garcinia just to keep it simple, and I advertise and
5    actually make my Garcinia 80 percent standardized, which
6    means you can test my product and you are going to find that
7    it's 80 percent Garcinia that's in there, okay?  Somebody
8    else advertises that they've got 90 percent Garcinia, but
9    when I send it to a lab, they've really only got 5 percent.
10           Well, that's an unfair competitive advantage
11   because they're telling the consumer, "We have this
12   stronger, better product," when in reality, they haven't
13   paid for the raw materials and they're not providing a
14   quality product.
15           You see none of that in their Amended Complaint.
16   Nothing that approaches any sort of allegation like that.
17   Where we provide all the details, they provide nothing,
18   Judge.  They just simply throw those allegations out and, I
19   guess, we are left to figure out what the problem is in that
20   advertising.
21           The point of what's up on the Elmo right now and
22   the chart and the point of the timing is that it clearly
23   shows to the Court that, at some point, I suspect
24   circumstantial evidence would be on October the 2nd the
25   light went on and they realized that they had first-to-file

1  problem with regard to the dec action so they had to get

2  something on file in an effort to try to hold on to

3  jurisdiction here in Houston.  If you find that those

4  actions needs to be dismissed -- and I'm going to make

5  arguments as to why they need to be dismissed -- then the

6  case here in Houston goes away anyway and goes back to

7  Atlanta.

8         So let me explain to you why part of their case

9  has to be dismissed.  They've got a Lanham Act case and

10 instead of doing what I explained to you, they are relying

11 on the Designer Steroid Act.  "DASCA" is what we call it,

12 okay?  The problem is: there's no private cause of action in

13 DASCA.  DASCA is set up basically for law enforcement.  It's

14 so the DEA can go after all these people that are doing the

15 prohormones and get them off the market.  There's no private

16 cause of action there.

17        So what they are saying is -- and you can read the

18 Complaint for yourself and see if you agree, but it's plain

19 as day, as far as I am concerned, is that the Lanham Act

20 violation is that we are making claims, steroid claims, with

21 regard to Hi-Tech products.  Number one: never happened.  Go

22 in, look at all the advertisement they had.  Never happened.

23        Hi-Tech products are herbal supplements.  That's

24 the way we advertise them.  We don't make any steroidal type

25 claims.  There's no comparison to steroids anywhere that

1  you'll find in any of our advertisements.

2         So having that as a background, the thing that

3  really bothers me is: they filed their Complaint, we filed

4  our Complaint, I get a motion for sanctions in Atlanta,

5  Judge.  I get a motion for sanctions for having the temerity

6  to file the Complaint on the 28th.  They have not brought

7  that Sanction Motion to your attention here, but I think it

8  is indicative of the aggressive litigation strategy that we

9  have here.

10         Now, setting aside the fact that a dec action

11  normally under all the Texas cases does not give

12  jurisdiction, yes, there are some where it occurs and

13  Counsel has cited them to you.  Disregarding the fact that

14  they raced to the courthouse the day after the conversation

15  between Mr. Wheat and Mr. Clapp and ignoring the way that

16  they have filed the Amended Complaint upon immediately being

17  served, they want the Court to ignore all these

18  circumstantial issues of proof and say the Court -- the case

19  is properly filed here in Houston.

20         What this case is really about is an effort to try

21  to pull the wool over the Court's eyes and try to do a

22  misdirection play in terms of their Complaint versus our

23  Complaint with the hope and the prayer that this Court will

24  rely strictly on first to file, not look at all the other

25  circumstances that the Court -- that the cases do direct the

1  Court to look at and that they will win the race to the

2  courthouse.

3        Now, I've already mentioned to you the Complaint

4  in Atlanta and I know and you've already mentioned and I

5  think it's the way that judges all around the country,

6  federal judges, look at civil RICOs is: you tend to glaze

7  over when you hear about civil RICOs.  But this a case

8  that is different and unique and I would invite the Court to

9  look at the RICO count, the first RICO count, which is what

10 we refer to as the "A" count.  There's three, A, B, and C

11 under Georgia law.  And in the A count, we set out in great

12 detail the fraud that has been committed here and how it

13 affects my client, Hi-Tech.

14        THE COURT:  You're talking about the RICO count in

15 the Judge Ellison case --

16        MR. LEACH:  Yes, that's what --

17        THE COURT:  -- in the other case?

18        MR. LEACH:  But I'm asking you to look at that

19 Complaint because I think, Judge, in terms of making this

20 judgment, number one, on motion to dismiss; number two, on

21 whether the case should be returned to Atlanta, and I do

22 think it has to be done in that order.

23        THE COURT:  Exactly.  So the question is:

24        If I look at the Motion to Dismiss and I find

25 that Motion should be granted -- and we're talking Docket

1  Number 11 in this case, right?

2          MR. LEACH:  Yes, ma'am.

3          THE COURT:  Then if this case goes away, what

4  happens to the Atlanta case?  It'll go back because there's

5  no program --

6          MR. LEACH:  Yes, ma'am.

7          THE COURT:  -- on which to grasp.  Okay.  So --

8          MR. LEACH:  And may I suggest --

9          THE COURT:  Are you going to talk about the Motion

10 to Dismiss?

11         MR. LEACH:  Yes, yes, ma'am.  All right.  And I

12 have talked about it.

13         THE COURT:  Because, it's -- frankly, the first

14 doctrine -- yeah, I can look at the various factors you talk

15 about, but this is a dec action and context and I will

16 locate all of the circumstances if I need to reach it, but

17 your suggestion that the Motion to Dismiss moots the Motion

18 to Transfer, whatever, has some interest to me.

19         My concern is that your concepts about what would

20 be typically included in a motion to dismiss may differ from

21 what is typical.  You're talking all the way outside the

22 Record and I'm confused by that.  And again, forgive my

23 ignorance, I sincerely apologize.  But the idea that I can

24 look outside the Record to the extent that you indicate I

25 should be doing is a concern to me.

1          On the Motion to Dismiss, what is it that is --

2    what -- you'll have to summarize that Motion for me and tell

3    me what it is I'm supposed to be looking at.

4          MR. LEACH:  Okay.  Judge, when we go to the Motion

5    to Dismiss, the number one thing that is going to strike the

6    Court -- and I know you look at hundreds of these kinds of

7    lawsuits all the time --

8          THE COURT:  Yeah.

9          MR. LEACH:  -- is that there is an absence of a

10   factual basis for the claims.  And, you know, I recognize

11   that we're in a different circuit here and that Rule 9

12   doesn't apply to Rule 8 that we've got to look at.  And, you

13   know, in terms of pleading what is necessary, the standards

14   are not quite as high as they would if I was home in

15   Georgia, but the issue that I point out to the Court is that

16   there is a total absence, a fatal absence of factual

17   allegations in this Complaint, false and misleading, when it

18   comes to the advertising claims, all right?

19          There has to be a factual basis asserted as to how

20   the advertisements deceived any consumer.  And this is where

21   we get into the question about whether they were relying on

22   DASCA statute or whether they were actually trying to tell

23   the Court in the Complaint that there was false and

24   misleading aspects to the advertisements.  The problem is:

25   they make --

1            THE COURT:  Your advertisements.

2            MR. LEACH:  Our advertisements.  They make no

3    allegation as to how so when -- for instance, if you were to

4    look at our Complaint, that is, the Hi-Tech Complaint filed

5    in Georgia --

6            THE COURT:  Isn't your Complaint filed in Georgia

7    about their wrongs?

8            MR. LEACH:  Yes.

9            THE COURT:  And this Complaint is about your

10   alleged wrongs.

11           MR. LEACH:  Right, but what I'm trying to get the

12   Court to understand is: you have to hold them up together.

13           THE COURT:  Well, I see that.  So you think that

14   their Complaint is bologna basically because they just

15   copied yours without a factual basis.

16           MR. LEACH:  And without investigation.

17           THE COURT:  Well, maybe, but the problem I'm

18   having is, on the Motion to Dismiss, is that's information

19   outside the Record.

20           MR. LEACH:  Except --

21           THE COURT:  And I hear you on the Rule 9 versus

22   Rule 8.  I don't know, I mean, I think that's an interesting

23   point for us to look at in terms of process but --

24           MR. LEACH:  When you look at the briefs, Judge,

25   what you will see is -- the position that we take is that in

1  doing their false advertising, claimed they're relying on

2  DASCA and they don't have a cause of action under DASCA so

3  they can't do it that way.  No --

4         THE COURT:  And that's your big picture point.

5         MR. LEACH:  That's a big picture point, all right?

6  Their response, when they came back, they said, "No, it's

7  false advertising," all right --

8         THE COURT:  All right.

9         MR. LEACH:  -- it's not DASCA, it's false

10 advertising, but when you read the Complaint, you're going

11 to see it's plain as day it's DASCA.  But that's fine.  If

12 they want to say it's false advertisement, where's the

13 notice within the Complaint?  And you'll see it is absent,

14 not thin, Judge, as sometimes we see on notice pleading --

15 you know, it's thin, maybe just enough to get you -- it's

16 absent.  So I think that when it comes to that, the Court

17 has to dismiss that count.

18        And all I can say is: look at our Complaint, look

19 at their Complaint and what you'll see is the right way to

20 do it and how wrong it is because they elected to go down

21 this DASCA road.  We're not on the DASCA track with the

22 exception of the fact that part of their fraud is to try to

23 relate to consumers that they're actually buying

24 pharmaceuticals.  And we set it out chapter and verse.

25        I don't expect the Court to be familiar with that,

1 but I just point it to your attention so that when you

2 finally do get into the Complaints, you can see the

3 difference between the two of them.  And, frankly, Judge, I

4 think it's a difference between people who practice in the

5 Lanham Act area and perhaps people that don't because if you

6 practice in that area, you know DASCA is not a basis with

7 which you can go forward on a Lanham Act.

8         THE COURT:  But they're not still are putting a

9 DASCA claim, correct?

10         MR. LEACH:  Well, if you look at their Response,

11 and they have basically abandoned it, but if you look at the

12 Complaint, it's all over the Complaint.  So, you know, I

13 think --

14         THE COURT:  Well, I'm looking at Counts One and

15 Two and Three that are actually alleged --

16         MR. LEACH:  Uh-huh.

17         THE COURT:  -- as written, First Amended

18 Complaint, and, yeah, I understand there's 15 pages or

19 more --

20         MR. LEACH:  Right.  So you --

21         THE COURT:  -- factual allegations.  But

22 forgetting those for the moment just for this purpose here,

23 if you've got a declaratory judgment of non-infringement

24 under the -- well, the Declaratory Judge Act, but it's

25 referencing the Lanham Act.

1            MR. LEACH:  Yes, ma'am.

2            THE COURT:  And then declaratory judgment of

3    abandonment.

4            MR. LEACH:  Right.

5            THE COURT:  That DSN also requests a judicial

6    declaration that Dianabol mark has been abandoned, the

7    mark --

8            MR. LEACH:  Correct, right.

9            THE COURT:  -- Dianabol, the mark.

10           MR. LEACH:  Without no factual basis for that.

11           THE COURT:  And then the third count, unfair

12   competition, false and misleading conduct or advertising in

13   violation of the Lanham Act.

14           MR. LEACH:  Right.  So the first two counts,

15   Judge, were in the Original Complaint.  When you get to the

16   third count and forward, that is the Amended Complaint.

17           THE COURT:  Okay.  They finally reference the

18   designer anabolic steroid control, I guess, but -- in

19   Paragraph 35.

20           MR. LEACH:  Yes, ma'am.  So, Judge, can I talk

21   about abandonment just for one moment?

22           THE COURT:  Yeah.

23           MR. LEACH:  Judge, "abandonment," when it comes to

24   a trademark, is a term of art and the statutes that apply,

25   which we've cited in our brief, set out with great

1  particularity what has to happen.  Basically you have to not

2  have the product available for up to three years.  You have

3  to ignore the product.  Basically you have to abandon it but

4  in a very specific way.  There's no evidence of that and

5  they don't make any allegation of that, Judge.

6          We've had -- we've got basically an uncontestable

7  patent.  It gets to a certain point after 10 years where you

8  can have an uncontestable trademark and we're in that

9  category with regard --

10          THE COURT:  You said, "Patent," but you really

11  mean "trademark."

12          MR. LEACH:  I meant "trademark," I'm sorry.  I do

13  a lot of patent stuff and so --

14          THE COURT:  No, it's okay.  I just want to be sure

15  I'm on the wavelength.

16          MR. LEACH:  Yes, ma'am.  It's trademark is what

17  I'm talking about here.  And the Dianabol trademark is in

18  that category.  We've had it for so long that it's in -- we

19  have applied to have it determined to be uncontestable.  So

20  if he went on the U.S. Patent Trademark Office website, he

21  can find it.  Mr. Clapp knew about it.  Mr. Clapp emailed

22  with Mr. Wheat about it.  He told Mr. Wheat that, "Your time

23  is coming up where you have to renew," and Mr. Wheat

24  responded back to him that he'd already taken care of it.  I

25  mean, he knows all this stuff, and for him to come in claim

1  that there is some abandonment is just -- well, there's no

2  facts to support it and he can't support it.  It doesn't

3  exist.

4          Judge, in our Complaint, we did an allegation of

5  false designation or origin where Mr. Clapp is trying to

6  make his product look like our product.  I mean, there are

7  several references you'll see in the paperwork that we've

8  submitted to you where he is not referring to Dianabol --

9  his product.  He actually says, "Dianabol," on his website.

10 I mean, he's talking about our product.

11         So, you know, the whole idea behind trademarks is:

12 you don't want to have confusion, and he's creating that

13 confusion.  And we cited the designation of origin that we

14 are complaining about is the fact that they're making it

15 appear that he is selling our product.

16         He has an allegation on designation of origin and

17 when you look at our products, typically that sort of count

18 has to do with the fact that you're not revealing that it's

19 from China or Thailand or, you know, wherever the heck it

20 is.  We have a very specific reference of who we are, where

21 we manufactured it, you know.  There is no factual

22 allegation for the count having to do with designation of

23 origin nor could there be.  I mean, it just doesn't exist.

24         So, Judge, what I would suggest to the Court --

25 and I don't know if the Court is willing to entertain this,

1    but as I went through the briefs, a series of questions come

2    to my mind with regard to both the transfer back and the

3    counts the Motion to Dismiss.  And what I have done is: I

4    have put together a series of questions for this oral

5    argument.  And if I could give Your Honor a copy?  And I've

6    got a copy for Counsel.

7             Would you mind tendering that?

8             And the point behind these questions, Judge, is

9    that I think it will bring to light everything this Court

10   needs to know both about the Motion to Dismiss and the

11   Motion to Transfer.  So I'm starting with the Motion to

12   Transfer and I apologize, Judge, if I had anticipated that

13   you didn't want to discuss that, I would have stayed away

14   from that.

15            THE COURT:  No, I'm not -- I'm just so interested

16   to hear the Motion to Dismiss.  I'm not interjecting a

17   concept to the Motion to Transfer.

18            MR. LEACH:  So I think that the question needs to

19   be asked whether there was a coincidence in terms of them

20   receiving the Cease and Desist Letter and the conversations

21   that occurred on September the 11th and the filing of the

22   Complaint on Saturday, the 12th.

23            Judge, there is a series of emails with Mr. Clapp

24   on --

25            THE COURT:  Excuse me.  Tell me the case or the

1  part of your brief that you think is so -- most important

2  regarding this Motion to Transfer.

3          MR. LEACH:  My Reply Brief, Judge.  If you went

4  straight to the Reply Brief and you did nothing else, you

5  would have everything that you need --

6          THE COURT:  Just a minute.  It drives me crazy

7  when people -- I'll just tell you point blank.  I really try

8  to be prepared for my conferences and you're hitting me

9  cold.

10         MR. LEACH:  I'm sorry, Judge.

11         THE COURT:  And for you to file something late

12 Friday for this hearing today without delivering a courtesy

13 copy and without somehow communicating to the staff that it

14 was there, some notice of the filing, really --

15         MR. LEACH:  It was in our planning conference as

16 well that we notice it.

17         THE COURT:  Well, that's fine, but I'm just

18 telling you that it's difficult for me to follow all you're

19 talking about because I went to a wedding last weekend --

20 you couldn't know that, but life happens so I'm --

21         MR. LEACH:  Judge, let me just say --

22         THE COURT:  Just a minute.  Just a minute.  I

23 would like to understand where in your briefs on a motion to

24 transfer or to transfer back whatever you want to call it --

25 I think that Motion is before Judge Ellison, not before me.

1          I mean, technically, it's my choice, I get that,

2 but where is it, what document am I supposed to be looking

3 at?

4          MR. LEACH:  Judge, it would be our initial

5 pleading, which I believe is 11.

6          THE COURT:  That's the Motion to Dismiss, but when

7 you all told me that --

8          MR. LEACH:  And then the Reply Brief --

9          THE COURT:  Okay.  The Reply.  Yeah, let's --

10 there's --

11          MR. LEACH:  It would -- all of it would be

12 captured in those two documents.

13          THE COURT:  And where in -- and here's your Reply

14 in the Record, actually Number 19.

15      (Pause/voices off Record.)

16          THE COURT:  Tell me just...

17      (Voices off Record.)

18          MR. LEACH:  Okay.  So, Judge, if you look at

19 the --

20          THE COURT:  I'm looking at the most significant

21 case that you rely on for the transfer.  I'm switching gears

22 on you because, truthfully, I'm very concerned about your

23 concepts of motion to dismiss versus motion for summary

24 judgment so we're going to have this a little differently.

25 I've got your questions and I understand, but I'm trying to

1  figure out what the most efficient way to direct your

2  argument is.  You wanted me to go through this list of

3  questions.

4          So what cases for transfer purposes do you most

5  significantly rely on?

6          MR. LEACH:  Judge, I think that --

7          THE COURT:  I'm looking at your Reply Brief at

8  least.

9          MR. LEACH:  There's a couple different steps that

10  you have to undertake here.

11          THE COURT:  All your cases are -- and good for you

12  that you've cited lots of Southern District cases --

13          MR. LEACH:  Yes, ma'am.

14          THE COURT:  -- but they're all District Court

15  cases.

16          Do you have a Court of Appeals case for me here?

17          MR. LEACH:  I don't think on that issue we have a

18  Fifth Circuit case.

19          THE COURT:  Well, you've got *Jackson*, *Texas*

20  *Employers versus Jackson*.  Anyway --

21          MR. LEACH:  Yeah.  I don't think that we disagree.

22  I think that the cases that we cite they cite so, you know,

23  they have cited some cases where the Court retained

24  jurisdiction on the --

25          THE COURT:  Do you have affidavits or are you

1   relying solely on argument in your Motion?

2          MR. LEACH:  Judge, I think there was an affidavit

3   that was attached to the Motion, but I don't think it's a

4   critical abrogated --

5          THE COURT:  Well, how am I supposed to figure out

6   what to rely on that is all this factual argument you're

7   making in regard to the Motion to Transfer?

8          MR. LEACH:  Judge, the only reason why I give you

9   facts is so that you can put it in --

10         THE COURT:  So that I will rely on it.

11         MR. LEACH:  No, no, put it in context.  What I

12  want you to do is: look at the Complaint, their Complaint,

13  which is the one that you have to decide whether to dismiss

14  or not, and see if there's any factual basis --

15         THE COURT:  Right, right.

16         MR. LEACH:  -- or legal basis.

17         THE COURT:  Okay.  And I'm going to do that, no

18  problem.

19         MR. LEACH:  Yeah.

20         THE COURT:  But I'm on the Motion for Transfer,

21  which --

22         MR. LEACH:  Okay.

23         THE COURT:  You -- the only reason I switched

24  this.  You gave me this list of questions so --

25         MR. LEACH:  Correct.

1          THE COURT:  -- now I'm focused on the Motion for

2    Transfer.

3          MR. LEACH:  Okay.

4          THE COURT:  And I'm wondering -- and again, I

5    cannot emphasize enough that I'm asking to forgive my

6    ignorance, but if -- there's a lot of ignorance so I would

7    like to understand where I get the foundation for most of

8    what you're arguing that you're asking me to rely on for the

9    transfer part, maybe for this other, maybe for the transfer.

10          MR. LEACH:  Judge, in terms of the transfer, we

11   are arguing the compelling circumstances exception, which is

12   found on Page 4 of our brief.  And what you will find is:

13   There is a series of cases that we have reviewed,

14   Chappicking (phonetic) one, which they were also relying, as

15   well as SIRCO Services.  And then on Page 6, there's a

16   series of cites that have to do with the contact that was

17   made between Mr. Clapp and Mr. Wheat.  And some of the very

18   same language that is cited in these cases was used by

19   Mr. Clapp.

20          And, Judge, the Complaint is filed on the 12th,

21   but Mr. Clapp is having communications with Mr. Wheat on the

22   12th and the 13th trying to find an amicable solution which

23   is actually the language that is used in some of these

24   cases.

25          THE COURT:  Uh-huh.

36

 1          MR. LEACH:  So Mr. Wheat doesn't realize that a

 2   case has been filed.  He hasn't been notified that a case

 3   has been filed.  But Mr. Clapp is still dealing with him in

 4   an effort to try to avoid the lawsuit that ended up being

 5   filed.  And all of that, for the point of these cases, is

 6   that declaratory judgment actions brought in anticipation of

 7   a lawsuit should generally --

 8          THE COURT:  While negotiations are going on.

 9          MR. LEACH:  Yeah.

10          THE COURT:  Right, I understand.

11          MR. LEACH:  Yeah.  So the other part of the

12   argument that we made further down is that dec actions don't

13   generally confer jurisdiction.  In other words, because the

14   main claim in this case -- I mean, nobody ignores or

15   disregards the fact that the main cause of action has to do

16   with the Dianabol trademark.  And the Dianabol trademark,

17   the company that owns that, is in the Atlanta, Georgia

18   general vicinity.

19          So generally what these cases that we have cited

20   state is that the claim should go -- in other words, the

21   person who owns that claim should have the right to choose

22   the what -- the venue and a race to the courthouse shouldn't

23   cause the venue to change.  And that's the *Enron Corporation*

24   *Securities* derivative and ERISA litigation, which I cite.

25   This is at the bottom of Page 8, *Tapin Technologies*

1  (phonetic) 11022 versus --

2          THE COURT:  I'm reading Mr. Wheat's Affidavit now.

3          MR. LEACH:  Okay.

4          THE COURT:  And it's a two-pager.  And it does not

5  talk about any -- most of what you're discussing today on

6  the continuing negotiations.

7          MR. LEACH:  The emails are part of --

8          THE COURT:  Does he refer to that?

9          MR. LEACH:  And it's part of what we filed as

10 well, Judge.  The emails are actually there so you can

11 actually drill down and find the actual email communications

12 between the parties.

13         THE COURT:  Okay.  Well, I hope you refer to them

14 somewhere in this brief because --

15         MR. LEACH:  We do, we do.

16         THE COURT:  The cross-references are critical.

17         MR. LEACH:  Yeah, we do, Judge.

18         THE COURT:  Okay.

19         MR. LEACH:  Judge --

20         THE COURT:  Let me do this -- I'm not going

21 through your list of questions right now, maybe in a little

22 while.

23         MR. LEACH:  Okay.

24         THE COURT:  Let's give the other side a chance.

25         MR. LEACH:  Okay.

1          THE COURT:  Thank you.  Go ahead for Dynamic.

2          MR. HOFFER:  Thank you, Your Honor.

3    Stewart Hoffer, on behalf of Dynamic Sports.  Like

4    Mr. Leach, I am very proud of the service that I have in the

5    Federal Court system.  One of the things that the Judge for

6    whom I clerked taught me was to focus on procedure first,

7    and Your Honor's already hit upon that.  This is a motion to

8    dismiss.  All of the allegations about the merits are very

9    fascinating but they have no point in this hearing or in

10   these pleadings.

11          So I'll move on to the substantive issue and that

12   is the Motion to Dismiss on the basis of first to file.

13   What Mr. Leach didn't tell you, what he said just a second

14   ago -- and I'll focus on that statement -- the person that

15   owns the claim should get the right to choose the forum.  No

16   disagreement there.  The problem is:  The party that

17   threatened to sue us for infringement didn't own the claim

18   at the time they threatened the infringement, they didn't

19   own the trademark.

20          So, Your Honor, as Your Honor knows, the policy

21   behind the rule of first to file is not to deprive a

22   punitive plaintiff of the cause of action that he or she or

23   it has the right to assert in the venue of his or her or its

24   choice.  That policy is not implicated here because Hi-Tech,

25   the company that threatened to sue for infringement, did not

1  own the trademark at the time it sent us letters threatening

2  to sue us for infringement.

3       And you don't need to take my word for it because

4  I'd like to use Mr. Leach's timeline again to show you that,

5  the dates here, 9/11 and 9/12, when we filed our lawsuit.

6  What happened, Your Honor, is: once Mr. Leach's client

7  figured out that we -- that he had been sued here, they took

8  steps to file their case in the Northern District of

9  Georgia, but what they realized when they did that was that

10  Hi-Tech didn't own the trademark Dianabol, Jared Wheat did.

11       And so what they had to do was: file a trademark

12  assignment with the U.S. Patent and Trade Office and you

13  will see that that Assignment wasn't filed until 9/24, which

14  means it is -- I don't want to say disingenuous, but it's

15  not meritorious to claim that the first to file rule here

16  applies when the Plaintiff, who is bringing the first to

17  file argument, didn't have a right to file in the first

18  place.

19       THE COURT:  I'm not sure that he's claiming that

20  he's -- they're technically the first to file because

21  everybody knows you beat them to the courthouse.  They're

22  arguing that equity and basically scrutiny of the facts,

23  which is permitted under a first-to-file analysis, dictates

24  return of the second case and presumably this case to -- or

25  at least somehow affecting this case, Georgia.  So, yeah,

1  you're right, they couldn't have filed -- the company
2  couldn't have filed on the day you did, that's true.  I
3  don't think that's in dispute.  But let's just keep in mind
4  you're the first to file.  The question is: whether the
5  first to file should get the deference that it typically
6  would.

7          MR. HOFFER:  Yes, Your Honor.  And with that, I
8  will address the second argument with respect to the first
9  to file and that is the factors that you just -- Your Honor
10 just mentioned.  Mr. Leach went into them in great detail.
11 There's no --

12         THE COURT:  I didn't let him go into all that.

13         MR. HOFFER:  Well, yes, Your Honor, but they are
14 in his pleadings and they are in ours as well.

15         THE COURT:  Okay.

16         MR. HOFFER:  First and foremost, Your Honor, there
17 is no dispute from us that Mr. Clapp's company filed first
18 after having an exchange of communications with --

19         THE COURT:  Good.

20         MR. HOFFER:  -- Mr. Wheat.  Primarily or partly
21 the reason for that filing was: Mr. Wheat, we felt,
22 didn't -- or Hi-Tech didn't have the standing to assert the
23 claim, which was why we filed the dec action here first.

24         Now, if you look at the content of the --

25         THE COURT:  You're saying to me that Hi-Tech

1  didn't have the right to file so you filed first?  What's

2  that argument?

3         MR. HOFFER:  Your Honor, what I'm saying is: the

4  entity who has threatened to sue us for infringement in the

5  communications of 9/11 did not have standing -- didn't own

6  the trademark at the time.

7         THE COURT:  Okay.

8         MR. HOFFER:  So it couldn't have sued us for

9  infringement.  It didn't own the trademark.

10        THE COURT:  Oh, I understand.  I understood that

11 point.

12        MR. HOFFER:  Okay.

13        THE COURT:  I just don't understand the next point

14 in the logic of it.

15        MR. HOFFER:  The next --

16        THE COURT:  You didn't have to file in Texas just

17 because they couldn't file the day they started threatening

18 you with a suit.

19        MR. HOFFER:  Oh, no, that's true.

20        THE COURT:  That's the --

21        MR. HOFFER:  Yes, Your Honor, that's true.

22        THE COURT:  That's the -- just thinking.

23        MR. HOFFER:  That's true, Your Honor.  But part of

24 the reason that we filed the suit here is just as Mr. Leach

25 said and they're -- I'm not going to beat around the bush.

1 Mr. Wheat has a lot of litigation in this area as does

2 Mr. Leach, both federal, civil and criminal.

3          THE COURT:  Experience?

4          MR. HOFFER:  Experience.  He is a -- no stranger

5 to the courthouse in Atlanta.

6          THE COURT:  It's a federal courthouse.  You're

7 saying he's got inside --

8          MR. HOFFER:  No, meaning he's been there a lot.

9          THE COURT:  Okay.  Good for him.

10          MR. HOFFER:  Yes.  So, Your Honor, the reason we

11 filed it here in part was because we knew that Mr. Wheat was

12 going to pursue us there --

13          THE COURT:  Okay.

14          MR. HOFFER:  -- on a claim that we believe didn't

15 have merit.

16          THE COURT:  Okay.  Let's get down to the brass

17 tacks here.

18          MR. HOFFER:  Yes, Your Honor.

19          THE COURT:  I don't care about any of that.

20          MR. HOFFER:  Okay.

21          THE COURT:  It's so not interesting.  My concern

22 is, with regard to you, that you have filed claiming their

23 trademark is somehow invalid or weak.  Their suit is not

24 about that, their trademark.  Their suit is fundamentally

25 about the inadequacies, the falseness, the blah, blah, RICO,

1  yadda, yadda, about your trademark or your purported

2  branding.

3          Isn't that what that suit is about, his suit, that

4  is, Hi-Point -- or Hi-Tech's suit?  They're not about the

5  same trademark.

6          MR. HOFFER:  They are, Your Honor.

7          THE COURT:  Okay.  Tell me about that.

8          MR. HOFFER:  One of the first claims in the

9  lawsuit that was transferred from the Northern District to

10  here is a claim for an infringement of the trademark

11  Dianabol, which is the same trademark for which we filed a

12  declaratory judgment to say we haven't infringed.

13          THE COURT:  Okay.  But you're using a different

14  mark and you want to defend or pursue the use of your D with

15  a hyphen mark.

16          MR. HOFFER:  Correct.

17          THE COURT:  Okay.

18          MR. HOFFER:  So -- and just so Your Honor knows

19  that those similarities in the cases have both been

20  judicially admitted by both parties actually --

21          THE COURT:  Okay.

22          MR. HOFFER:  -- that the cases are substantially

23  the same and are mirror images of one another.

24          THE COURT:  Right.  But -- okay.  I hear you.

25          MR. HOFFER:  So primarily, Your Honor, our defense

1  to having filed here first is: the proper use of the

2  declaratory judgment rule, which is not to wait around and

3  see if he makes good on his threats.

4          THE COURT:  Were there negotiations going on --

5          MR. HOFFER:  There was a demand.

6          THE COURT:  -- during the period -- there was a

7  demand I gather.

8          MR. HOFFER:  There was no response.

9          THE COURT:  There was no response from your --

10  Clapp?

11         MR. HOFFER:  That's correct, Your Honor, and --

12         THE COURT:  And there was a demand and it was --

13  they were -- it was one day delay, according to the

14  Schedule.

15         MR. HOFFER:  Well, Your Honor, I think if you read

16  the content of the emails, you'd be hard pressed to say that

17  those are negotiations.

18         THE COURT:  Okay.  Where are these emails in this

19  Record, I'm sorry?

20         MR. HOFFER:  Your Honor, I believe they are --

21         THE COURT:  They're not in with the Motion, I

22  don't think, so I could use a cross-reference if it -- I'm

23  sure we'll eventually find it, but I'm curious because I'd

24  like to look at it.

25         MR. HOFFER:  Fine.

1          THE COURT:  Thank you.

2          MR. HOFFER:  So, Your Honor, I'd like to move on

3  to -- if Your Honor would permit --

4          THE COURT:  Did you see his list of questions?  I

5  haven't.

6          MR. HOFFER:  I did.  Most of them are --

7          THE COURT:  Am I going to find the answers to his

8  questions in the Record?

9          MR. HOFFER:  No, you will not.  Most of them, the

10  ones that I skimmed, you will not.  For instance, "What sort

11  of legal research did DSN do before it filed its lawsuit?"

12          THE COURT:  All right.  That's -- I respond to

13  that one, too.

14          MR. HOFFER:  Right.

15          THE COURT:  That's what provoked me to start

16  looking for the Affidavit.  But your -- so do you have any

17  responses to these questions?

18          MR. HOFFER:  To the series of rhetorical

19  questions, Your Honor?

20          THE COURT:  Either substantively or procedurally.

21          MR. HOFFER:  "Is it coincidental that the day

22      after Hi-Tech sends a cease and desist letter DSN filed

23      its declaratory judgment action?"

24          Your Honor, the way I read that question here is:

25  it's asking me to divulge communications between my client

1  and myself and it's asking me to divulge information that

2  would be protected by the attorney work product.

3          THE COURT:  Okay.  Next one.

4          MR. HOFFER:  "What did Brain Clapp's emails to

5  Jared Wheat state?"  That's a factual question that's

6  certainly a good question for a deposition.

7          THE COURT:  Uh-huh.

8          MR. HOFFER:  I don't think I can answer that

9  because I wasn't -- I didn't write Mr. Clapp's emails for

10  him.

11          Did he -- Yes, we did, Your Honor, to answer a

12  question about whether the Dianabol trademark had been

13  abandoned.  The facts that outline the abandonment theory

14  are set forth in Paragraph 11 of the First Amended

15  Complaint.  That's docket entry 5.

16          THE COURT:  I've got that.

17          MR. HOFFER:  It's a failure to police --

18          THE COURT:  Paragraph 11?

19          MR. HOFFER:  -- argument, Your Honor, that not

20  only DSN where a number of other competitors had been using

21  Mr. Wheat's trademark in a manner inconsistent with his

22  claimed rights.  Mr. Clapp pointed that out to him many

23  times over many years and Mr. Wheat, for reasons that will

24  become clear perhaps later on, did not pursue those claims,

25  did not pursue those infringers.  And by doing so, he failed

1  to police his mark and lost the rights to pursue any other

2  relation infringers thereafter.  That's the abandonment

3  theory and those are the facts that are outlined in that

4  paragraph.

5           THE COURT:  Let me see if I understand this.

6  Because they -- Wheat didn't agree that Mr. Clapp's view of

7  the law, the company, Hi-Tech, abandoned a trademark it was

8  using in the marketplace?

9           MR. HOFFER:  Well, Your Honor, I think that's part

10 of the problem.  Hi-Tech was not using the trademark in the

11 marketplace.

12          THE COURT:  Well, this --

13          MR. HOFFER:  Mr. Wheat was the owner of the

14 trademark at the time all of these events took place.

15          THE COURT:  You know what?  You're going into a

16 different issue.  Stay with the marketplace.  Tell me about

17 that.

18          Was the company, Hi-Tech, marketing their product?

19 "Yes" or "No."   "Yes" or "No."

20          MR. HOFFER:  At various points in time, yes.

21          THE COURT:  Okay.  Was the company, Hi-Tech,

22 marketing under the -- whatever the name is of the

23 Product --

24          MR. HOFFER:  Dianabol.

25          THE COURT:  -- Dianabol when --

1          MR. HOFFER:  I believe they were, Your Honor.

2          THE COURT:  -- it did market --

3          MR. HOFFER:  I believe they were, Your Honor.

4          THE COURT:  -- had it marketed within the first --

5    within the prior few years from this lawsuit that has had --

6    in the 2010 to 2015 range time frame?

7          MR. HOFFER:  I believe that's correct, Your Honor.

8          THE COURT:  How can you say they were abandoning

9    their mark?

10          MR. HOFFER:  Well, Your Honor, it's the failure to

11   police theory that constitutes essentially constructive

12   abandonment.

13          THE COURT:  Explain the theory to me please.

14          MR. HOFFER:  When one has ownership interest in a

15   trademark and has knowledge of those infringing upon it, the

16   owner can lose its rights to sue for future infringement by

17   failing to police the use or misuse of its mark.

18          THE COURT:  Well, what happened that there was a

19   failure to police?  I don't understand that.

20          MR. HOFFER:  Mr. Clapp had sent a number of emails

21   to Mr. Wheat notifying for him all of the --

22          THE COURT:  So while Clapp's working for Hi-Tech.

23          MR. HOFFER:  No, Clapp with his own company, DSN.

24          THE COURT:  Okay.  I'll --

25          MR. HOFFER:  A competitor, pointed out to

1  Mr. Wheat, when they were on friendlier terms, that there

2  were folks out there who were using his mark inconsistent

3  with Wheat's view of infringement because we had sued other

4  people in the past claiming infringement of its mark.

5        THE COURT:  So Wheat is actually out there

6  prosecuting lawsuits to preserve his -- its mark, Hi-Tech's

7  mark, his mark, whatever, and Clapp is sending emails

8  saying, "Oh, there's another guy out there cheating on

9  your -- you know, claiming to be you -- associated with

10 you," and Wheat did not pursue it and so because Wheat

11 doesn't have 100 percent enforcement policy, he only had a

12 call it, I don't know, 50 percent, which I'm, of course,

13 making up, that's the theory, that he didn't fully enforce

14 the mark; is that the theory?

15       MR. HOFFER:  That's the theory, Your Honor.

16       THE COURT:  How many -- I know I'm getting behind

17 the facts here and I apologize, but everybody else is so I'm

18 going to do it, too, because I'm curious.

19       What percentage or what number of notices or --

20 I'm sorry -- instances did Clapp give Wheat that you rely on

21 for this policing abandonment theory?

22       MR. HOFFER:  Your Honor, I don't want to be held

23 for explicit accuracy, but by memory --

24       THE COURT:  Give or take.

25       MR. HOFFER:  -- of the documents is: notification

1    of seven or eight infringers over a two to three-year

2    period.

3            THE COURT:  Okay.  And did Clapp have anything to

4    do with those infringers?

5            MR. HOFFER:  No, Your -- well, he was suing them

6    for the own infringement that they were perpetrating on his

7    trademarks.  But to answer your question, no.

8            THE COURT:  Okay.  When did Clapp start using this

9    D'anabol?

10           MR. HOFFER:  Nine years ago.

11           THE COURT:  Okay.  And how do we know about that?

12           MR. HOFFER:  He didn't, Your Honor, because he

13   didn't raise it until very recently, and that's another one

14   of our arguments is a laches theory --

15           THE COURT:  I see.

16           MR. HOFFER:  -- that we offered as a defense to

17   the infringement claim in the other case but --

18           THE COURT:  Okay.  Yeah.

19           MR. HOFFER:  -- I guess, laches.  And also,

20   another failure to police.

21           THE COURT:  Are both these companies located in

22   Georgia?

23           MR. HOFFER:  No.  DSN's located here, Your Honor.

24   Mr. Clapp lives here.  The company is a Texas LLC based in

25   this district.

1          THE COURT:  Okay.  I see.  And so you have this

2   failure to police and abandonment theory.

3          How many lawsuits did -- you had said at your

4   opening comments that Mr. Leach and Mr. Wheat were well

5   known in the Georgia courthouse, said they are aggressive

6   and were bringing lots of suits.

7          Were they bringing those suits about anabol or

8   Dianabol, right?

9          MR. HOFFER:  Your Honor, honestly, I would defer

10  to Mr. Leach to that.  Part of my comment relates to things

11  that Mr. Leach has objected to my bringing up in court.  I

12  brought it up in pleadings, but it has to do with both civil

13  and criminal issues.

14         THE COURT:  I see.  Okay.  So big picture, your

15  guy's out there using a name that's quite similar to the

16  original trademark word "Dianabol" and instead of an I, you

17  have a hyphen.

18         Is that the difference is -- I haven't studied

19  this, as you know.

20         MR. HOFFER:  That is one difference, Your Honor.

21         THE COURT:  What is another difference?

22         MR. HOFFER:  Another difference is:  Our product

23  is "D/" and it's pronounced differently.  Mr. Wheat's

24  trademark or now, I guess, Hi-Tech's trademark is Dianabol

25  and ours is D-anabol, and then we added 25 on the end.

1          THE COURT:  Okay.

2          MR. HOFFER:  That has reference to a measurement

3     of an ingredient in our product, in my client's product.

4          THE COURT:  But they're in the same space in terms

5     of what they purport -- what the drug -- or the product

6     purports to do.  It's not a drug.

7          MR. HOFFER:  I would feel comfortable saying they

8     are competitors --

9          THE COURT:  Direct --

10          MR. HOFFER:  -- in the same space selling --

11          THE COURT:  Direct competitors.

12          MR. HOFFER:  Selling nutritional supplements to

13     users online.

14          THE COURT:  Oh, okay.  Online.

15          MR. HOFFER:  And there may --

16          THE COURT:  So there's not --

17          MR. HOFFER:  -- be other channels --

18          THE COURT:  -- a lot of audio.  There's not a lot

19     of audio on when you're searching the web.

20          MR. HOFFER:  Well, the -- Your Honor, there is.

21     If you review the websites, there are videos and discussions

22     on our website about our products that have the

23     pronunciation in the audio.

24          THE COURT:  Okay.  For your products.

25          Is that true in the other?

1          MR. HOFFER:  That I don't know, Your Honor.

2          THE COURT:  Okay.  Gotcha.  And what's the 25 have

3   to do with --

4          MR. HOFFER:  It's the measurement of one

5   particular ingredient in my client's product.  I can't --

6          THE COURT:  Out of how many ingredients?

7          MR. HOFFER:  My memory, from looking at the label,

8   it's -- there's 15 or 16.

9          THE COURT:  Oh, okay.  Is the 25 referencing the

10   largest ingredient?

11          MR. HOFFER:  That I don't know, Your Honor.

12          THE COURT:  Is the --

13          MR. HOFFER:  Probably most --

14          THE COURT:  Is -- does D-anabol have -- that is,

15   the Hi-Tech, product have numbers following any of its

16   products?

17          MR. HOFFER:  Does -- let me see if I understand

18   your question, Your Honor.

19          Does Hi-Tech --

20          THE COURT:  I'm just --

21          MR. HOFFER:  -- have numbers about the name of

22   some of its products?

23          THE COURT:  Correct.

24          MR. HOFFER:  From the Dianabol product at issue

25   here, I don't believe they do.

```
 1            THE COURT:  Okay.  I'm not talking --

 2            MR. HOFFER:  Others they might.

 3            THE COURT:  I'm not talking about your product.

 4    I'm talking about Hi-Tech's product.

 5            MR. HOFFER:  They might have other numbers that

 6    follow the names of other products that they sell.  That

 7    Dianabol product --

 8            THE COURT:  Oh, I get it.  So your guy decides

 9    he's going to take out the I, put in a hyphen and then put

10    25 to follow and your guys knows that other products, not

11    the very same competitive product, but other products in

12    this space, so to speak, this marketing space that Hi-Tech

13    promotes, your guy knows that Dianabol has products with a

14    number after it.

15            MR. HOFFER:  I can't say that I agree or disagree

16    with that because I'm --

17            THE COURT:  Okay.  Well, let's -- let me go at a

18    different -- that's fair.  The idea is that on Hi-Tech's

19    website because it's all, right, Internet or most of it's

20    Internet, they have a list of products and your guy is

21    competing with a product that doesn't have a number after it

22    from -- that Hi-Tech sells, but Hi-Tech sells other products

23    in this -- of this genre that do have numbers after it.

24            MR. HOFFER:  Again, Your Honor, I don't know that

25    for a fact.  I also don't want to leave the Court with the
```

1  impression that Hi-Tech is a market leader.  The truth is:

2  Dynamic Sports Nutrition has been selling these products for

3  just as long, if not longer, than Hi-Tech and has on its

4  website numbers behind a number of the products --

5          THE COURT:  Okay.  I'm just --

6          MR. HOFFER:  -- so it's not --

7          THE COURT:  -- trying to get a sense of the

8  marketplace.  So that's a fair point.

9          MR. HOFFER:  Certainly.

10         THE COURT:  But I was wondering about Hi-Tech.

11 But you're saying you have products with numbers and they

12 probably have products with numbers, but I obviously I can

13 get this from Mr. Leach so I'm not relying on your comments

14 for what Hi-Tech sells, okay?

15         MR. HOFFER:  Yes, Your Honor.

16         THE COURT:  Okay.  Do you have any cases

17 supporting this abandonment thing?

18         MR. HOFFER:  There are cases out there that we

19 have reviewed.

20         THE COURT:  Do you cite them in your briefs?

21         MR. HOFFER:  They're not cited in our briefs,

22 Your Honor.

23         THE COURT:  Because I've done a bunch of Lanham

24 Act claims.

25         MR. HOFFER:  I know.  Yes, Your Honor.

1           THE COURT:  I don't know a whole lot about the

2  facts of this case, as must be grossly apparent, but I am

3  interested in this theory because it's really hard for me to

4  digest.  And so I will just tell you --

5           MR. HOFFER:  Right.

6           THE COURT:  -- on this theory and on anything else

7  that you tell me in this court, you better have law and

8  facts to support it --

9           MR. HOFFER:  Yes, Your Honor.

10           THE COURT:  -- because they are accusing you of

11  some pretty bad stuff, that you're just basically

12  handwriting in order to get venue here and I don't know

13  what -- I mean, Mr. Leach is way outside the Record, let's

14  face it.

15           So I'm just going to say to you, and then I'm

16  going to say to Mr. Leach, you tell your clients from me I

17  will not book statements for law arguments that are not made

18  with meaningful legal authority.  And if there is no

19  meaningful legal authority, Rule 11 allows there to be an

20  argument made so long as it's disclosed to the Court that it

21  was a theory of first impression of whatever, okay?

22           MR. HOFFER:  Yes, Your Honor.

23           THE COURT:  So that I know exactly where you and

24  your clients stand, okay?

25           MR. HOFFER:  Understood, Your Honor.

1          THE COURT:  Because the similarity in the wording

2     of the products is equally obvious.  That doesn't mean you

3     lose or you win or he loses or he wins for sure, but I am

4     really concerned that we have a Rule 11 agreement with us.

5          And, Mr. Leach, same to you -- same to you --

6     because you all are going to get the opportunity to put in

7     additional facts because I am not making a decision on the

8     Motion to Transfer and I think in the real world, the Motion

9     to Transfer is going to be based -- is going to basically be

10    a more robust argument than the Motion to Dismiss until I --

11    in my mind now, I don't know anything.

12          I'm trying to find out about the Motion to Dismiss

13    and whether or not there's case law for this abandonment

14    theory, but you may have other arguments that are in the

15    briefs that I haven't read.  But I want additional facts to

16    be part of this Record on the Motion to Transfer.

17          So if anybody is trying to get me to -- frankly,

18    some of these question, Mr. Leach, are so far out of the

19    ballpark it's not even funny, but there are questions in

20    here that probably are relevant.  I cannot go behind

21    people's reasoning and all of that for transfer purposes,

22    but to the extent that there is factual material as to the

23    chronology and the issues that the case law does look at for

24    first filed and what's the equitable thing to do because

25    some of this is equity.

1        MR. LEACH:  Yes, Your Honor.

2        THE COURT:  I would like to understand and rely on

3   facts in the Record.  This list of questions -- and I've

4   skimmed down the first page.  I haven't gotten to the second

5   page yet, but the point is: I'm being asked to rely on

6   things that are -- or to consider things that I'm not sure

7   are in this Record.  And if they're not, I am giving you the

8   opportunity to put them in to the extent they're -- things

9   known by one or the other clients.

10       MR. LEACH:  Judge, can I say this?  First, we've

11  got this tension between the Motion to Transfer Back and the

12  Motion to Dismiss.

13       THE COURT:  Right.

14       MR. LEACH:  And I apologize for blending the

15  facts.  You can't get away from the facts when it comes to

16  the transfer back point.

17       THE COURT:  Exactly.

18       MR. LEACH:  All right.  But here's my point,

19  Judge, and in deference to Counsel: I had not filed a

20  Rule 11 motion.  I know you can take it up *sua sponte* and

21  I'm not fighting that and I don't intend to get anybody in

22  trouble with this Court.

23       THE COURT:  That's fine, but let me make it very

24  clear.  I find trademark cases some of the most aggressive

25  litigation out there.  I am coming off a case called "Test

1   Masters" that is recently decided by the Fifth Circuit and

2   if you bother to look at the District Court -- and I know

3   you must be familiar with this one, Mr. Hoffer, but I am

4   highly sensitive -- and I don't mean to insult Mr. Hoffer.

5   He does not have what I consider the strong grounding for

6   his theory, but it may be that it is well within Rule 11 on

7   the theory that you're asking for extension of the

8   recognized doctrines.

9          But I am just giving both of you these warnings

10  because this sounds like a similar pissing contest.  And I

11  think that there's real money involved, there's long-term

12  relationships with individuals with their businesses and

13  maybe with each other.  It's all got the same prescription

14  for problems and I am giving you both warnings now.

15         We will not be making statements as counsel or

16  statements of argument in briefs that are outside of

17  recognized doctrines without at least a statement to the

18  Court, "There is no case like this, Judge.  It's a matter of

19  first impression.  But we think by analogy," blah, blah,

20  blah, or whatever the argument's going to be.  I'm fine with

21  that.  But I am not find with me being asked to go outside

22  the Record for anything.

23         So I am going to take -- say to both of you --

24  and, yes, Mr. Hoffer got the first wave of my comments on

25  Rule 11, but I'm going to say to you -- and this is in good

1  faith.  Nobody is accusing -- because I'd like the Record to

2  be clear.  I am not accusing anybody of misconduct or

3  otherwise.  I am telling you from this court without regard

4  to anything you have done that I will be looking for

5  adherence, close adherence to Rule 11.

6          And so on a motion to dismiss, this sheet of

7  questions is gone.  On the other hand, on the Motion to

8  Transfer, I get it.  But then I go and look at the briefing

9  and a lot of what you've argued to me I'm not sure is in the

10 Record.  And I'm saying to you doing argue to me stuff in

11 this courtroom on this Record unless it's in the written

12 record on file, okay?  And to the extent that I have asked

13 Mr. Hoffer some substantive questions, I respect -- I've

14 been asking him because I want to know.

15          So having said that, Mr. Hoffer, I would like to

16 go back to the unfair trade practice.  Tell me what the

17 upshot of your claim is there.

18          MR. HOFFER:  Oh, the false advertising.

19          THE COURT:  And the false advertising.  And again,

20 while you guys think these are so identical, these cases

21 between Georgia and here, Ellison and me, I'm seeing focus

22 being different.  I'm seeing a focus in my case being on the

23 false advertising, your -- that the Hi-Tech people has

24 falsely advertised.  And the Hi-Tech people, I'm assuming,

25 are saying you have falsely advertised.  And again, I

1   haven't read Ellison's Complaint, but that's the thrust of

2   the argument that was made here.  So I'm trying to get the

3   lay of the land.  Help me out there.

4           MR. HOFFER:  I will, Your Honor.  I think

5   Mr. Leach might be agree with me if I tell you there's

6   really three claims at issue.  One is a claim -- in the

7   Ellison case and this one --

8           THE COURT:  Okay.

9           MR. HOFFER:  I know that's outside the Record but

10  let me see --

11          THE COURT:  No, it's all right --

12          MR. HOFFER:  -- if I can get past that.

13          THE COURT:  -- because it's filed.  We can look at

14  that.

15          MR. HOFFER:  There is a claim from Hi-Tech against

16  my client, DSN, for trademark infringement of Dianabol.

17          There is a series of allegations from Hi-Tech

18  against my client, DSN, for essentially unfair competition

19  that would include false advertising, Georgia RICO and a

20  couple of other companion state law claims in Georgia.

21          And then there is the --

22          THE COURT:  But that's again for conduct that your

23  people did --

24          MR. HOFFER:  Correct.

25          THE COURT:  -- not his client's conduct.

1          MR. HOFFER:  Correct.  Correct.  And then there is

2    the claim -- this case and before Your Honor is essentially

3    a declaratory judgment action that we didn't infringe, DSN,

4    did not infringe Hi-Tech's rights and Hi-Tech is engaging in

5    conduct that constitutes false advertising under the Lanham

6    Act.  Mr. Leach has a point that if you read our Complaint,

7    I can see where one might think that we are essentially

8    saying that DASCA has some basis, some predicate basis for

9    our false advertising claim.

10         What I'd like to do, Your Honor, is ask for leave,

11   which frankly I think is the appropriate thing to do in a

12   case where the Motion to Dismiss is meritorious -- I'm not

13   saying that it is, but let's assume that it is -- on two

14   points: the DASCA issues, and the false designation of

15   origin issues.  If I amended the Complaint to take those

16   out, not asserting any new claims, not asserting any new

17   parties --

18         THE COURT:  Just basically --

19         MR. HOFFER:  Clean that up.

20         THE COURT:  -- abandon those claims.

21         MR. HOFFER:  Clean that up so that Your Honor

22   perhaps could avoid the need of having to deal with those

23   issues.  And I can do that within three or four days or

24   maybe even sooner.  Maybe that would --

25         THE COURT:  All right.  And what would be

1   remaining, in your mind?

2          MR. HOFFER:  What would be remaining in our -- my

3   mind for the case in this court would be a declaratory

4   judgment claim of non-infringement, a declaratory judgment

5   claim of failure to lease, waiver of laches, abandonment and

6   then claims for false advertising under the Lanham Act.

7          THE COURT:  But false advertising by Hi-Tech.

8          MR. HOFFER:  By Hi-Tech.

9          THE COURT:  And what is it -- that's where we

10  started.  I appreciate the proposal and I'll hear from

11  Mr. Leach, but I would be very interested in that.

12         The point though is: what is -- this is where I

13  started this line of questioning: what is the false

14  advertising that you actually rely on a claim?

15         MR. HOFFER:  Your Honor, if I could pull our First

16  Amended Complaint?  There's an allegation -- the allegations

17  made in that Complaint deal with 43 separate statements of

18  fact that are contained in the Hi-Tech website and those

19  allegations begin --

20         THE COURT:  Paragraphs 20 and -- well, actually --

21         MR. HOFFER:  Paragraph 14, Your Honor --

22         THE COURT:  Fourteen.

23         MR. HOFFER:  -- on Page 7.

24         THE COURT:  Yes, I'm there now.  Uh-huh.

25         MR. HOFFER:  And it primarily has to do with

1   statements that essentially talk about the efficacy of the

2   various supplements and how one can expect changes in their

3   physiology and such a body composition that taking these

4   products will, for instance, support, enhance testosterone

5   levels.  And, Your Honor, the reason I want to get into this

6   because I think it's relevant, Mr. Leach, in his pleadings,

7   says that there's no facts that outlined why we believed

8   some of these statements are false.

9           Part of the reason we believe that, Your Honor,

10  is: Mr. Wheat has been accused by the FDC and -- for false

11  advertising in other drugs.  He was -- by a judge in

12  Atlanta, was fined $15 million, and there's still an ongoing

13  proceeding in front of that same judge, Charles Pannell, who

14  is a senior district judge in the Northern District.  So

15  it -- I'm not raising that to disparage Mr. Wheat.  I'm -- I

16  know it might appear that way, Your Honor, but Mr. Wheat is

17  not somebody who can claim he has no idea --

18          THE COURT:  He's not wearing any -- okay.  I get

19  you.

20          MR. HOFFER:  Right.  So part of the reason why I

21  think these allegations are false is because in that case,

22  Mr. Wheat was accused and admitted that the advertising that

23  he and his company, a different company, had engaged in

24  didn't have scientific support.

25          THE COURT:  Okay.

1        MR. HOFFER:  And so -- and to answer your other

2    question: is that in the Record?  It's cited and it's

3    attached to our First Amended Complaint, Your Honor.

4        THE COURT:  Okay.  Fair enough.  But why would

5    misconduct as to one product by -- I guess Mr. Wheat is

6    president or some --

7        MR. HOFFER:  Yes, Your Honor.

8        THE COURT:  -- whatever his title.

9    Why would misconduct as to one product and maybe

10   with a different company, I'm not sure, cause me to believe

11   that there's misconduct with regard to all of these

12   statements or any of these statements in Paragraphs 14

13   through 22 in this world?

14       MR. HOFFER:  Well, Your Honor, the reason why my

15   client has made its false advertising allegations, my

16   information and belief, is: we don't know what factual basis

17   Mr. Wheat's company relies upon for the accuracy of his

18   factual statements.

19       THE COURT:  Does your company make similar factual

20   statements for its product?

21       MR. HOFFER:  Similar?  I would say, "Yes."

22       THE COURT:  Comparable.

23       MR. HOFFER:  Comparable?  I would say, "Yes."

24       THE COURT:  Okay.  So what kind of --

25       MR. HOFFER:  Well, yes and no.

1          THE COURT:  What kind of backup do you guys have?

2          MR. HOFFER:  Well, we have to look, I think,

3   Your Honor, at the specifics of the advertising.  For

4   instance, one of the -- or one of the statements that I know

5   my client makes on its website is that certain products are

6   designed or formulated for a specific result.

7          THE COURT:  That's on your -- which website?

8          MR. HOFFER:  That's on my client's website.

9   He's -- he --

10          THE COURT:  I see.  So it's designed to achieve

11   this.  Whether you do or not has not been represented.

12          MR. HOFFER:  I'm not the FDC lawyer for my client.

13          THE COURT:  I understand.

14          MR. HOFFER:  I didn't have anything to do with the

15   advertising copy, but that is what I've been told, in terms

16   of the belief that that sort of statement is not false

17   advertising and, at best, may be buffering but it doesn't

18   constitute an untrue statement of fact.

19          THE COURT:  Okay.  So that's a distinction that

20   you've drawn.

21          MR. HOFFER:  Yes, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. HOFFER:  So the allegations of false

24   advertising are contained in those specific paragraphs.

25          THE COURT:  Right.

1          MR. HOFFER:  And so that's what I would point the

2    Court to for specificity as to why we believe -- on

3    information to believe the allegations are false.

4          THE COURT:  Did you guys get -- are there more

5    statements or did you go through literally every statement

6    in the website of Hi-Tech?

7          MR. HOFFER:  Your Honor, there's more statements,

8    but we didn't raise all of the ones that my client felt were

9    literally false.

10          THE COURT:  Does your client have any basis to

11    believe other than the information belief and this concept

12    that Mr. Wheat was cited earlier in other -- regarding other

13    products, do you have any specific evidence that there's

14    falsity?

15          MR. HOFFER:  No, Your Honor, in terms of --

16          THE COURT:  Roughly.

17          MR. HOFFER:  -- in terms of do we have a document

18    or is there --

19          THE COURT:  Or has somebody tested it and --

20          MR. HOFFER:  No, Your Honor.

21          THE COURT:  -- they failed?

22          MR. HOFFER:  Not that I'm aware of.

23          THE COURT:  Do you do a lot of Lanham Act cases?

24          MR. HOFFER:  The Lanham Act cases that I do are

25    mainly for this client, Your Honor.  And, yes, I've done --

1   there's probably five or six in this district that I've done

2   for this client.

3          THE COURT:  In this district?

4          MR. HOFFER:  And some in State Court.

5          THE COURT:  I see.  Okay.  Have there been prior

6   cases filed against your client?

7          MR. HOFFER:  For false advertising?

8          THE COURT:  Right.

9          MR. HOFFER:  I think this is the first one that

10  I'm aware of, Your Honor.  There is a pending case in the

11  Middle District of Florida on a -- it's not related to this

12  factually but has some --

13         THE COURT:  Well, different product.

14         MR. HOFFER:  -- allegations of false advertising.

15         THE COURT:  Uh-huh.  Does your client do any

16  testing?  I don't -- this is probably proprietary.  I'll

17  withdraw it.

18         Are you -- this is a message back to your own

19  client, okay?

20         MR. HOFFER:  Yes, Your Honor.

21         THE COURT:  And again I'm not trying to pick on

22  you because I don't -- this is probably equally applicable

23  to Mr. Leach and his client.  Watch out what you allege

24  because it frames the scope of discovery and so there could

25  be a lot of -- I mean, there could be a lot of opening of

1    kimonos, I guess.

2            MR. HOFFER:  Understood, Your Honor.

3            THE COURT:  And it may not be that pretty, but I

4    don't know.  The point is:  You don't have any evidence, I

5    think you've said, that there was a failure somehow of a

6    person to achieve results or any of that.  You're just

7    literally transposing the -- it's like prior bad acts under

8    the Rules of Evidence is what I'm hearing, 404(d) kind of

9    stuff.

10           MR. HOFFER:  And I think Mr. Leach has actually

11   made that assertion.

12           THE COURT:  Oh, okay.  I see.  Okay.  All right.

13   I don't know where that leaves us.  I'm just trying to get

14   the lay of the land.  Okay.

15           MR. HOFFER:  Well, Your Honor, I think where that

16   leaves us is:  The other two Motions that remain as part of

17   this amass of paper --

18           THE COURT:  Right.

19           MR. HOFFER:  -- there's a motion to strike that

20   Mr. Leach with respect to the history of Mr. Wheat some of

21   which were discussed today, and there's also a 1404(a)

22   motion to transfer that Mr. Leach has filed.

23           THE COURT:  Right.

24           MR. HOFFER:  Excuse me, Your Honor.  If I can just

25   get one drink of water?  And in terms of the cases I would

1  address to Your Honor on those issues, the 1404(a) Motion,

2  Your Honor, I think was addressed by your own Opinion in

3  *Mid-Continent Casualty Company versus Petroleum Solutions*,

4  which I would be happy to provide your law clerk a copy --

5          THE COURT:  No, it's okay.

6          MR. HOFFER:  I'm sure you have it.  And I think

7  that's a 1404(a) case that disposes of the issue here.

8  Basically what we have is an equal convenience of parties,

9  which is not sufficient under the standards to justify

10 1404(a) transfer.

11         And then on the Motion to Strike, Your Honor, it's

12 a 12(h) motion to strike the scandalous allegations

13 essentially.  I think the standard there is that the

14 allegations have no bearing to the case and that there's

15 some prejudice suffered by Mr. Wheat.  Our argument on that

16 is, Your Honor: there is some relevance to the allegations

17 of Mr. Wheat's conduct, one of which I've already mentioned,

18 which is his prior history with the FDC of false

19 advertising.

20         The second is: as Your Honor knows, there is

21 treble damages and attorney's fees in exceptional cases in

22 the Lanham Act.  I think that history, to some extent, is

23 marginally relevant to those issues, if we get that far, and

24 so that's another reason why it's there.  I don't think

25 there's any prejudice to Mr. Wheat because it's already in a

1   public record anyway.

2          So with that, I'll give -- unless the Court has

3   any further questions.

4          THE COURT:  I don't have any right now.  Thank you

5   very much.  I appreciate it.

6          MR. HOFFER:  Thank you.

7          MR. LEACH:  Can I reply, Your Honor?

8          THE COURT:  Yes.

9      (Pause in the proceedings.)

10         MR. LEACH:  Judge, going back to the very

11  beginning of the argument, Counsel made the argument about

12  Hi-Tech not owning the trademark.  It did own the trademark

13  by the time the lawsuit was filed, point one.

14         Point two, throughout the entire period of time,

15  it was the authorized user.  Mr. Wheat was -- is the actual

16  name.  Mr. Wheat is the sole owner of Hi-Tech.  And there

17  was documentation that Hi-Tech was the authorized user of

18  that trademark.

19         Judge, you talked about equity in terms of

20  transferring the entire thing back to Georgia.  There's

21  another component to it: you've got equity injustice, and I

22  think there's a very large justice factor here when you

23  consider everything.

24         And, Judge, I recognize and appreciate the fact

25  that you haven't looked at all these -- this material, but I

1   think you will find in terms of the things that we have put

2   before the Court and to include the Complaint, Judge, our

3   Complaint out of Georgia, which is a vital part of this

4   because the exhibits that you're looking for, the emails,

5   Judge, are Exhibits 4 and 5 to our Complaint so you will

6   have those materials and you'll be able to see that.

7          You know, one thing that I picked out -- and Your

8   Honor caught it and mentioned it just for a moment -- that

9   there's an inherent contradiction in the position that

10  Counsel has submitted to you.  He starts by saying, "The

11  reason we filed is because Mr. Wheat and Mr. Leach are, you

12  know, no strangers to the Federal Courthouse," and we

13  litigate aggressively to defend, unfortunately, Judge.

14         In the world of supplements, this is something

15  that you have to do all the time.  You have to be vigilant

16  in order to protect your marks.  If you don't, if you're not

17  vigilant, you've got the laches arguments, you've got the

18  equitable arguments that you, you know, sat on right rights

19  and you haven't done anything.  So on the one hand -- and

20  you'll see it in the emails.  Mr. Clapp is befriending

21  Mr. Wheat and pulling him close and directing Mr. Wheat to

22  all the other people that are infringing on the Dianabol

23  mark.  Why?  To increase his share.  And he's got Mr. Wheat

24  out there doing all the heavy lifting.

25         You know, I know the Court sees a lot of these

1    Lanham Act cases but there are another 100 time that amount

2    that the demand letter goes out and things were resolved.

3    So, you know, it's not just what litigation was filed.  It's

4    what aggressive action has been taken to protect these marks

5    over time.

6           And Mr. Clapp knew from what was filed and the

7    things that Mr. Wheat does that he was aggressive and that

8    he was going to demand, you know, that he withdraw this

9    stuff and he knew that the lawsuit was coming and that's why

10   we saw the filing of the Complaint a day after.  It was a

11   race to the courthouse.

12          THE COURT:  How did Mr. Wheat learn about Clapp's

13   product, Dynamic's product?

14          MR. LEACH:  Because -- that's a great question,

15   Judge, but -- and I don't think this is in the Record.  It

16   might be in Mr. Wheat's Affidavit or it may certainly be in

17   the emails, let me put it to you that way, but Mr. Clapp

18   brought it to his attention that there's all these people

19   that are infringing on Dianabol.  So Jared Wheat goes out

20   and he's looking to figure out, you know, "I've got to amass

21   my evidence so that I can send demands and so forth."

22          And who comes up?  Mr. Clapp.  And that's how this

23   email exchange starts, which is attached to the Complaint,

24   saying, "My God!  Is this your company?"

25          THE COURT:  Why did Mr. Wheat not transfer the

1  ownership of the trademark materially before the time of

2  this dispute?

3          MR. LEACH:  It's just never been an issue.  He --

4  you know, he has always taken the marks in his own name,

5  Judge, for reasons that go way beyond the time that I've

6  been with him.  I've been with him since 2005.  So, you

7  know, these things predate me by a good bit.  So he just

8  always did it that way and he basically licensed it to

9  Hi-Tech so that, you know, they could --

10          THE COURT:  So why didn't Hi-Tech just turn around

11  and -- I mean, why didn't he and Hi-Tech turn around and sue

12  immediately?

13          MR. LEACH:  He did.

14          THE COURT:  Well, he didn't because he waited a

15  couple -- a week.

16          MR. LEACH:  Oh.  Well, Judge, I mean, we had a lot

17  of work to do.  I mean, we got right on it.  When all this

18  occurred, we got right on it.  We don't turn lawsuits in a

19  day and --

20          THE COURT:  Right.

21          MR. LEACH:  -- so, I mean, it -- you know, as

22  you'll see when you see our Complaint, there's a lot of meat

23  on the bones in the case research, investigation, of course,

24  legal --

25          THE COURT:  Okay.

1          MR. LEACH:  -- aspects of it as well.

2          So the other thing about equity, Judge, is: it

3   requires clean hands.  And I make this argument, you'll see

4   it in our briefing, that Mr. Clapp does not qualify under

5   clean hands for a whole bunch of reasons.  I mean, you know,

6   all these ideas of laches and, you know, his failures from

7   an equitable standpoint requires that somebody be coming to

8   the Court that has clean hands and he simply doesn't.

9          Judge, you asked Counsel about their mark and the

10  thing that hasn't been mentioned in that exchange, which I

11  did mention to the Court in my opening remarks, is that

12  Mr. Clapp applied to the USPTO and was denied for all the

13  reasons that you articulated when the two of you were

14  talking about it, that the hyphen and the fact that you

15  added a 25 and that they're in the same marketplace and

16  they're going after the same customers and they go after

17  them in the same way, and the similarities and so forth make

18  it where they couldn't get their mark registered.  So not

19  only is he denied, but he goes forward anyway.  So, you

20  know, this is another aspect, you know --

21          THE COURT:  Well, that goes to intent.

22          MR. LEACH:  Excuse me?

23          THE COURT:  I would think that goes to intent, but

24  I'm not sure that -- how it fits in here.

25          MR. LEACH:  Well, you know, in the criminal world,

1   we talk about badges of fraud, you know, badges of unclean

2   hands, you know?

3           THE COURT:  Okay.  You're on the admin claim.

4           MR. LEACH:  Yeah.  So Mr. Wheat's mark has been in

5   existence since 2002.  And when you go through the

6   paperwork, which we have attached to both the Complaint and

7   the materials that we've submitted in support of our Motion

8   to Dismiss, you'll see those items are in there.

9           There's an allegation of abandonment.  I don't

10  know how -- you didn't address that with Counsel, but I

11  don't see how they get abandonment.

12          THE COURT:  Oh, I addressed it big time.

13          MR. LEACH:  Okay.

14          THE COURT:  I was asking all about the theory and

15  how in the world you could have abandonment when the

16  company's using the product.

17          MR. LEACH:  Okay.

18          THE COURT:  That's what provoked my comment about

19  that --

20          MR. LEACH:  Okay.

21          THE COURT:  -- because I don't understand the

22  abandonment theory, but I don't --

23          MR. LEACH:  Judge --

24          THE COURT:  -- I certainly -- he -- Mr. Hoffer

25  says he's got basis which say essentially that failure to

1  aggressively enforce your mark is an indication of

2  abandonment.  And I asked him if there was -- if that was

3  true when the company was failing to enforce in a particular

4  instance is using and enforcing it in other instances, and

5  that's what -- I never got a full answer on that one.  But

6  that's -- I mean, I have a problem with that theory as a

7  matter of practicality and, frankly, I just don't know what

8  the law is but I -- it doesn't ring logical to me.

9          MR. LEACH:  Judge --

10         THE COURT:  Did your client use -- is this --

11 well, I'm just going to ask you, but then I'll ask you if

12 it's in the Record.

13         Did your client -- does your client -- no, let me

14 rephrase.  I know your client -- it has had the mark and

15 Mr. Wheat has had the mark since '02, but has Hi-Tech been

16 using the mark to market goods?

17         MR. LEACH:  Yes, ma'am.

18         THE COURT:  Since 2009?

19         MR. LEACH:  Oh, yes, ma'am, absolutely.

20         THE COURT:  Regularly, constantly --

21         MR. LEACH:  Yes, ma'am.

22         THE COURT:  -- market out there on the Internet,

23 whatever.

24         MR. LEACH:  Marketing and actually selling.  I

25 mean, you know, in the world of a trademark, the fact that

1    you sell a bottle and it's got a label, you know --

2              THE COURT:  Right, right.

3              MR. LEACH:  -- that's all considered advertising

4    as well so, you know --

5              THE COURT:  Right, right.  So the answer is though

6    you were actually selling.

7              MR. LEACH:  Yes, ma'am.  Yes, ma'am, just --

8              THE COURT:  And you're on the Internet with the

9    product's name out there obviously.  Well, I don't care

10   about Internet versus store.  I'm just simply saying people

11   were buying in the back of the -- some guy's truck.

12             MR. LEACH:  Yes, we were definitely out there.

13             The problem with Internet, Judge, just so you

14   know, is: we're a wholesaler.  So, you know, the Internet

15   sites are going to be retailers out there and they're

16   Internet retailers so Dianabol is going to be out there with

17   the retailers where we try not to compete against --

18             THE COURT:  Oh, okay.  What you're selling to

19   retailers.

20             MR. LEACH:  Yes, ma'am.

21             THE COURT:  Well, that's the same thing in my

22   book.

23             MR. LEACH:  Yes.  So we -- I mean, it's a -- it'll

24   be on the shelf at GNC, CVS, Rite Aid.

25             THE COURT:  Okay.

1          MR. LEACH:  You know, it'll be at all those stores

2  on top of the fact that we've got much smaller, you know,

3  gas stations and all.

4          THE COURT:  Do you have case law for the

5  proposition that this abandonment theory is simply

6  inapplicable in --

7          MR. LEACH:  Yes, ma'am.

8          THE COURT:  -- the factual context alleged in the

9  Complaint?

10          MR. LEACH:  Yes, ma'am.  And in our Reply Brief,

11  we addressed it very specifically.  I think you'll find

12  everything that you need.

13          THE COURT:  What about the issue of unfair trade

14  practice and the Lanham Act, false --

15          MR. LEACH:  Yes, ma'am.  We address that very

16  specifically both in our initial briefing and in our Reply

17  Brief, but that takes me to where I wanted to go next and

18  that is: the re-crafting that Mr. Hoffer suggested to the

19  Court.

20          THE COURT:  Yeah, I'm with you.

21          MR. LEACH:  Your Honor, I guess -- I think we all

22  understand what that means in terms of Mr. Hoffer making

23  that admission or that suggestion to the Court and, you

24  know, while I appreciate the idea that he'd like to re-

25  craft, I think when you look at the Complaint, the problem

1   is: it's a wholesale change -- it's a wholesale change.

2   Right now it is basically relying upon on DASCA and it's --

3   you can't simply excise and have a sufficient complaint

4   and --

5           THE COURT:  But why should I not give him the

6   chance to do it and then look at it?  Because I think there

7   is a concession -- it's not explicit, but there's a

8   concession that that DASHA or -- is it DASHA or DASCA?

9           MR. LEACH:  DASCA.  Uh-huh.

10          THE COURT:  Theory --

11          MR. LEACH:  Designer Anabolic Steroid Act is what

12  it is.

13          THE COURT:  Okay.  Thank you, fantastic.  That

14  that theory's not going to hold water.  Okay.  Fine.  They

15  didn't think of that originally, but that kind of thing

16  happens, mistakes happen.

17          Why shouldn't I be allowing him to clean up the

18  Complaint and then me look at it while you're briefing on

19  the remaining theories and arguments?

20          MR. LEACH:  The --

21          THE COURT:  Because, frankly, he can't throw the

22  baby out with the bath water.  It's just not how Civil Court

23  works.

24          MR. LEACH:  Well -- but you have the authority,

25  under the transfer power, to not only send back the dec

1  action but to send back the entirety of his case.  If he had

2  a perfectly valid complaint --

3          THE COURT:  Oh, yeah, I -- right.

4          MR. LEACH:  Right.  So, I mean, that's really

5  where I'm going.  In other words, if it needs to be

6  reformulated, it should be reformulated under the guise of

7  being in Atlanta and reformulated under the guise of

8  responding to the -- to our Complaint if he's got

9  counterclaims or whatever it is that he wants to submit.  He

10 can submit them there.  That's my thought, Judge.

11         THE COURT:  But there's -- okay.  But there's

12 nothing that -- I mean, he's already filed an amended

13 complaint.

14         MR. LEACH:  Yes, ma'am.

15         THE COURT:  So he needs leave to file a --

16         MR. LEACH:  Exactly.

17         THE COURT:  -- further amended complaint.

18         MR. LEACH:  He's outside the 21 days.

19         THE COURT:  But I don't understand why the

20 analysis wouldn't be clearer, frankly, and simpler if the

21 DASCA allegations were removed so that then I, frankly,

22 could look at what's left in light of the various arguments.

23 I just --

24         MR. LEACH:  Well --

25         THE COURT:  And I'm not precluded from doing that

1   right now, I've got the case and --

2          MR. LEACH:  Yes, ma'am.  No, I totally see that.

3   It's just that --

4          THE COURT:  I think -- I'm trying to remove a lot

5   of the smoke.

6          MR. LEACH:  Okay.  No, and I understand that,

7   Judge, but from my client's perspective, just so that I can

8   be painfully honest with the Court about what's going on

9   here is that this mark -- these products are out on the

10  market and we are trying our level best to find the swiftest

11  point from A to B and so --

12         THE COURT:  I understand.  Time is of the essence,

13  I get it.

14         MR. LEACH:  Yes.  All right.  Judge, the whole

15  idea -- and you will see our Motion to Strike -- I think

16  it's Paragraphs 24 to 26 -- and I think you will see that

17  there is absolutely no parallel between anything that is

18  alleged and anything that's going on in this case.  The

19  allegation before Judge Pannell is a labeling allegation

20  that has been going on literally, Judge, for 11 years with

21  the FTC.  And, you know, when these companies are brand new

22  and just getting up and running, mistakes are made and we

23  entered into a consent agreement with the FTC and FTC moved

24  for contempt.  Been going on for 11 years.

25         Recently what happened was: Judge Pannell found

1  that we were in contempt and rendered a $40 million

2  judgment, which was reversed by the Eleventh Circuit, so

3  we're back again.  All the labels are now correct because

4  Judge Pannell wanted it done right away, and all those

5  labels have been fixed.  And now, I guess we're just

6  litigating over the number, you know, and, you know, it has

7  to do with consumer address and things of those nature.  But

8  it's not the sort of situation where anybody, not a single

9  consumer, has been hurt by our products.  I mean, this is

10  straight up labeling.

11         Our contention that, you know, we were using

12  puffery.  Their contention that we didn't have scientific

13  evidence to back it up.  And, you know, we litigated the

14  issue.  Judge Pannell found against us.  He said that we

15  were bound by collateral estoppel.  The Eleventh Circuit

16  reversed it.  And now we're doing the science.  We're going

17  to be presenting the science and Judge Pannell, I'm sure, is

18  going to have a hearing.  And it just has nothing to do with

19  what we're doing here.

20         THE COURT:  Do you address the issue of -- well,

21  I'm just going to -- for shorthand, 'm going to call it the

22  "404(b)" issue --

23         MR. LEACH:  Yeah.

24         THE COURT:  -- because that's what it is.

25         MR. LEACH:  Well -- and doesn't it apply, Judge,

1    because, I mean, it's a rule of evidence so, I mean, it

2    applies civilly, it applies criminally.

3              THE COURT:  But that seems to be the basis so is

4    there --

5              MR. LEACH:  It's just apples and oranges.

6              THE COURT:  -- case law that that's an adequate

7    basis for allegations?

8              MR. LEACH:  I don't think so.  I think you would

9    always have the discretion.  But think of the analysis that

10   we do in criminal cases, Judge, where you have to look at

11   the similarity of the two events and -- all right.  So we've

12   got a cocaine dealer and he's selling cocaine to -- you

13   know, and an undercover so we say that's sufficiently

14   similar and it comes in.  That's not what's going on here.

15   Totally different products, doesn't have anything to do with

16   the products that are involved in this case, as far as I can

17   recall.

18             THE COURT:  Here's my concern and I say this to

19   both sides: I am concerned that, Mr. Hoffer, what you were

20   basing your information and belief -- and I appreciate your

21   candor, frankly, very much, thank you -- but I'm concerned

22   that this information and belief based on other products,

23   other companies, other time and place is not a sufficient

24   basis for allegations under pleading standards.

25             MR. HOFFER:  Do you mean under 12(h),

1    Your Honor --

2              THE COURT:  Under --

3              MR. HOFFER:  -- under Rule 12(h)?

4              THE COURT:  Under everything, 12(h) --

5              MR. LEACH:  Eight?

6              THE COURT:  A -- and -- well -- and I think

7    Mr. Schaffer can attest that I'm not that keen on 404(b)

8    evidence.  It has to be very close for me to let it in.  And

9    it's a rule of evidence.  It's not a pleading standard.  And

10   even then, as a rule of evidence, I'm pretty -- I try to be

11   pretty strict.  But I'm bothered by that as your sole basis

12   for factual allegations of this nature and I don't know what

13   to do about it.

14             So my feeling about this is this: I hate to waste

15   time and, frankly, I'm trying desperately to move this case.

16   I do try to move my cases.  But I am interested in another

17   complaint -- over opposition but I am interested in another

18   complaint that takes out the DASCA business.  I want to see

19   what you've got.

20             MR. HOFFER:  Yes, Your Honor.

21             THE COURT:  And I want you to do the legal

22   research to find out if information and belief means casting

23   aspersions on a person's integrity as a basis for specific

24   factual allegations of falsity.  I mean, false markings is

25   an allegation of falsity.  Whether it fits under Rule 9 or

1  under Rule 8, that -- I'll worry about that later.

2          But I am concerned that there is no evidence

3  that -- or information that your client has that these

4  statements that you identify in the Complaint lack -- I'm

5  concerned that they lack any factual foundation with

6  reference to these specific statements.  I'm bothered by

7  that.

8          And I have never, in my 20 years on the Bench,

9  heard of a case where someone essentially alleged statutory

10 war, violations or fraud, or even negligent

11 misrepresentation.  Here, they're supposed -- anyway, I've

12 never heard that theory, those sort of wrongdoing kinds of

13 theories being asserted because somebody is in a different

14 framework in trouble with the Government or in trouble for

15 having misstated, yadda, yadda.

16         That trouble in the prior setting might or might

17 not be admissible in evidence at a trial to bolster an issue

18 of intent or pattern and practice maybe, but right now, you

19 have nothing that you're identifying for me in this

20 Complaint, those Paragraphs 14 through 22, for

21 misstatements.  And I don't mean to put you on the spot here

22 so this is not the time and place for you to respond, but

23 since we've had the benefit of a real hair-letting-down

24 situation, I am going to tell you that you need to find me a

25 case where that's good enough, if you're going to stand on

1    that basis.  I'm just going to tell you right now.

2              MR. HOFFER:  Understood, Your Honor.

3              THE COURT:  And if -- it better be good because

4    "information and belief" typically means because of the

5    facts of this case, I am drawing a circumstantial -- I'm

6    making some sort of circumstantial relief or step to say we

7    think the following event happened or the following intent

8    exists.  But this is a lot of your Complaint on the

9    aggressive claim when you're telling me you have no basis

10   for this except that he committed allegedly wrongs in

11   another setting.  I'm not happy with that.

12             MR. HOFFER:  Understood, Your Honor.

13             THE COURT:  This goes way beyond the Motion to

14   Dismiss and way beyond whether this case gets transferred

15   back.  I'm just not -- I'm not punishing you.  I'm not

16   saying anything negative.  This is not a sanction.  This is

17   a from me to you because if this case stays here as you

18   hope, we're going to have a long relationship.

19             MR. HOFFER:  Yes, Your Honor.

20             THE COURT:  And the relationship needs to be

21   grounded on what you can prove or believe you can prove and

22   I'm not hearing that you can prove anything about these

23   statements specifically, so you will not get to a jury and

24   you will not get anywhere in this litigation until there's

25   some foundation.

1        So the Motion to Dismiss is here and I'm not sure

2  what the heck to do with it at the moment, but I'm going to

3  ask you to go ahead and file an amended complaint.

4        And then I'm going to tell you, Mr. Lynch, that --

5  Leach, sorry, that you can just say, "This section I brief,

6  that section I brief and here's a new section," and you'll

7  supplement your Motion and we're going to do it on a short

8  time frame even though the holidays are here so that we can

9  just get this show on the road.  I will be ready to turn to

10  this in sort of mid or early January anyway.

11        So how long would you like for refiling or

12  amending your complaint over objection?  I'm giving you an

13  opportunity to file a second amended complaint.  Today, for

14  instance, is the 22nd.  Christmas is in the middle.  The

15  following Friday is New Year's Eve -- is New Year's Day.

16        So do you want to do it like the 31st of December,

17  the 30th of December?

18        MR. HOFFER:  That's what I was going to suggest,

19  Your Honor.

20        THE COURT:  And --

21        MR. HOFFER:  December 31st or January 4th is a

22  Monday, either one is -- the 31st will be fine.

23        THE COURT:  Well, let's do the 30th or the 31st

24  and some --

25        MR. HOFFER:  Yes, Your Honor.

1          THE COURT:  Okay.  By 5:00 o'clock so you can

2   have --

3          MR. HOFFER:  Yes, Your Honor.  Courtesy copy to

4   Chambers?

5          THE COURT:  Yes.

6          MR. HOFFER:  Yes, Your Honor.

7          THE COURT:  And then you, within a week, give me

8   a -- either a new motion -- you can cut and paste.  I'd like

9   to just deny your Motion without prejudice, but I'm willing

10  to do whatever you want, but I want a --

11         MR. LEACH:  I'd like you to grant the Motion to

12  Dismiss with leave to refile.

13         THE COURT:  Yeah.

14      (Laughter.)

15         THE COURT:  Because I want to write on that, take

16  too long.  I'm not doing that.

17         MR. LEACH:  Okay.  Well, you asked.

18         THE COURT:  Again, the point is: to the extent

19  that -- you'll want to scrutinize the new Complaint.

20         MR. LEACH:  Judge, we're going --

21         THE COURT:  You may just --

22         MR. LEACH:  -- a new brief.

23         THE COURT:  -- need a new motion.

24         MR. LEACH:  We will file an entirely new brief.

25         THE COURT:  It would help me if you would.

1              MR. LEACH:  Yes, that's what we're going to do.

2              THE COURT:  Okay.  So here's what I'm going to do:

3    there are too many issues on this current Complaint to

4    satisfy me and I don't want to go through writing a whole

5    big thing and then you having to file another motion and

6    then having it.  This is going to shortcut it all.

7              You are welcome to abandon the DASCA claims if you

8    continue to prefer to do that, Mr. Hoffer, but I am thinking

9    I need a new motion within say two weeks of them filing.  If

10   you're going to do a whole new motion, then it's two weeks

11   from their filing.

12             MR. LEACH:  Okay.  So that would be January 14th,

13   Judge?

14             THE COURT:  Correct.  And then you can have three

15   weeks to respond if you want.

16             And then in the meantime, I will look at the

17   Record on the Motion to Transfer.  I don't know if I'll get

18   to it or not, but I will look at it because I think that's

19   still good.  That's fully briefed, I think.

20             MR. LEACH:  Yes.

21             THE COURT:  Do you agree, Mr. Hoffer?

22             MR. HOFFER:  I agree, Your Honor.  I do.

23             THE COURT:  Okay.  So we have other cases right

24   now, we're working on some big things, but I will try to at

25   least get a good feel for what I want to do on the Motion to

1    Transfer, but I want the new Complaint anyway.

2            MR. HOFFER:  Yes, Your Honor.

3            THE COURT:  And the Motion to Transfer will not

4    come out, that decision, even if I were to reach it, would

5    not come out before the 14th of January, that's for sure.

6            How much time do you want to respond; do you have

7    any -- do you want three weeks to respond to the new Motion

8    to Transfer?

9            MR. HOFFER:  Without having seen it, Your Honor,

10   it's hard for me to say.

11           THE COURT:  Let's say three weeks.

12           MR. HOFFER:  I do intend to make some changes to

13   the existing Complaint that might again short circuit a lot

14   of the issues that we've discussed today.

15           THE COURT:  Fine.

16           MR. HOFFER:  I need to speak with my client about

17   that.

18           THE COURT:  Fine.  So I'll deal with this case and

19   the current Motion and then I will decide what we're going

20   to do.  If I keep this case, then we're going to have to

21   figure out about Judge Ellison and me and the RICO, but

22   let's just postpone that decision a little bit, okay?

23           MR. HOFFER:  Yes, Your Honor.

24           MR. LEACH:  Judge, would it be your intent to hear

25   us on that Motion?  No.  Have --

1           THE COURT:  No.  You get a chance to reply.  He'll
2    get three weeks, you'll get one week.

3           MR. LEACH:  Okay.  One week on the reply?

4           THE COURT:  Uh-huh.  If I need you, I'll let you
5    know.

6           MR. LEACH:  Okay.

7           THE COURT:  That means that I will not be worrying
8    about the full joint management plan.  And I think that will
9    do it for today.

10          Is there anything else?  Do you want to make any
11   other comments in light of my granting your motion for leave
12   to amend?

13          MR. HOFFER:  No, Your Honor.  Thank you for your
14   time.

15          THE COURT:  Okay.  Thank you all very much.
16   You're excused.

17          MR. LEACH:  Yes, ma'am.

18       (These proceedings concluded at 2:22 p.m.)

19

20

21

22

23

24

25                    *  *  *  *  *

1          I certify that the foregoing is a correct

2   transcript to the best of my ability produced from the

3   electronic sound recording of the proceedings in the above-

4   entitled matter.

5   /S/ MARY D. HENRY

6   CERTIFIED BY THE AMERICAN ASSOCIATION OF

7   ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337

8   JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9   JTT INVOICE #54915

10  DATE:  MARCH 1, 2016

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25