# EXHIBIT 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

DYNAMIC SPORTS NUTIRITON, LLC,    )
)
Plaintiff,    )
)     CIVIL ACTION NO. 4:15-cv-02645
v.    )
)
HI-TECH PHARMACEUTICALS, INC.,    )
)
Defendant.    )
)

## HI-TECH PHARMACEUTICALS, INC.'S MOTION FOR RULE 11 SANCTIONS

COMES NOW, Hi-Tech Pharmaceuticals, Inc., Defendant in the above-styled action, and hereby submits this Motion for Rule 11 Sanctions for all costs associated with litigation of the current case, respectfully showing this Court as follows:

### NATURE AND STAGE OF PROCEEDINGS

As stated by Dynamic Sports Nutrition, LLC ("DSN") in its Second Amended Compliant, on September 11, 2015, Hi-Tech's CEO Jared Wheat sent an email to Brian Clapp, DSN's President and owner, threatening a lawsuit against DSN for infringing the Dianabol® trademark through the sale of DSN's "D-anabol 25" product. Doc. 27, ¶ 8. Within hours of receiving this threat, on a Saturday, DSN "raced to the courthouse" and filed its Original Complaint, a declaratory judgment action. *See* Doc. 1. To date, DSN has not denied that this filing constituted forum shopping on its part, or provided any alternative explanation for its Saturday filing. *See generally* Doc. 10; Doc. 15.

Then, on October 2, 2015, when DSN was served with Hi-Tech's Complaint and Motion for Temporary Restraining Order ("TRO") filed in the Northern District of Georgia, DSN responded that same day by amending its Original Complaint to add Lanham Act claims mirroring those that Hi-Tech had filed against it. *Compare* Doc. 5 *with* Doc. 8-2. DSN's First Amended Complaint, however, was replete with misstatements of the law, and its new (and confused) factual allegations reflected DSN's failure to conduct a reasonable investigation into the facts alleged. *See* Doc. 11.

After Hi-Tech moved to dismiss the Original and First Amended Complaints, and after DSN responded by defending its pleadings, DSN changed its position and voluntarily withdrew the newly added claims at the December 22, 2015 hearing in this matter. This Court then granted DSN leave to amend. *See* Doc. 26. In doing so, this Court "warn[ed] [the] parties to ensure, in compliance with Rule 11, that their legal and factual arguments have the necessary foundation." *Id*. DSN proceeded to file its Second Amended Compliant, without Lanham Act claims, on December 30, 2015. Doc. 27. DSN's Second Amended Complaint, another declaratory judgment action, contains claims relating to alleged "Non-Infringement" and "Laches/Abandonment." *Id*.

In the interim, DSN filed to dismiss or transfer Hi-Tech's case in the Northern District of Georgia pursuant to the "first-to-file" rule. The Court granted DSN's request for transfer to allow this Court, as the court of first filing, to decide whether the subject cases should be heard here or the Northern District of Georgia. Doc. 14-1. Hi-Tech's case against DSN, *Hi-Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, et al*., case number 4:15-cv-034-1, is currently pending before Judge Keith P. Ellison in this District.

For additional details, Hi-Tech refers this Court to the chronology of events reflected on pages 3 and 4 of its Reply in Support of its Motion to Dismiss DSN's First Amended Complaint, Doc. 19, attached hereto as "Exhibit A." Hi-Tech served counsel for DSN with a warning letter and copy of this Motion on January 15, 2016, but did not receive a response.

## SUMMARY OF THE ARGUMENT

Hi-Tech now moves for the imposition of Rule 11 sanctions against DSN and its counsel related to the filing of its Second Amended Complaint, the latest example of its repeatedly improper and baseless filings. As with DSN's Original and First Amended Complaints, DSN's Second Amended Complaint lacks the requisite factual and legal foundation. DSN knew, prior to filing, that the allegations central to its claim for Non-Infringement were false and, similar to claims asserted in previous complaints, its claim for Laches fails to include basic elements. This frivolous nature of this filing, along with frivolous nature of DSN's previous filings, reveals that DSN is motivated by improper purposes including forum shopping, imposing delay, and unnecessarily increasing Hi-Tech's litigation costs.

## ISSUES TO BE RULED UPON BY THE COURT

1. Whether, to the best of DSN's knowledge, information, and belief, its allegation that the date of the first Dianabol[®] trademark application was 2007 has evidentiary support or is likely to have such support after reasonable investigation or discovery.

2. Whether, to the best of DSN's knowledge, information, and belief, its allegation that DSN was a "prior user" of the subject mark has evidentiary support or is likely to have such support after reasonable investigation or discovery.

3. Whether DSN's claim for Laches is supported by existing law or a good faith argument of extending existing law; and

4. Whether DSN filed its Second Amended Complaint for an "improper purpose."

## LEGAL STANDARD AND STANDARD OF REVIEW

The Fifth Circuit has explained that Rule 11 is designed to address "misuse and abuse of the legal process." *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866, 872-73 (5th Cir. 1988) (noting that an award of Rule 11 sanctions is reviewed for abuse of discretion).

Rule 11(b) provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . .

Fed. R. Civ. P. Rule 11(b). Rule 11 establishes an objective standard, which can be violated

through "culpable careless[ness]." *Downstream Envtl., LLC v. Gulf Coast Waste Disposal Authority*, 2006 WL 3426348, *1 (S.D.Tex. 2006). As set forth herein, DSN's claims are not only objectively frivolous in light of known facts and established law, but also intentionally brought for improper purposes.

## ARGUMENT AND CITATION OF AUTHORITY

I. **DSN Based Its Claim for Non-Infringement Upon Factual Allegations and Assumptions It Knows Are False**.

In permitting DSN to amend its First Amended Complaint, this Court "warn[ed] [the] parties to ensure, in compliance with Rule 11, that their legal and factual arguments have the necessary foundation." Doc. 26. DSN, however, did not heed this warning. Specifically, DSN's Second Amended Complaint alleges that it did not infringe upon the Dianabol® trademark because Mr. Wheat did not apply to register the trademark until 2007, and DSN began selling its D-anabol 25 product in 2006. Prior to filing its Second Amended Complaint, however, DSN knew that Mr. Wheat first applied to register the Dianabol® trademark in 2002, not 2007, and that Hi-Tech began selling its Dianabol® product at least as early as 2005.

### a. Prior to Filing Its Second Amended Complaint, DSN Knew That Hi-Tech's CEO Applied to Register the Dianabol® Trademark in 2005 and 2002.

According to DSN's Second Amended Compliant, it has not infringed upon Hi-Tech's trademark because, *inter alia*, Hi-Tech's CEO "did not apply to register the "Dianabol" trademark until June 26, 2007." Doc. 27, ¶ 12. Mr. Wheat, however, did not

first apply to register the Dianabol® trademark in 2007, but years earlier in 2002 and 2005,[1] and DSN has long had actual knowledge of this fact.

After DSN's President and owner, Brian Clapp, applied to register the mark "D-Anabol" in November of 2005,[2] the U.S. Patent and Trademark Office ("PTO") refused his application on June 2, 2006. Exh. C.[3] In this refusal, the PTO not only notified him of Mr. Wheat's "Prior Pending Application" to register "Dianabol," but also attached a copy of the earlier 2005 application, and stated that:

> The filing date of the referenced application precedes applicant's filing date. There may be a likelihood of confusion between the two marks under Trademark Act Section 2(d), 15 U.S.C. §1052(d).[4] *Id.*, p. 4.

DSN received notice of the 2002 application more recently, in October of 2015, when Hi-Tech filed documents relating to the 2002 application in its Northern District of Georgia suit against DSN.[5] Thus, DSN's contention that 2007 is the date of Mr. Wheat's

---

[1] Mr. Wheat first applied to register the DIANABOL® trademark on March 5, 2002, only a few weeks prior to Hi-Tech launch of the product. *See* Exh. K. Mr. Wheat, however, was unfamiliar with the process at that time, and submitted an insufficient application, which was rejected for procedural insufficiencies and later went abandoned. *See Id.* Mr. Wheat subsequently hired an attorney to assist him with the application process, and filed the 2005 application and the 2007 application, which resulted in registration of the mark.

[2] *See* Doc. 27, ¶ 14.

[3] *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F.Supp.2d 745, 754 fn. 9 (S.D.Tex., 2003) (a court may take judicial notice of publically available documents issued by governmental agencies).

[5] *See* Docs. 20-23 & 20-24 in *Hi-Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, et al.*, Northern District of Georgia, Atlanta Division, 1:15-cv-03393-MHC, filed October 23, 2015.

first "Dianabol" trademark application – a contention central to its Non-Infringement claim – constitutes a known falsity.[6]

### b. Prior to Filing Its Second Amended Complaint, DSN Knew That Hi-Tech Sold Its Dianabol® Product Before DSN Began Selling D-Anabol 25.

In support of its claim for Non-Infringement, DSN's Second Amended Complaint also alleges that it began selling its D-Anabol 25 product in August of 2006, rendering it the "senior user" relative to Mr. Wheat's 2007 trademark application. Doc. 27, ¶ 12. ("DSN's mark, 'D-Anabol 25,' was used in commerce before [Hi-Tech's] President sought to register the 'Dianabol' mark.") DSN's Second Amended Complaint, therefore, necessarily (and erroneously) implies that Hi-Tech did not begin selling its Dianabol product before the 2007 application – an implication which does not have, nor will likely have, evidentiary support "to the best of [DSN's] knowledge, information, and belief."

First, prior to filing its Second Amended Complaint, DSN was in possession of multiple Hi-Tech sales invoices documenting Hi-Tech's sale of the Dianabol product at least as early as July of 2005. Exh. D, filed as Doc. 20-21 in the Northern District of Georgia case on October 23, 2015, and authenticated by affidavit Doc. 20-1. These 2005 invoices demonstrate not only that Hi-Tech began selling its Dianabol product long before the 2007 trademark application, but also long before DSN's alleged first use of "D-anabol 25" on August 15, 2006. *Id.*; Doc. 27, ¶ 12.

---

[6] This is, of course, not to mention that had DSN performed a reasonable investigation in accordance with Rule 11, it would have discovered the 2002 and 2005 trademark applications through its search of publically available documents on the PTO website. *See* Doc. 27, ¶ 12.

Second, prior to the filing of its Second Amended Complaint, DSN had notice of Hi-Tech's March 31, 2002 date of first use in commerce by way of PTO filings. This date of first use is reflected on Mr. Wheat's 2005 trademark application received by DSN in 2006 [Exh. C, p. 6], Mr. Wheat's 2007 trademark application attached to DSN's Second Amended Complaint [Doc. 27-2, p. 2], and the trademark registration of "Dianabol" [Exh. E], which is publically available via the PTO website and was served upon DSN in Hi-Tech's Northern District of Georgia case as Doc. 1-2.

While DSN may contend these government filings and invoices do not conclusively demonstrate Hi-Tech's date of first use, it is apparent from DSN's Second Amended Complaint that it is not aware of evidence sufficient to support its assertion to the contrary.[7] DSN, therefore, did not allege it was the "senior user" "to the best of its knowledge [or] information" after a reasonable inquiry. *See Worell v. Houston Academy*, 2008 WL 2753405, *4 (5th Cir. July 16, 2008) (imposing Rule 11 sanctions where the plaintiff's complaint contained "unsupported and factually incorrect allegations"; the plaintiff alone conducted "extremely limited [pre-filing] research"; and the plaintiff did not have any evidence contrary to that presented by the defendant).

As for the best of DSN's "belief," the actions of Mr. Clapp prior to the current litigation demonstrate that DSN, in fact, believes that Hi-Tech has a valid and enforceable

---

[7] When Mr. Wheat first confronted Mr. Clapp with DSN's use of "D-anabol 25," Mr. Clapp stated that he had "looked online and spoken with [unspecified] distributors and [saw] no evidence that [Hi-Tech] advertised or sold [its] product before [DSN's]." Exh. B, p. 3. Since that time, however, Hi-Tech has supplied DSN with invoices showing Hi-Tech's prior sale of the product, and DSN has apparently made no attempt to confirm their accuracy as part of a "reasonable investigation." *See* Exh. D.

trademark in Dianabol®. After Mr. Clapp's unsuccessful attempt to register "D-anabol" in 2006, DSN applied to register "D-anabol 25" in or about 2011. *See* Exh. F. The PTO, however, rejected this second application based upon a likelihood of confusion with Hi-Tech's by-then-registered Dianabol® trademark. *Id.*, pp. 1-3. Three days after the PTO's final rejection of this application, Mr. Clapp reached out to Mr. Wheat in order to ingratiate himself with Mr. Wheat and Hi-Tech. *Compare* Exh. F *with* Exh. G. Mr. Clapp then proceeded to assist Mr. Wheat with the enforcement of the Dianabol® trademark by notifying him of potential infringers (as admitted in DSN's Second Amended Complaint, Doc. 27, ¶¶ 15-17) and by e-mailing a potential infringer on Mr. Wheat's behalf. *See, e.g.,* Exh. H; Exh. I. Of course, if Mr. Clapp had actually believed that DSN, not Hi-Tech, had the protectable mark, DSN would have presumably pursued the potential infringers itself, as it has pursued alleged infringers of other DSN trademarks in this Court.[8]

Indeed, on May 30, 2014, Mr. Clapp even went to far as to give Mr. Wheat a "heads up" that the Dianabol® trademark was expiring (unbeknownst to Mr. Clapp, Mr. Wheat had already filed for a six-year extension as well as a Declaration of Incontestability), and that another entity was attempting to register the mark. Exh. J. Moreover, over the course of three and one-half years, Mr. Clapp affirmatively concealed both the existence of DSN and his association with it. These are hardly the actions of a company which sincerely

---

[8] *See the following examples of DSN enforcement actions relating to various trademarks: Dynamic Sports Nutrition, LLC v. IBUY BODY, LLC, et al.,* 4:14-cv-00151; *Dynamic Sports Nutrition, LLC v. Ironmag Labs, LLC, et al.;* 4:14-cv-02570; *Dynamic Sports Nutrition, LLC v. Vital Pharmaceuticals, Inc.,* 4:14-cv-02624; *Dynamic Sports Nutrition, LLC v. Accelerated Sports Nutrition, LLC et al.,* 4:14-cv-02741.*

believes that it had priority to a trademark and the legal right to use same. Consequently, DSN, yet again, relies upon "facts" it objectively knows, and subjectively believes, are false.

## II. DSN's Claim for "Laches" Lacks the Necessary Factual and Legal Foundation.

To defeat a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007); *Reliable Consultants, Inc. v. Earle,* 517 F.3d 738, 742 (5th Cir.2008); *Guidry v. American Pub. Life Ins. Co.,* 512 F.3d 177, 180 (5th Cir.2007). The "[f]actual allegations of [a complaint] must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted). Thus, "in practice, a complaint ... ***must contain either direct or inferential allegations respecting all the material elements*** necessary to sustain recovery under *some* viable legal theory." *Bell Atlantic Corp.*, 127 S.Ct. at 1969 (internal citation and punctuation omitted; emphasis added).

However, despite this clear and oft-cited authority, and despite this Court's warning that the parties' positions must have adequate factual and legal support, DSN added its new claim for Laches in its Second Amended Complaint while making no attempt to actually plead facts pertaining to each of the claim's three elements. It is well-established that the defense of laches includes:

(1) delay in asserting one's trademark rights,
(2) lack of excuse for the delay, and

(3) undue prejudice to the alleged infringer caused by the delay.

*American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 334 (5th Cir. 2008); *Board of Supervisors for Louisiana State University Agricultural and Mechanical College v. Smack Apparel Co.*, 550 F.3d 465, 489-90 (5th Cir. 2008); *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). However, even if it could be said that DSN adequately pleaded the first element of delay, which Hi-Tech disputes,[9] DSN plainly failed to allege that any such delay was inexcusable (much less why), and failed to allege that DSN was in any way prejudiced by the alleged delay. *See generally* Doc. 27. In light of the extensive briefing already conducted, and in light of this Court's prior warning, DSN's failure to meet such basic pleading requirements represents more than the "culpable carelessness" required for the imposition of Rule 11 sanctions.[10]

### III. DSN Filed Its Second Amended Complaint for the Improper Purposes of Delay and Needlessly Increasing the Cost of Litigation.

The intentionally dilatory actions of DSN with respect to the subject trademarks and this litigation represent attempts to delay enforcement of the Dianabol® trademark against DSN, thereby enabling it to prolong its sale of the D-anabol 25 product. DSN's Second

---

[9] Hi-Tech notes the disingenuous nature of DSN's allegation that Hi-Tech "knew or should have known" about DSN's use of the D-anabol 25 mark [Doc. 27, ¶ 14] in light of the fact that Mr. Clapp affirmatively reached out to Mr. Wheat, hid information concerning DSN from Mr. Wheat, and distracted Mr. Wheat with notice of other infringers over the course of several years.

[10] *See Downstream Envtl., LLC v. Gulf Coast Waste Disposal Authority*, 2006 WL 3426348, *1 (S.D.Tex. 2006).

Amended Complaint is no exception. DSN's course of conduct calculated to impose such delay includes the following:

- Mr. Clapp's unsolicited contact of Hi-Tech to alert Mr. Wheat of other infringers (*i.e.* divert Mr. Wheat's attention from DSN's infringing activities) Exh. G ("There are a bunch of people stealing his marks and I would like to talk to him about that."); Exh. H; Exh. I.

- Mr. Clapp's active concealment of the existence of DSN and his association therewith from Mr. Wheat for approximately three and one-half years, and his apparent intent to do so indefinitely;

- Mr. Clapp's request to continue selling D-anabol 25 for one year after Mr. Wheat discovered DSN's infringement, while DSN covertly raced to the courthouse on a Saturday to file its declaratory judgment action in this Court [Exh. B; Doc. 1];

- DSN's filing of a First Amended Complaint in attempt to perpetuate dilatory litigation in Texas upon learning of Hi-Tech's Georgia suit;

- DSN's failure to serve Hi-Tech with its First Amended Complaint, resulting in Hi-Tech's subsequent preparation of a motion to dismiss the Original Complaint [*See* Exh. A, p. 3]; and

- DSN's refusal to voluntarily dismiss its Lanham Act claims in its First Amended Complaint until the December 22, 2015 hearing in this matter despite extensive prior briefing on the issue.

The totality of these circumstances reveals that DSN's litigation strategy can be characterized as "delay, obstruct, mislead, delay, obstruct, mislead," and its Second Amended Complaint, which also lacks a legal and factual basis, is consistent with this tactic. Making matters worse, DSN's efforts to stall have worked: Hi-Tech's litigation in Georgia came to a screeching halt, and there has been no progress with respect to either Hi-Tech's claims or its request for a temporary restraining order despite the passage of several months.

DSN plainly elected to "pick a fight" in Texas not only in the course of improper forum shopping,[11] but also to tie up and hinder the lawsuit it knew was about to be filed against it in Georgia. Indeed, DSN's dilatory motive is illustrated by the fact that it is apparently unable to state claims against Hi-Tech with a proper factual and legal basis. For instance, DSN has:

- Pleaded a claim for Abandonment without alleging any fact relevant to trademark "abandonment" under the law [Doc. 1; Doc. 7, pp. 14-16];

- Pleaded multiple claims under the Lanham Act based upon purported violations of the Designer Anabolic Steroid Control Act, which cannot legally form the basis for Lanham Act claims [Doc. 5; Doc. 11, pp. 9-12];

- Pleaded a claim for false designation of origin without alleging that Hi-Tech falsely designated the origin of its goods [Doc. 5; Doc. 11, pp. 17-19];

- Pleaded a claim for Laches with no attempt to plead two of the claim's three requisite elements, despite a specific warning by this Court against such actions [Doc. 27];

- Included entirely irrelevant allegations and exhibits in its First Amended Complaint in attempt to prejudice Hi-Tech [Doc. 5; Exh. A, pp. 21-23]; and

- Filed multiple statements mischaracterizing the transfer Order of the Northern District of Georgia in attempt to support its pleadings [Doc. 14; Doc. 15, pp. 8, 23; Doc. 19, p. 4-5; Doc. 21].

DSN's Second Amended Complaint should be evaluated in this context of this conduct.

*See Whitehead v. Food Max of Mississippi, Inc*., 332 F.3d 796, 806 (5th Cir. 2003)

---

[11] "Rule 11's list of improper purposes is only illustrative; 'to harass' is but one of the possible improper purposes." *Whitehead v. Food Max of Mississippi, Inc*., 332 F.3d 796, 806 (5th Cir. 2003).

("[W]hether sanctionable conduct was part of a pattern of activity, or an isolated event is a proper consideration.") quoting Fed. R. Civ. P. 11 advisory committee's note (internal punctuation omitted); *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866, 874 (5th Cir. 1988) (noting that a "series of filings may indicate a pattern of attorney conduct of some consequence.")

 DSN has, time and time again, required Hi-Tech to defend itself against claims that plainly should never have been brought, dragging out the motion to dismiss stage of the case at bar, delaying the progression of Hi-Tech's suit, and forcing Hi-Tech to incur extensive and unnecessary litigation costs.  This Court should seize this opportunity to stop such conduct and force DSN to remedy some of the damage it has caused.  *See Marceaux v. Lafayette City-Parish Consol. Gov't*, 614 Fed.Appx. 705, 709 (5th Cir. June 8, 2015) (affirming award of attorney fees where plaintiff's amended complaint failed to heed the magistrate court's prior warning, and where plaintiff's complaints contained "obviously deficient" and "unwarranted" claims, causing an unnecessary increase in the length of proceedings) (attached hereto as Exh. L); *Osborn v. Bell Helicopter Textron, Inc.*, 828 F.Supp. 446, 452 (N.D.Tex. 1993) (granting Rule 11 sections for the plaintiff's attempt to avoid dismissal through the "continued assertion of frivolous claims" in an amended complaint, stating that "[s]uch gamesmanship offends the rules, places in question the merits of [the plaintiff's] case, and demonstrates a cavalier lack of candor with this Court.")

The Federal Rules permitted DSN to amend its Complaint once, and this Court permitted DSN to amend its Complaint a second time.  DSN, however, still refuses to abide

by the law or proceed in accordance with known facts, and has failed to heed the clear warnings of this Court, more than warranting the sanctions requested by Hi-Tech.

## REQUEST FOR HEARING

Counsel for Hi-Tech believes that oral argument before the Court will further clarify the appropriateness of sanctions in this case and, therefore, hereby request an opportunity to be heard by the Court on this Motion.

## CONCLUSION

DSN has repeatedly relied upon misstatements of fact and law, filing wholly improper claims against Hi-Tech, enabling it to halt and delay the lawsuit and request for TRO filed by Hi-Tech and to continue selling an infringing and otherwise illegal product. In doing so, DSN has repeatedly acted in defiance of the Federal Rules, statutory and common law and, now, this Court's prior Order, and has given no indication that it will proceed differently in the future absent the intervention of this Court.

Wherefore, for the aforementioned reasons, Hi-Tech respectfully requests that this Court impose Rule 11 sanctions against DSN and its counsel in the amount of Hi-Tech's attorney fees and costs associated with the current litigation including, but not limited to, those associated with oral argument and travel costs, and the attorney fees and costs associated with the filing of the current Motion and repeated motions to dismiss.

Respectfully submitted this 11th day of February, 2016.

*/s/ Arthur W. Leach*

Arthur W. Leach
Ga. Bar No. 442025
(admitted *pro hac vice*)
The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com

/s/ Kent A. Schaffer
Kent A. Schaffer
Federal ID No. 3603
TBA No. 17724300
712 Main Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 228-8500
Facsimile: (713) 228-0034
kentschaffer@gmail.com


Counsel for Hi-Tech Pharmaceuticals, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

/s/ Arthur W. Leach
Arthur W. Leach

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| DYNAMIC SPORTS NUTIRITON, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | )     CIVIL ACTION NO. 4:15-cv-02645 |
| v. | ) |
| | ) |
| HI-TECH PHARMACEUTICALS, INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## HI-TECH PHARMACEUTICALS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S FIRST AMEDNED COMPLAINT OR, IN THE ALTERNATIVE, MOTION TO STRIKE AND TRANSFER VENUE

This, the 4th day of December, 2015.

/s/ Kent A. Schaffer
Kent A. Schaffer
Federal ID No. 3603
TBA No. 17724300
712 Main Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 228-8500
Facsimile: (713) 228-0034
kentschaffer@gmail.com

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT.   .   .   .   .   .   1

NATURE AND STAGE OF THE PROCEEDING   .   .   .   2

STATEMENT OF ISSUES AND RELATED AUTHORITIES   .   2

RE: FACTUAL BACKGROUND.   .   .   .   .   .   3

ARGUMENT AND CITATION OF AUTHORITY   .   .   .   4

   A.  The "Compelling Circumstances" Exception Is Not
       Moot and Provides this Court with Ample Basis for
       Dismissing or Transferring the Current Case.   .   .   .   4

   B.  DSN's Claims Must Fail Regardless of Whether Its
       Amended Complaint Relies Entirely or Partially on
       the DASCA.   .   .   .   .   .   .   .   11

   C.  DSN's Argument that the DASCA has No Relevance
       is Disingenuous and Contrary to the Language
       Repeatedly Set forth in its Amended Complaint.   .   .   17

   D.  DSN has Failed to Assert Sufficient Facts Regardless
       of Whether its Amended Complaint Relies in Whole
       or in Part on the DASCA.   .   .   .   .   .   19

   E.  DSN Fails to Provide this Court with Any Basis to
       "Preserve" its Claim for False Designation of Origin.   .   19

   F.  DSN's Not Only Failed to State a Claim Relating to
       "Abandonment," it Did Not Even Try to State a
       Claim Relating to "Abandonment."   .   .   .   21

   G.  DSN's Use of Paragraphs 24 through 26 and its
       Related Exhibits Is Absurd and Unnecessary.   .   .   21

   H.  The Interests of Justice and Factors to Be Considered
       by this Court Mandate that, if this Court does not
       Dismiss DSN's Claims, the Current Case Must Be

Transferred.     .     .     .     .     .     .     .     23

CONCLUSION.     .     .     .     .     .     .     .     25

REQUEST FOR ORAL ARGUMENT     .     .     .     .     .

# TABLE OF AUTHORITIES

**Statutes**

28 U.S.C. § 1404(a) .         .         .         .         .         .         .         .         9, 23, 24

O.C.G.A. §10-1-372(a)         .         .         .         .         .         .         .         24

O.C.G.A. § 16-14-4 .         .         .         .         .         .         .         .         24

**Cases**

*909 Corp. v. Village of Bolingbrook Police Pension Fund,*
     741 F.Supp. 1290 (S.D.Tex. 1990)         .         .         .         .         6, 9

*Bank of America v. Berringer Harvard Lake Tahoe,*
     2013 WL 2627085 (N.D.Tex. 2013)         .         .         .         .         8

*Bell Atlantic Corp. v. Twombly,*
     550 U.S. 544 (2007) .         .         .         .         .         .         .         3, 13

*Chapa v. Mitchell,*
     2005 WL 2978396 (N.D.Tex. 2005)         .         .         .         .         5

*Collins v. Morgan Stanley Dean Witter,*
     224 F.3d 496 (5th Cir. 2000)         .         .         .         .         .         2, 13

*Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.,*
     208 F.Supp.2d 719 (S.D.Tex. 2002)         .         .         .         .         2, 16

*Dewan v. M-I, L.L.C.,*
     2014 WL 2981362 (S.D.Tex. 2014)         .         .         .         .         6

*Doubletree Partners, L.P. v. Land America American Title Co.,*
     2008 WL 5119599 (N.D.Tex. 2008)         .         .         .         .         23

*Genentech, Inc. v. Eli Lilly & Co.,*
     998 F.2d 93 (Fed.Cir.1993) .         .         .         .         .         9

*Hi-Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, LLC,*
     1:15-cv-03393-MHC, (N.D.Ga. 2015)         .         .         .         .         2

*In re Enron Corporation Securities, Derivative & "ERISA" Litigation*,
  2008 WL 4166172 (S.D.Tex.2008) .  .  .  .  8

*In re Radmax, Ltd.*,
  720 F.3d 285 (5th Cir. 2013) .  .  .  .  24

*IQ Prods. Co. v. Pennzoil Prods. Co.*,
  305 F.3d 368 (5th Cir. 2002) .  .  .  .  12

*KCCR, Inc. v. Brunner*,
  2010 WL 4236868 (S.D.Tex. 2010) .  .  .  6

*Kinetic Concepts, Inc. v. Connetics Corp.*,
  No. Civ. A. SA–04–CA–0237–XR, 2004 WL 2026812
  (W.D.Tex. Sept. 8, 2004) .  .  .  .  8

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*,
  113 S.Ct. 1160 (U.S.Tex. 1993) .  .  .  .  3, 13

*Mugworld, Inc. v. G.G. Marck & Associates, Inc.*,
  563 F.Supp.2d 659 (E.D.Tex. 2007) .  .  .  11

*Multi-Shot, LLC v. B & T Rentals, Inc.*,
  2010 WL 376373 (S.D.Tex. 2010) .  .  .  8

*New Orleans Public Serv. Inc. v. Majoue*,
  802 F.2d 166 (5th Cir.1986) .  .  .  9

*PAJ, Inc. v. Yurman Design, Inc.*,
  1999 WL 68651 (N.D.Tex. 1999) .  .  .  9

*People's Choice Home Loan, Inc. v. Mora*,
  2007 WL 708872 (N.D.Tex. 2007) .  .  .  22

*Polly America, L.P. v. Stego Indus., LLC*,
  694 F.Supp.2d 600 (N.D.Tex. 2010) .  .  .  8

*Serco Services Co. v. Kelley Co., Inc.*,
  1994 WL 715913 (N.D.Tex. 1994) .  .  .  5

*Service Corp. Intern. v. Loewen Group Inc.*,
  1996 WL 756808 (S.D.Tex. 1996) .  .  .  6

*Sherwin-Williams Co. v. Holmes County*,
    343 F.3d 383 (5th Cir. 2003) . . . . . . 8

*Tape & Technologies, Inc. v. Davlyn Manufacturing Co., Inc.*,
    2005 U.S. Dist. LEXIS 8291 (W.D.Tex. May 6, 2005) . . 8

*Texas Employers' Ins. Ass'n v. Jackson*,
    862 F.2d 491 (5th Cir. 1988) . . . . . . 7

*University System, Inc. v. American University*,
    858 F.Supp.2d 705 (N.D.Tex. 2012) . . . . . 7

*U.S. v. Planned Parenthood of Houston and Southeast Texas, Inc.*,
    2013 WL 9583076 (S.D.Tex. 2013) . . . . . 10

*York Group, Inc. v. Horizon Casket Group, Inc.*,
    459 F.Supp.2d 567 (S.D.Tex. 2006) . . . . . 12

## **Rules**

Fed. R. Civ. P. 11(b) . . . . . . . . 14

Fed. R. Civ. P. 12(b) . . . . . . . . 9

Fed. R. Evid. 403 . . . . . . . . . 22

Fed. R. Evid. 404(a)(1) . . . . . . . . 22

Fed. R. Evid. 404(b)(1) . . . . . . . . 22

COMES NOW, Hi-Tech Pharmaceuticals, Inc., Defendant in the above-styled action and hereby submits its Reply in Support of its Motion to Dismiss Plaintiff's First Amended Complaint or, in the Alternative, Motion to Strike and Transfer Venue, respectfully showing this Court as follows:

## SUMMARY OF THE ARGUMENT

The response brief of Dynamic Sports Nutrition, LLC ("DSN") does nothing but emphasize the insufficient and inappropriate nature of both its filing and Texas and the contents of its claims against Hi-Tech. Indeed, DSN did not even bother to address many of Hi-Tech's arguments or the law cited therein. Instead of doing so, DSN proffers misleading and disingenuous characterizations of the transfer order from the Northern District of Georgia, the contents of its Amended Complaint, and the law.

A proper review of these documents and law reveals that this Court properly dismisses or transfers cases such as this one, where the plaintiff has engaged in bad faith procedural fencing and it is in the interests of justice. These sources also reveal that DSN did not provide Hi-Tech with Rule 8 "notice" of any claims aside from those relating to supposed violations of the wholly inapplicable Designer Anabolic Steroid Control Act of 2014. Moreover, the inadequate notice aside, DSN's claims relating to trademark abandonment and false designation of origin represent its misunderstanding or intentional disregard for these doctrines and are entirely out of place. Indeed, instead of making efforts to state a coherent claim, DSN's Amended Complaint is nothing but a quick "copy and paste" job from Hi-Tech's website, which improperly devotes several paragraphs, and over

a third of its exhibits, to entirely unrelated and highly prejudicial material. Under these circumstances, DSN's claims simply cannot survive as pleaded or filed.[1]

**NAUTRE AND STAGE OF PROCEEDING**

To avoid redundancy, Hi-Tech incorporates its section regarding the "Nature of Stage of the Proceeding" from its Motion to Dismiss the Amended Complaint, Doc. 11, pp. 8-9, attached hereto as "Exhibit A," as if fully set forth herein.

**STATEMENT OF ISSUES AND RELATED AUTHORITIES**

Also to avoid redundancy, Hi-Tech incorporates its section regarding the "Statement of the Issues and Related Authorities" from its Motion to Dismiss the Amended Complaint, Doc. 11, pp. 6-8, as if fully set forth herein. However, to the extent this Court may find that DSN's claims are not solely based upon DASCA violations, the Court should address the following issue:

- **Whether DSN has met the pleading requirements of Fed. R. Civ. P. 8 ("Rule 8")**

"A plaintiff must plead specific facts, not mere conclusory allegations or unwarranted deductions of fact, in order to avoid dismissal for failure to state a claim." *Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.*, 208 F.Supp.2d 719, 726 (S.D.Tex. 2002) citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498

---

[1] Adding insult to injury, in addition to DSN's disingenuous race to the courthouse, its assertion of claims with no known factual or legal basis, its repeated mischaracterization of facts and law to the courts, and its outrageous injection of unrelated proceedings, DSN has recently extended its spirit of bad faith even further by filing a motion for attorney fees against Hi-Tech in Atlanta in light of the transfer of its case. *See Hi-Tech Pharmaceuticals, Inc. v. Dynamic Sports Nutrition, LLC, et al.*, Northern District of Georgia, 1:15-cv-03393-MHC, Doc. 33 (November 30, 2015).

2

(5th Cir. 2000); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007) (A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face.")  A plaintiff's complaint must also provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 113 S.Ct. 1160, 1163 (U.S.Tex. 1993).

## RE: FACTUAL BACKGROUND

The "Factual Background" DSN incorporates into its response is audacious and misleading.  Indeed, DSN's attempt to characterize Hi-Tech's litigation strategy as reactive to its own is entirely incorrect.  Review of an un-distorted timeline of events reveals the opposite is true:

| | |
|---|---|
| 09/11/12 | Jared Wheat informs Clapp that Hi-Tech intends file suit for trademark infringement, and sends Clapp a cease and desist/demand letter and gives a one-week deadline. <br> Doc. 8-1, p. 3. |
| 09/12/15 (the next day) | DSN files a declaratory judgment action in the Southern District of Texas for Non-Infringement and Abandonment while Clapp attempts to placate Mr. Wheat and makes no mention of the action filed by DSN.  Doc. 1. |
| 09/15/15 | Hi-Tech is served with the Texas suit.  Doc. 9. |
| 09/28/15 | Hi-Tech files suit against DSN and Clapp in the Northern District of Georgia for trademark infringement, unfair competition, and false advertising-related causes of action. Doc. 8-2. |
| 10/02/15 | DSN is served with Hi-Tech's suit. Doc. 11-1. |
| 10/02/15 (the same day DSN is served) | DSN files its First Amended Complaint in the Southern District of Texas, which includes unfair competition and false advertising-related causes of action directly comparable to those Hi-Tech filed against it.   DSN does not serve or otherwise notify Hi-Tech of this filing.  Doc. 5. |
| 10/06/15 | Hi-Tech files a Motion to Dismiss Plaintiff's Original Complaint or, In the Alternative, Transfer Venue, which Hi-Tech prepared before learning of DSN's still un-served First Amended Complaint.  In its Motion to Dismiss, Hi-Tech argues the "compelling circumstance" exception to the first-filed rule. Doc. 8. |

| 10/16/15 | DSN and Clapp file a Motion to Dismiss or, In the Alternative, Transfer Venue in the Northern District of Georgia, arguing application of the first filed rule and ignoring the "compelling circumstances" previously argued by Hi-Tech.  DSN and Clapp attach a copy of their First Amended Complaint as an Exhibit, representing the first "service" of the First Amended Complaint upon Hi-Tech.  Doc. 10-3. |
| 10/30/15 | Hi-Tech files its Motion to Dismiss Plaintiff's First Amended Complaint in the Southern District of Texas.  Doc. 11. |

Hi-Tech wishes to provide clarity in this regard, as these circumstances illustrate the disingenuous and bad faith nature of DSN's filings in Texas.  Indeed, DSN filed the Texas action within 24 hours of threatened litigation specifically so it could abuse the first-filed rule.  It is such "compelling circumstances" that warrant an exception to the first-to-file rule and the dismissal or transfer of the Texas case.

## ARGUMENT AND CITATION OF AUTHORITY

### I.  The "Compelling Circumstances" Exception Is Not Moot and Provides this Court with Ample Basis for Dismissing or Transferring the Current Case.

In transferring Hi-Tech's Northern District of Georgia case to this Court, Judge Cohen found that:

> [T]he United States District Court for the Southern District of Texas [as the court of first filing] is the appropriate court to decide whether the Georgia action should be allowed to proceed or be consolidated with the Texas Lawsuit and, ultimately, whether the Southern District of Texas or the Northern District of Georgia is the appropriate venue to resolve this dispute.

Doc. 15-4, p. 4.  Thus, the Northern District of Georgia simply transferred the case to this Court in order for this Court to decide whether the cases should proceed in Texas under the "first-to-file" rule or whether the "compelling circumstance" exception mandates their transfer back to Georgia.  *See generally* Doc 15-4.  The Northern District of Georgia plainly did *not* find that Texas is the proper venue for the current suits.  *Id*.

4

DSN, however, in an unbelievably misleading fashion, tells this Court that Hi-Tech's "compelling circumstances" argument is "moot" because "[t]he transfer of the second filed case to this District effectively precludes the Court from having to even consider the arguments Hi-Tech raises regarding the first-to-file rule." Doc. 15, p. 8. DSN then goes even further by disingenuously telling this Court that the Northern District of Georgia "has already concluded that this case is properly filed in [Texas] as opposed to the Northern District of Georgia." *Id.*, p. 23. As is evident from the Northern District of Georgia's Order, Judge Cohen made no such findings, and the parties' dispute over application of the "first-to-file" rule and the "compelling circumstance" exception is still very much at issue.

In its prior arguments, which DSN incorporates into its response, DSN attempts to distinguish itself from the plaintiff in *Chapa v. Mitchell*, 2005 WL 2978396 (N.D.Tex. 2005) on the grounds that it did not request extensions of the deadline in Hi-Tech's cease and desist letter so that it could file suit, as did the plaintiff in that case. Doc. 10, pp. 10-11. DSN, however, engaged in the very same type of bad faith and misleading conduct: Precisely as the plaintiff in *Chapa* misleadingly "played nice" with the defendant while covertly filing a declaratory judgment action, Mr. Clapp repeatedly attempted to placate Mr. Wheat via e-mail, while covertly filing a declaratory judgment action. Indeed, DSN "raced to the courthouse," retaining counsel and filing suit within just 24 hours of Hi-Tech's threatened litigation. This type of bad faith forum shopping is precisely the type of behavior the "compelling circumstances" exception seeks to preempt. *Serco Services Co. v. Kelley Co., Inc.*, 1994 WL 715913 (N.D.Tex. 1994) (dismissing the plaintiff's suit where

the plaintiff had received a cease and desist letter and represented that it wished to reach an "amicable solution" while discreetly filing a declaratory judgment action) *compare* Doc. 9-1, p. 2 (e-mail from Mr. Clapp to Mr. Wheat inquiring as to an "amicable solution"); *see also KCCR, Inc. v. Brunner*, 2010 WL 4236868, at *4 (S.D.Tex. 2010); *909 Corp. v. Village of Bolingbrook Police Pension Fund*, 741 F.Supp. 1290, 1292-93 (S.D.Tex. 1990); *Service Corp. Intern. v. Loewen Group Inc*., 1996 WL 756808, at *3 (S.D.Tex. 1996) (noting that declaratory judgment actions brought in anticipation of a lawsuit should "generally be dismissed by the district court"); *Dewan v. M-I, L.L.C*., 2014 WL 2981362, at *4 (S.D.Tex. 2014) discussed by Hi-Tech in Doc. 9, pp. 11-13.  *See also* Doc. 11, pp. 14-15.[2]

While DSN has repeatedly argued that it did not have to "wait around" to see if Hi-Tech would file suit, this statement is, again, disingenuous. Doc. 10, pp. 13, 15; Doc. 15, p. 8.  As acknowledged by the Fifth Circuit:

> One of the main purposes of the Federal Declaratory Judgment Act (note 2, *supra*) was to provide a means to grant litigants judicial relief from legal uncertainty in situations that had not developed sufficiently to authorize traditional coercive relief. Litigants would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril; nor, if they had already acted, would they be forced to wait, for perhaps many years, until the statute of limitations expired, to know whether they had been subjected to some significant liability.

---

[2] Hi-Tech notes that the opinions primarily relied upon by DSN are from the Northern District of Texas, not this Court.  *See* Doc. 15, pp. 13-14.  As established by the Southern District of Texas cases cited by Hi-Tech, this Court has made its approach to the "compelling circumstances" exception clear – bad faith anticipatory suits are not a proper basis for application of the first-to-file rule.

*Texas Employers' Ins. Ass'n v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988).  DSN was not caught in such a dilemma.

As a result of Mr. Clapp's extensive efforts to ingratiate himself with Mr. Wheat, DSN had full knowledge of Hi-Tech's extensive enforcement efforts with respect to trademark infringers (efforts Mr. Clapp had assisted) and, therefore, knew that Hi-Tech would certainly file suit against DSN if DSN failed to cease and desist as requested.  *See* Doc. 9-2 (Exhibits 5-7 to *Verified Complaint*).  This is precisely why DSN raced to the courthouse within hours of the first threat of litigation.  The current case, therefore, is not an instance where a company was, or would have been, forced to live in fear of suit, never knowing if or when it was coming, such that it was compelled to file for some sort of certainty or closure.  DSN's attempts to suggest otherwise are entirely insincere – it was fully aware that there would have been no "waiting" on the part of DSN, which is precisely why DSN took the immediate and bad faith action that it did.

DSN's filing within hours of threatened litigation is in stark contrast to *American University System, Inc. v. American University*, 858 F.Supp.2d 705 (N.D.Tex. 2012), a case heavily relied upon by DSN.  In that case, over the course of approximately six or so months, the defendants sent the declaratory judgment plaintiff at least three cease and desist letters as well as a draft complaint for trademark infringement.  In that instance, the court found that the plaintiff was entitled to bring the declaratory judgment action rather than wait to see if the defendants made good on their threats.  *Id.*, at 711-12.

DSN does not deny its filing was an attempt to forum shop, and the cases cited by DSN for the proposition that bad faith forum shopping is a permissible practice also do not

call for a different conclusion.  For example, in *Sherwin-Williams Co. v. Holmes County*, 343 F.3d 383, 399-400 (5th Cir. 2003), the Fifth Circuit found that the plaintiff had not engaged in "impermissible forum shopping" or "impermissible procedural fencing" because it was simply seeking to avoid litigating multiple lawsuits in multiple courts as opposed to simply a change in forum for one law suit.  *Id*.  Additionally, in *Polly America, L.P. v. Stego Indus., LLC*, 694 F.Supp.2d 600, 610 (N.D.Tex. 2010), the court found that the suit had not been filed for an improper or abusive reason.  Lastly, in *Multi-Shot, LLC v. B & T Rentals, Inc*., 2010 WL 376373, at *6 (S.D.Tex. 2010), this Court found that the plaintiff had not engaged in a "race to the courthouse" as evidenced by the plaintiff's previous dismissal without prejudice and nonsuit.  In the present case, however, there has been impermissible forum shopping, impermissible procedural fencing, abusive of process, and a race to the courthouse.

Moreover, the Fifth Circuit and United States district courts in Texas "generally disallow the use of a declaratory judgment action to establish venue."  *Bank of America v. Berringer Harvard Lake Tahoe*, 2013 WL 2627085, at *3 (N.D.Tex. 2013) (noting, "it is the *court of first filing* that makes such a determination.") (internal citations omitted, emphasis original).  Indeed, Texas district courts have repeatedly recognized "a general policy that a party whose rights are apparently being infringed should have the privilege of electing where to enforce its rights."  *In re Enron Corporation Securities, Derivative & "ERISA" Litigation*, 2008 WL 4166172, at *15 (S.D.Tex. 2008) citing *Tape & Technologies, Inc. v. Davlyn Manufacturing Co., Inc.,* 2005 U.S. Dist. LEXIS 8291, *7 (W.D.Tex. May 6, 2005); *Kinetic Concepts, Inc. v. Connetics Corp.,* No. Civ. A. SA–04–

CA–0237–XR, 2004 WL 2026812, *3 (W.D.Tex. Sept. 8, 2004); and *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993) ("[A]n action for declaration of noninfringement of a trademark should give way to a later-filed suit for trademark infringement.")

The policy considerations behind this framework are clear. *See PAJ, Inc. v. Yurman Design, Inc.*, 1999 WL 68651, at *3 (N.D.Tex. 1999) ("A plaintiff's choice of forum should *only* be given protection where the plaintiff before the court is the proper plaintiff – *not a manufactured plaintiff through misapplication of a declaratory judgment*.") (emphasis added, internal citation omitted); *909 Corp. v. Village of Bolingbrook Police Pension Fund*, 741 F.Supp. 1290, 1293 (S.D.Tex. 1990) ("Anticipatory suits deprive a potential plaintiff of his choice of forum," and are "not a proper use of the declaratory judgment act as [they] provoke a disorderly race to the courthouse.") (internal punctuation and citation omitted); *New Orleans Public Serv. Inc. v. Majoue,* 802 F.2d 166, 168 (5th Cir. 1986) ("The wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum."

Moreover, while DSN argues that its Amended Complaint should not be dismissed or transferred because it contains more than simply declaratory judgment claims, this fact should not affect this Court's analysis. First, this Court has the discretion to dismiss or transfer the current case regardless of the nature of the claims. *See* F.R.C.P. 12(b); 28 U.S.C. § 1404(a). Second, the only reason this Court is addressing the "first-to-file" rule is because DSN raced to the courthouse with its Original Complaint, which contained *only* declaratory judgment claims – declaratory judgment claims *entirely unrelated* to the

Lanham Act claims subsequently added. Hi-Tech filed its Complaint in the Northern District of Georgia *before* DSN filed its Amended Complaint, rendering Hi-Tech's Complaint the "first filed" among the two currently-pending Complaints. Thus, DSN's argument that its case should not be dismissed in accordance with policy applicable to declaratory judgment claims is inconsistent with the fact that it is relying upon its initial declaratory judgment claims to establish venue. *Cf. U.S. v. Planned Parenthood of Houston and Southeast Texas, Inc.*, 2013 WL 9583076, at *4 (S.D.Tex. 2013) ("The Fifth Circuit has held that when evaluating subject matter jurisdiction in the context of the [False Claims Act's] first-to-file bar, the original complaint, rather than the amended complaint, must be considered.")

DSN's legally unsupported argument regarding Hi-Tech's standing and the date of assignment is also unavailing. The aforementioned policy and legal considerations remain. DSN's declaratory judgment action represents an action filed by a purported infringer, who is nothing more than a "manufactured plaintiff" who raced to the courthouse. Indeed, DSN raced to the courthouse within hours, such that neither Hi-Tech nor Mr. Wheat had time to assert any rights through the filing of a lawsuit, precisely as DSN intended.

Simply put, there is a difference between simply choosing a forum among potential forums and manipulating procedural rules, and people, to get one's forum of choice – DSN has clearly done the latter. The fact that DSN was in such a hurry shows exactly what they were trying to do, as does the insufficient and highly suspicious nature of its Amended Complaint, which was plainly calculated not only to retaliate against Hi-Tech's for its lawsuit, but also to improperly strengthen its hold on Texas as a potential venue. This

10

Court has repeatedly refused to permit such actions on the part of plaintiffs in the past, and it should again do so here.

### J. DSN's Claims Must Fail Regardless of Whether Its Amended Complaint Relies Entirely or Partially on the DASCA.

In its response brief, DSN argues that the DASCA is not the "sole basis" for its allegations that Hi-Tech's claims are false and misleading. *See* Doc. 15, pp. 14, 19. It is, however, the sole basis DSN sets forth in its Amended Complaint – a basis it asserts immediately preceding its list of over 40 allegedly false advertisements.[3] *Complaint*, ¶¶ 13. DSN's Amended Complaint also incorporates this sole (stated) basis into its single Lanham Act count. *Id.*, ¶¶ 32, 35. Indeed, DSN's Amended Complaint makes no attempt to assert, or even imply, a basis for any allegations of deception aside from those relating to the DASCA, and DSN's Amended Complaint does not allege that any of the advertisements in question are *not* violations of the DASCA, but rather false or misleading for other, unspecified reasons. *See generally Id.*

Under these circumstances, regardless of DSN's now claimed intent, the "notice" DSN's Amended Complaint provides to Hi-Tech is that that DSN is attempting to state Lanham Act claims premised upon alleged DASCA violations – a type of Lanham Act claim not permitted under the law.[4] *See Mugworld, Inc. v. G.G. Marck & Associates, Inc.*,

---

[3] For ease of reference, Hi-Tech refers to each of DSN's bulleted quotes of advertising language as "an advertisement."

[4] As a plaintiff cannot base a Lanham Act claim upon a statutory scheme that does not create a private cause of action, DSN's three and one-half pages of argument concerning the fact it titled its count "Unfair Competition and False and Misleading Advertising in Violation of Lanham Act" and supposedly pleaded Lanham Act elements is irrelevant. *See* Doc. 15, pp. 11-14.

563 F.Supp.2d 659, 666 (E.D.Tex. 2007) ("[A] court "should not allow a party under the guise of a Lanham Act claim to create a private right of action where none exists under the regulatory or statutory scheme."); *see also IQ Prods. Co. v. Pennzoil Prods. Co*., 305 F.3d 368, 374 (5th Cir. 2002); *York Group, Inc. v. Horizon Casket Group, Inc*., 459 F.Supp.2d 567, 579 (S.D.Tex. 2006); *see also* Doc. 11, pp. 9-11.

Notably, while admitting that at least some of its (unspecified) allegations relate to supposed DASCA violations, DSN's response brief makes no attempt to address either the *Mugworld*, *IQ Prods*., or *York* cases, or its lack of standing to classify Hi-Tech's products as "illegal anabolic steroids" under the DASCA. *See* Doc. 11, pp. 15-17. DSN also noticeably does not dispute Hi-Tech's detailed argument that, even if DSN could utilize the terms of the DASCA, which it cannot, the advertising at issue does not "suggest that consuming [Hi-Tech products] will promote muscle growth or other pharmacological effects similar to that of testosterone or steroids," such that a DASCA violation could exist. *See* Doc. 11*,* pp. 18-23; Doc. 5, ¶ 13. Thus, it is evident – apparently even to DSN – that any and all of DSN's claims premised upon alleged violations of the DASCA must fail as a matter of law, as must any and all claims based upon any allegation that Hi-Tech's advertisements otherwise "suggest that consuming [Hi-Tech products] will promote muscle growth or other pharmacological effects similar to that of testosterone or steroids." The advertisements simply make no such comparison, and this is undisputedly evident from their plain language.

The problem then becomes that even if DSN's Amended Complaint, despite its content and organization, alleges Lanham Act violations independent of the DASCA and

independent of any claim relating to improper comparisons to anabolic steroids, DSN's shotgun and confusing approach to pleading leaves the Amended Complaint falling short of Rule 8's notice requirements. While Hi-Tech acknowledges that Texas is different from many jurisdictions in that it does not require that false advertising claims under the Lanham Act be pleaded with the particularity required by Rule 9(b), "the plaintiff must [still] plead *specific facts, not mere conclusory allegations or unwarranted deductions of fact*, in order to avoid dismissal for failure to state a claim." *Decorative Center of Houston, L.P. v. Direct Response Publications, Inc*., 208 F.Supp.2d 719, 726 (S.D.Tex. 2002) (emphasis added) citing *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir. 2000); *see also Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547 (2007) (A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face.")

DSN, however, fails to meet these requirements, thereby denying Hi-Tech "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 113 S.Ct. 1160, 1163 (U.S.Tex. 1993). For instance, DSN gives no indication as to which of the over 40 advertisements are allegedly deceptive or unfair due to a claimed violation of the DASCA and/or improper comparisons; which of the over 40 advertisements are allegedly deceptive due to a claimed violation of the DASCA and/or improper comparisons *and* for other, unspecified reasons; or which of the over 40 advertising statements do not allegedly violate the DASCA or constitute an improper comparison, but are allegedly false for other, unspecified reasons. The fact that *not one* of the advertisements in question mentions an anabolic steroid or compares a Hi-Tech product to an anabolic steroid further compounds

the confusion over which, if not all, of the claims supposedly implicate the DASCA or otherwise constitute improper comparisons to anabolic steroids.

Also adding to the confusion over the grounds for DSN's claims is that while Hi-Tech references the over 40 "advertisements" in question, there are, in fact, many more than 40 alleged assertions of fact set forth in the Amended Complaint.[5] Most, if not all, of the advertisements quoted by DSN contain multiple and/or compound alleged assertions. Indeed, there are well over 100 or 150 alleged assertions of fact contained in the 43 advertisements pleaded.[6] A few of the many such advertisements relied upon by DSN state as follows:

- Unlike most low potency Tribulus products on the market, Bulasterone™ contains the highest standardized version of Bulgarian Tribulus terrestris extract available, which consists of 60% protodioscin, 70% furanostalsaponins, and 90% total saponins content, resulting from multiple extraction processes to ensure optimal potency;

- Additionally, Bulasterone™ incorporates 6-keto-diosgenin (25R spirostan-5adiol-6-one-3-one) undecanoate, 5-methyl-7-methoxyflavone, and also turkesterone, which is one of the primary active constituents in Rhaponticum carthamoides extract (RCE). Turkesterone has been used by elite Russian athletes since the early 1970s to enhance the anabolic activity of testosterone, specifically by supporting magnification of the translational phase of protein synthesis;

---

[5] Hi-Tech reserves the right to raise any and all defenses relating to any of the advertising language at issue constituting un-actionable "puffery." Hi-Tech assumes, for purposes of this brief, that the advertisements all represent assertions of fact given it is the motion to dismiss phase, and this is what DSN has pleaded.

[6] Given the sheer number of alleged factual assertions, the scientific nature of the language, and the fact that DSN filed the current claims the same day it was served with Hi-Tech's Northern District of Georgia lawsuit, Hi-Tech sincerely questions whether DSN or its counsel performed an inquiry, much less a "reasonable inquiry," into whether any of the hundred or more alleged factual statements cited are, in fact, false, such that they could possibly make the allegations to the best of their knowledge, information, and belief. *See* Fed. R. Civ. P. 11(b). Hi-Tech intends to address this fact outside of the Motion at bar.

- Without the contribution of these synergistic creatine ingredients, the phosphagen system quickly becomes bottlenecked during periods of intense muscular contraction, well before the potential contribution of creatine can be fully realized. Thus, the bodybuilder who wisely chooses Phosphagen™ over another typical creatine product will have the extra amount of muscle fuel available to complete the one additional rep required to pull the trigger for muscles to grow;

- Nitric oxide (NO) sports nutrition has become the largest sports nutrition product category. Yet, despite dozens of 'advancements' in NO supplementation, traditional NO sports nutrition still remains flawed for one fundamental reason. This flaw can easily be detected by simply inspecting the formulations in NO products across-the-board throughout the sports nutrition industry. The formulations in these products demonstrate a failure on the part of other supplement companies to understand and address the most efficacious means to serve L-arginine up on a platter for the production of NO, which is to incapacitate the arginase enzyme;

- Anavar® also contains efficacious dosages of several key anabolic compounds, including three of the most potent anabolic compounds ever researched by Russian scientist V.N. Syrov and his team of colleagues, who are responsible for many of the greatest advances in herbal-based nutraceutical sports nutrition. These interesting compounds are 25R, spirostan-5a-diol-6-one-3-one (ecdybolin) (which demonstrates a 33:1 anabolic to androgenic ratio), the 6-keto derivative of diosgenin (6-keto-diosgenin), and 20- hydroxyecdysone decanoate isolated from Rhaponticum carthamoides extract; and

- Somatomax® Ultra Concentrate has all the same components as the original formula but with the addition of ß-phenyl-?-Aminobutyric acid Ethyl Ester Hcl and Gamma-Amino-beta-hydroxybutyric acid (GABOB). Phenibut (betaphenyl-gamma-aminobutyric acid) was discovered in Russia during the 1960's. It is a derivative of the neurotransmitter GABA and is capable of passing the blood brain barrier.

These examples are just six of the over 40 advertisements relied upon by DSN in its

Amended Complaint.

DSN, however, despite the sheer number of advertisements quoted, and despite the

highly compound nature of the advertisements quoted, provides absolutely no indication

of which part or part(s) of the advertisements are supposedly false or misleading.  DSN

also fails to set forth any information concerning what is allegedly false about the advertisements or how consumers are supposedly deceived. As a result, DSN has done nothing more than hastily claim that "all or most of Hi-Tech's advertising for its muscle and strength products is false (for unspecified and unnumbered reasons)," with no indication of what language supposedly influenced consumers or how. Thus, if DSN is not simply alleging that the advertising in question is deceptive and unfair due to alleged violations of the DASCA, but rather false for other unspecified reasons, Hi-Tech and this Court are left with little to no idea of what exactly DSN is claiming.

Indeed, despite its representation to the Court otherwise,[7] DSN also does not plead which of Hi-Tech's over 100 alleged assertions of fact are "material" (*i.e.* likely to influence purchasing decisions), or that any of the over 100 alleged assertions are likely to deceive a "substantial segment of the intended audience" – both of which are required to state a claim under the Lanham Act. *Decorative Center of Houston, L.P.*, 208 F.Supp.2d at 727. DSN's claims must fail for these reasons alone.

While DSN, in a conclusory manner, argues that its "allegations are sufficiently clear to state a claim against Hi-Tech, as this Court essentially concluded in *Decorative Center of Houston*"[8], this Court did *not* make any finding justifying DSN's ridiculous pleading. In *Decorative Center of Houston*, this Court evaluated, *inter alia*, the plaintiff's Lanham Act claim based upon the defendants' unspecified oral statements to various

---

[7] Doc. 15, pp. 17-18.

[8] This is the only case cited by DSN in support of this proposition.

commercial building tenants – statements, which allegedly mislead the tenants into believing that they were advertising in plaintiff's, not defendant's, building directory. This Court simply found that given the number of tenants, the nature of the oral statements, and the defendant's motion to dismiss, it was premature to make a conclusive determination about whether the defendant had stated a Lanham Act claim based upon the unspecified oral statements. *Id*. at 727.

Thus, in *Decorative Center of Houston*, while the plaintiff did not provide the specific contents of the oral statements, as DSN, here, denies Hi-Tech specificity with the over-inclusion of written statements, the defendant in that case at least had notice of specifically how it was allegedly misleading consumers (*i.e.* deceiving them as to which directory was at issue). In the present case, however, DSN provides no specificity, except for the purported DASCA violations, as to what it is about Hi-Tech's muscle and strength advertising that is supposedly deceptive and/or unfair. DSN, therefore, by failing to state exactly what claims are at issue, how they are allegedly false, or how consumers are allegedly deceived, fails to provide notice of the grounds for its claims and fails to nudge the claims into the realm of plausibility.

**K. DSN's Argument that the DASCA has No Relevance is Disingenuous and Contrary to the Language Repeatedly Set forth in its Amended Complaint.**

DSN argues that the question of whether DASCA applies is irrelevant because it did "not assert a cause of action for violation of the DASCA." Doc. 15, p. 15. DSN has, however, improperly asserted a cause of action *based upon* alleged violations of the DASCA. For instance, while DSN now downplays its reliance upon the DASCA and

17

argues that "DSN's Claims Are Not Based Upon Alleged Violations of the DASCA,"[9]

according to DSN's Amended Complaint:

> **[I]n violation of the Designer Anabolic Steroid Control Act of 2014, HTPI has been marketing or otherwise promoting some of its products to suggest that consuming them will promote muscle growth or other pharmacological effects similar to that of testosterone or steroids, and then selling such products to the public.** According to the Designer Anabolic Steroid Control Act of 2014, if a substance is "marketed or otherwise promoted in any manner that suggesting that consuming it will promote muscle growth or any other pharmacological effect similar to testosterone," then it shall be considered an illegal anabolic steroid. Public Law 113-260, Section 2(a)(C)(i)(II) (codified at 21 U.S.C. § 802(41)(C)(i)(II*)). By marketing such products and selling them to the public in violation of the DASCA, HTPI is violating federal law and proximately harming DSN's commercial interests and the sales of DSN's own products, which are sold in full compliance with the DASCA*, in that HTPI's deception of consumers, upon information and belief, causes consumers to withhold trade from DSN in favor of HTPI's products;
> …
>
> Defendant's marketing or promoting of its products in any manner suggesting that consuming them will promote muscle growth or any other pharmological effect similar to that of testosterone means that **such products are considered anabolic steroids pursuant to the Designer Anabolic Steroid Control Act of 2014**. Defendant's marketing and **selling of such products violates the Designer Anabolic Steroid Control Act of 2014**, and further constitutes unfair competition.

Doc. 5, ¶¶ 13, 35 (emphasis added).[10]  Under these circumstances, the relationship between

DSN's claims and the DASCA cannot be ignored, and this relationship is plainly not

"mythical" as suggested by DSN.  *See* Doc 15, p. 15.

Moreover, the decision over whether the DASCA could apply in the present case

---

[9] Doc. 15, p. 14.

[10] As previously stated, it is DSN, not Hi-Tech, that is advertising its products as being the same as or equivalent to anabolic steroids, which is a basis for Hi-Tech's claims against it, including Georgia RICO, filed in Atlanta. *See generally* Doc. 9-2; Doc. 11, pp. 9-10 (DSN advertising "products that mimic anabolic steroids," products that "provide a similar effect to anabolic steroids," and "steroids without a prescription.")

does not involve "contests about the facts or merits of a case" as argued by DSN. *Id*.
Choosing applicable law is an inherent necessity for courts when deciding a motion to
dismiss – it is not a decision on the merits. *Cf. De Oliveira v. Delta Marine Drilling Co*.,
707 F.2d 843, 845 (5th Cir. 1983) ("[T]he choice of the applicable law is itself a question
of law …")  DSN, however, presumably makes its argument to the contrary in attempt to
compensate for the fact that it undisputedly does not allege facts sufficient to implicate the
DASCA. Specifically, DSN does not allege that Hi-Tech's dietary supplement products
fall within the "drugs or hormonal substances" contemplated by 21 U.S.C. § 802(41)(C)(i),
which is a requirement for the application of 21 U.S.C. § 802(41)(C)(i)(II), the subsection
relied upon by DSN. DSN, rather, conveniently ignored and omitted this limiting language
of the DASCA when drafting its Amended Complaint. *See* Doc. 11, pp. 17-18.

**L.  DSN has Failed to Assert Sufficient Facts Regardless of Whether its Amended Complaint Relies in Whole or in Part on the DASCA.**

DSN, in a conclusory fashion, argues that it has pleaded sufficient facts to support
its claims. In doing so, DSN acknowledges that dismissals of actions are appropriate where
"the plaintiff has not provided fair notice of its claim." Doc. 15, p. 16. As set forth in
Section B herein, however, DSN has not provided fair notice of its claims in accordance
with Rule 8 – regardless of whether or not its claims are based in part upon the DASCA.
Under these circumstances, and under the standard acknowledged by DSN, the Amended
Complaint must be dismissed.

**M.  DSN Fails to Provide this Court with Any Basis to "Preserve" its Claim for False Designation of Origin.**

Hi-Tech understands that DSN has claimed "false designation of origin" as one

basis for its Lanham Act count, and Hi-Tech's Motion to Dismiss does not argue otherwise. Hi-Tech's Motion to Dismiss, rather, argues that in the event this Court elects not to dismiss DSN's claims in their entirety, it should, at a minimum, dismiss any claim based solely upon alleged false designations of origin. Doc. 11, pp. 23-25. Thus, DSN's argument in this regard is confused.

Moreover, in its response, DSN entirely ignores the clear law previously cited by Hi-Tech, which establishes that false designation of origin claims relate to the alleged misidentification of the producer or geographic origin of the goods. *Id.* Instead, it misleadingly argues that "the elements required to prove both a false designation of origin and false advertising are the same." Doc. 15, p. 18. This Court, however, has previously outlined the difference, in detail, between false designation of origin claims under 15 U.S.C. § 1125(a)(1)(B), and false advertising claims under 15 U.S.C. § 1125(a)(1)(A). *See Decorative Center of Houston, L.P.*, 208 F.Supp.2d at 727-31. While both claims do involve five, almost identical elements, the first elements of the two claims are materially different: A false designation of origin claim first requires that "the defendant made a misleading fact ***about its product's origin***," while a false advertising claim first requires that "the defendant made a false statement of fact about its product in a commercial advertisement." *Id.* at 727 & 730 (emphasis added). Thus, DSN's argument that it has pleaded a false designation of origin claim because it has pleaded a false advertising claim (which it has not) is not only disingenuous, but patently incorrect. As DSN's Amended Complaint undisputedly fails to make any allegation of fact relating to a misleading statement about Hi-Tech products' *origin*, any Lanham Act claim based upon an alleged

false designation of origin must be dismissed.

## N. DSN's Not Only Failed to State a Claim Relating to "Abandonment," it Did Not Even Try to State a Claim Relating to "Abandonment."

Once again, DSN conveniently fails to address the argument and law cited in Hi-Tech's Motion to Dismiss.  Doc. 11, pp. 25-27.  Simply put, under the Lanham Act, trademark "abandonment" occurs where its use has been discontinued with the intent not to resume such use, when it is not used for three consecutive years, or when the owner's conduct causes it to lose significance. 15 U.S.C. § 1127.  DSN, however, has made not one single allegation relating to this definition –  a fact DSN does not dispute.  Under these circumstances, DSN's claim for declaratory judgment on abandonment cannot stand.

## O. DSN's Use of Paragraphs 24 through 26 and its Related Exhibits Is Absurd and Unnecessary.

DSN's inclusion of paragraphs 24, 25, and 26 in its Amended Complaint is absurd and unnecessary.  It plainly included these paragraphs for no other reason than to prejudice Hi-Tech before this Court, and any eventual jury, as is evident from both the language of the Amended Complaint and its response in which it gratuitously repeats the paragraphs' contents for the Court's review.  Doc. 15, p. 19.  DSN is simply attempting to inject "facts" and evidence into the case, which would not otherwise be admissible, in the hopes that this Court will be distracted from the gross insufficiency its claims.

As made clear by the Federal Rules of Evidence, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait" and "evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion

the person acted in accordance with the character." Fed. R. Evid. 404(a)(1) & (b)(1); *see also* Fed. R. Evid. 403 (providing for the exclusion of evidence based upon its misleading nature and unfair prejudice). This is, however, exactly what DSN is attempting to do with its inclusion of the subject paragraphs and six entirely inappropriate exhibits.[11]

DSN does not deny that the previous litigation does not involve the subject products, the subject type of products, or the subject advertisements. DSN also does not deny that its paragraphs 25 and 26 relate to *entirely unrelated and pending litigation*, or that, with respect to paragraph 24, "[a]s a general matter, references to criminal indictments and/or criminal pleas that do not serve to prove a necessary element of the civil causes of action or that do not arise out of the same series of events as the civil action should be stricken from the pleadings." *People's Choice Home Loan, Inc. v. Mora*, 2007 WL 708872, at *2 (N.D.Tex. 2007).

DSN also noticeably fails to explain how two *ongoing* cases or how the sale of

---

[11] Indeed, improper character evidence is DSN's entire "case." Despite the fact that the allegations in the Amended Complaint are supposedly true to the best of DSN's knowledge, information, and belief, realistically speaking, DSN has no knowledge, information, or belief as to whether Hi-Tech's hundreds of alleged factual statements are true *except* any knowledge, information, and belief wrongly based upon the improper character evidence. This is, of course, not to mention that the evidence indicates that to the best of DSN's knowledge, information, and belief, all of Hi-Tech's advertising is entirely legitimate, as Brian Clapp, DSN's President and CEO, had previously reached out to Mr. Wheat regarding a joint venture involving the same type of muscle and strength products currently at issue. *See* Doc. 9-2 (Exhibit 6 to *Verified Complaint*, p. 1); *see also Id.* (Exhibit 6 to *Verified Complaint*, p. 2) (May 17, 2014 e-mail from Mr. Clapp to Mr. Wheat stating, "I have been impressed by you and your company for many years."). Inquiring into a joint venture with Hi-Tech, similar to Mr. Clapp decision to reach out and ingratiate himself with Mr. Wheat, is hardly the conduct of a man and company that believe Hi-Tech is falsely advertising and unfairly competing to DSN's detriment as it now claims.

generic drugs could possibly constitute "exceptional circumstances" in this entirely unrelated case, thereby justifying an award of attorney fees or treble damages. DSN simply wants the information before this Court to say, "Hi-Tech was bad, and it is bad now." This is character evidence, and this is prejudicial. The highly prejudicial nature of paragraphs and exhibits is apparent from their face and require no explanation, precisely as DSN intended. This is, of course, not to mention the fact that, admissibility aside, DSN has offered nothing to support its position that a complaint is the proper place for such "facts" and "evidence."

**P.** **The Interests of Justice and Factors to Be Considered by this Court Mandate that, if this Court does not Dismiss DSN's Claims, the Current Case Must Be Transferred.**

As set forth by Hi-Tech in its original Motion to Dismiss, pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, *in the interest of justice*, a district court may transfer any civil action to any other district or division where it might have been brought." *See* Doc. 9, p. 29 (emphasis added). Indeed, "it is well established that the interest of justice is a factor to be considered on its own, and is an *extremely important* one." *Doubletree Partners, L.P. v. Land America American Title Co*., 2008 WL 5119599, at *3 (N.D.Tex. 2008) (emphasis added). *See Id*., p. 14. As set forth herein and in Hi-Tech's original Motion to Dismiss, to permit DSN to have its choice of venue despite its bad faith conduct would be entirely contrary to the interests of justice. Moreover, if a plaintiff can obtain his venue of choice as the result of misleading comments to the defendant and covert "race to the courthouse," these circumstances would more than chill potential defendant's efforts to reach resolution before resorting to litigation.

The fact that the interests of justice would be served by a transfer to Georgia is also illustrated though application of the factors cited by DSN in its response.  As set forth by DSN in its response, courts in the Fifth Circuit looks to eight factors when evaluating a motion to transfer under 28 U.S.C. § 1404(a) including,

> (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious and inexpensive; (5) the administrative difficulties flowing from court congestion; (6) the local interest in having localized interests decided at home; (7) the familiarity of the forum with the law that will govern the case; and (8) the avoidance of unnecessary  problems of conflict of laws [or in] the application of foreign law." *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013) . . .

Doc. 15, p. 26.  To the extent DSN's claims could possibly survive dismissal, the first four factors weigh in favor of Hi-Tech, as the bulk of the claims in the cases relate to Hi-Tech's trademark and its 100 some-odd alleged factual assertions.

The last two factors also weigh in Hi-Tech's favor, as if the cases were to remain in Texas, as this Court could be faced with applying Georgia law due to Hi-Tech's claims against DSN under Georgia's Deceptive Trade Practices Act, O.C.G.A. §10-1-372(a), Georgia common law unfair competition, and Georgia's civil RICO statute, O.C.G.A. § 16-14-4 – *claims that do not overlap, much less substantially overlap, with any claims filed or issues raised by DSN in this Court.  See generally* Doc.  9-2.  Worse, in the event the cases remain in Texas and Texas law is applied, Hi-Tech could potentially lose its causes of action, which would be a highly unjust result in light of DSN's bad faith conduct to secure Texas as a venue.  There would be no such dilemma in the Northern District of Georgia, however, as DSN's claims involve only federal trademark and Lanham Act law.

## CONCLUSION

As revealed by DSN's failure to address many of the arguments in Hi-Tech's Motions to Dismiss, DSN has no legitimate or viable defense with respect to either the bad faith nature of its actions or the insufficient nature of its Amended Complaint – a Complaint DSN did not even bother to serve upon Hi-Tech. Indeed, it is apparent from DSN's Amended Complaint and its response that DSN filed its claims with no idea of how the DASCA is applied, no idea what a claim for false designation of origin is, and no idea of what trademark "abandonment" is. Or, DSN was aware of the improper and insufficient nature of its claims and filed them anyway. DSN also apparently filed claims based upon all but the totality of Hi-Tech's alleged advertising, despite the fact that the advertising undisputedly does *not* include any comparison to anabolic steroids, and despite the fact that DSN is apparently unable to allege how the multitude of alleged advertising claims could be otherwise false. Under these circumstances, DSN's claims simply cannot withstand dismissal, especially in light of the fact that their confusing and insufficient nature leaves Hi-Tech without the notice it is entitled to under Rule 8.

WHEREFORE, for the aforementioned reasons, Hi-Tech Pharmaceuticals, Inc. respectfully requests that this Court dismiss DSN's claims in their entirety or, in the alternative dismiss selected claims as set forth herein, strike paragraphs 24 though 26 of DSN's Amended Complaint with exhibits 10 though 15, and transfer any surviving claims to the Northern District of Georgia.

## REQUEST FOR ORAL ARGUMENT

DSN'S variety of improper allegations and legal arguments make this a case particularly suited for oral argument. As counsel for Hi-Tech, we contend this litigation is a classic example of abusive litigation, which, if necessary, may be made more clear through oral argument. Indeed, in oral argument, DSN will be in a position where it will be forced to answer for and explain its abusive conduct in a straight-forward manner, such that it will likely be required to abandon much of what it has alleged in its Amended Complaint. If, for no other reason than the supervision of the attorneys who practice before the Court, oral argument should be granted. It is our belief that with oral argument the clear issues presented in Hi-Tech's Motion to Dismiss and this Reply will become crystal clear, as will the proper course for the resolution of the Motion.

Respectfully submitted this 4th day of December, 2015.

/s/ Kent A. Schaffer
Kent A. Schaffer
Federal ID No. 3603
TBA No. 17724300
712 Main Street, Suite 2400
Houston, Texas 77002
Telephone: (713) 228-8500
Facsimile: (713) 228-0034
kentschaffer@gmail.com

Arthur W. Leach
Ga. Bar No. 442025
(motion for admission *pro hac vice* pending)
The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005

Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com

Counsel for Hi-Tech Pharmaceuticals, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

/s/ Kent A. Schaffer
KENT A. SCHAFFER

# EXHIBIT B



**Forwarding Email to Counsel Redacted**

-----Original Message-----
From: Brian Clapp <█████████████>
To: █████████████ >
Sent: Sun, Sep 13, 2015 2:56 pm
Subject: Re: is this you????? WTF

I am afraid that my email to you was not received the way I intended.  All I was trying to relay to you were reasons to why I felt strongly about our disagreement.  It was not meant to come across aggressively or offensive.  I have already offered to change the name to something else to accommodate you.  If I wanted I was doing something to purposely wrong you, I would not have been trying to help you as much as I have over the last 3 years or so... I would have been doing my best to avoid you.  Like I said, I've been selling the same product, the same way for 10 years and have never heard one thing about this issue from you, so I had no idea it even was an issue.  Besides changing my product name, how else can I accommodate you Jared?  I really am trying to find a solution.

On Sun, Sep 13, 2015 at 1:23 PM, <█████████████ > wrote:
> I do not know as below you stated you seemed to be right and we were just on the road to litigation and  "I KNOW TRADEMARK LAW VERY WELL" and " I have been in many and am very aggressive as you said you were" and that " I've tried to be very helpful to you and was very surprised by your email to me, which I found to be fairly disrespectful" ......with that said along with the statement in 1-3 below I do not see any resolution but to litigate to see who is right.

> 1) I have looked online and spoken with distributors and have seen no evidence that you advertised or sold your product before mine.

> 2) I HONESTLY dont think that I am in the wrong here man and I am no stranger to lawsuits.

> 3)  If you feel like you are right and I feel like I am right, you will have to guys beating each other senseless due to our strong convictions.

> With those points I do not see an amicable resolution in site. I wish you well with your Legal Anabolics line, but on this issue we just agree to disagree apparently.





-----Original Message-----
From: Brian Clapp ███████████████████
To ███████████████████ >
Sent: Sat, Sep 12, 2015 9:20 pm
Subject: Re: is this you????? WTF

Jared,

I am sorry that my email came off as disrespectful or ugly... It certainly wasn't meant to. I can see that you are quite upset and that was never the intention and if you felt personally attacked I do appolgize. What would be an amicable solution to this situation?

Brian

On Fri, Sep 11, 2015 at 11:06 PM, ███████████████████ > wrote:
Brian,
I will address this email but prior to this email I was amicable on finding a common ground but after this email you have shown to be a lot different person than I expected.....
1) I've tried to be very helpful to you and was very surprised by your email to me, which I found to be fairly disrespectful. I have in no way been disrespectful as you say --- you know trademark law then you knew you were infringing on my mark which makes it willful. The email below is disrespectful and nothing I am interested in. In fact, when I started looking into your company I found so many trademark infringements on my Dianabol mark you make the others you were throwing under the bus look like choir boys.....http://www.dianabol.com/
(really)

2) I have looked online and spoken with distributors and have seen no evidence that you advertised or sold your product before mine. I showed you proof that I was selling my product since no later than 2006. That shows how half assed you looked---

3) In the spirit of showing you that I would rather work closely with you rather than fight with you, I have a compromise. I was planning on relabeling my product line, as they have been the same for almost 10 years and it needs to be refreshed. I have another idea give me the money you made off my trademark for 9 years and I will not ask for treble damages

4) Also, I have another name that I feel is stronger and would work better for me anyway, plus make all of this work for us. Allow me the next year to liquidate, remake videos, relabel and rework my marketing materials, and I will simply change the product name. So let you continue to infringe on my mark for another year and walk away-- I do not think so as you must really be crazy and got a few trademark wins under your belt with these mickey mouse companies and think it will translate when fighting a $60+ million company--good luck

5) This lawsuit can drag on for nearly that time anyway and this will offer a way for us to move forward and remain cordial in this tiny industry. If you are a friend who needs enemies----no thanks as you are a hypocrite and nothing like me

6) I was a retailer selling your Stamina RX back in the day and admired your story. then you knew we sold Dianabol as of 2002

7) I've tried to be very helpful to you and was very surprised by your email to me, which I found to be fairly disrespectful. Fine I will lay it out in the complaint for you

8) No matter what, we are going to each spend 200k on this and in by that time, I can have a totally new line designed and updated marketing that would probably do better for me than it already does. If you can give me that time to address all of these issues, that would save us a lot of time and energy. I can have a lot of this done sooner, but I would like to have wiggle room for safety sake, as I have 4 other businesses and am really stretched thin. Money is not an issue as it is the principal and I will stretch you thinner as you will have graduated to the big leagues of trademark law

9) I HONESTLY dont think that I am in the wrong here man and I am no stranger to lawsuits. Then may the best man win

10) I KNOW TRADEMARK LAW VERY WELL. Apparently not as you are still violating my marks after knowing of them years ago
11) I have been in many and am very aggressive as you said you were. Then I will enjoy someone that is a crash dummy in litigation
12) Neither one of us will really win anything from this and I can use this to motivate me to make changes Ive been wanting to do anyway. ALL of my sales are done online and are ONLY promoted on steroid.com and 2 other sites. I will win whatever you sold and you will pay out 100% revenue and hopefully treble damages
13) With this compromise, we both win and save money and time in the process. This benefits you only and makes no sense to me

14) I am a fair guy and never do anything to step on the toes of others. It is others who step on my toes that causes me to react, so I understand your position completely. You are intellectually dishonest and have begun to believe your own crap

15) If you feel like you are right and I feel like I am right, you will have to guys beating each other senseless due to our strong convictions. Again, in that case, none of us win. I will win as you are on the wrong side of this one and your arrogance is astonishing

Case, none of us win. *I will win as you are on the wrong side of this one and your arrogance is astonishing.*

Attached is a demand letter from our in-house counsel. If you wish to resolve this short of litigation then you have a week to make some reasonable settlement as your email below is insulting to the hard work we have put in to build and brand our company.However, It may just be that I agree with Anthony Roberts for the first time in life below.

## buyer beware in online 'steroid' trade

Waterloo Region Record

WATERLOO — Cayenne pepper, fenugreek extract and sage might be great for cooking, but they're not likely to turn you into a hulk.

But that doesn't stop thousands of people from unwittingly buying those ingredients and other nutritional supplements online when they think they're buying steroids, often at $100 a bottle.

What they're really getting is scammed, says a New Jersey-based author who used to work in the industry.

"They're meant to take your money. But if you say 'wait, these aren't steroids,' what can you do? You're trying to make an illicit purchase," said Anthony Roberts, who has written three books on steroids. "They prey on that first-time buyer."

Roberts worked for three years as a web writer for Brian Clapp, the man behind websites such as Buysteroids.com, Steroid.com and RoidStore.com, which Roberts said are designed to trick buyers into thinking they're selling the illegal performance enhancing drugs.

Riding the popularity of illegal, mail-order steroid websites, these fake steroids sites are making their owners wealthy by selling cheap, everyday vitamins and nutritional supplements as something far more powerful. They ship around the world, including to here in Waterloo Region.

Clapp, a Houston-based bodybuilder and businessperson, insists his network of websites makes it clear they're selling "steroid alternatives."

But just how clear is up for debate. Using labels like "Buy Steroids," adopting common steroid brand names, and with promises of "discreet shipping," many customers can easily be fooled into thinking they're buying something other than a nutritional supplement.

Clapp's websites explain in the fine print they are selling "powerful alternatives to anabolic steroids," or that "all of our products are legal alternatives to anabolic steroids." But critics charge those labels aren't up front enough.

Clapp declined an interview request, insisting in an email he's been running his tax-paying business legitimately since 1998.

"The products are 'Dietary Supplements' and it not only says it's not a steroid on the bottle, but on the website as well," he wrote in an email.

Roberts said his former employer believes he's doing a public service by selling vitamins to would-be steroid users. The author said he quit working for Clapp in 2008, after getting fed up watching his former boss "ripping people off."

"He fancies himself a good businessman and not a con artist," Roberts said.

Most buyers don't know Clapp also runs several anti-steroid websites, including www.steroidabuse.com. Earlier this year, Clapp issued a press release stating he was partnering with Don Hooton, the man the University of Waterloo hired as a consultant in the wake the steroid scandal that suspended its entire football program.

Clapp claimed he was teaming up with Hooton to "educate youths about the dangers of steroid abuse." Hooton's website even published articles from the Association Against Steroid Abuse, a website also owned by Clapp. That site also has banner ads linking to DiscountSupplements.com, another company owned by Clapp.

Hooton, meanwhile, said there is no partnership between his foundation and Clapp, though he's met the man once for lunch and talked to him on the phone a few times. When Hooton learned of Clapp's connection to the supplements industry, the foundation distanced itself from Clapp, he said.

"We have no association with Brian Clapp nor any of those websites," he said. "While we support the anti-steroid messaging that he delivers on a couple of those websites, we cannot be associated with or partnered with an organization that in the end is pushing unregulated supplements."

The U.S. Drug Enforcement Agency wouldn't comment on Clapp's businesses. But the agency says fake steroid websites are illegal, even though they're not selling real drugs.

"It's fraud. It's misrepresentation. It's counterfeit," said DEA Rusty Payne. "They're trying to be smooth operators, and they're doing whatever it takes to make a buck. They'll lie and deceive as much as they have to."

The fake steroid websites are on the radar of the U.S. Food and Drug Administration, though few have faced prosecution so far. Still, Payne said, buyers should avoid buying any kind of pharmaceuticals or supplements online, he said.

"It just shows how dangerous it is to just jump on the internet and order pharmaceuticals, because you don't know what you're getting. It's not something I'd mess with," he said.

Clapp's former employee, meanwhile, said it's laughable to suggest Clapp's websites aren't misleading buyers. They're designed to mislead, he said.

"Why would you think you could buy steroids at buysteroids.com? It's absurd to even think that," Roberts said, sarcastically. "He tricks people and he takes their money and he's doing it all with the government sitting on their thumbs."



-----Original Message-----
From: Brian Clapp

From: Brian Clapp
To: ████████████████
Sent: Fri, Sep 11, 2015 7:31 pm
Subject: Re: is this you????? WTF

Jared,

In the spirt of showing you that I would rather work closely with you rather than fight with you, I have a compromise. I was planning on relabeling my product line, as they have been the same for almost 10 years and it needs to be refreshed. Also, I have another name that I feel is stronger and would work better for me anyway, plus make all of this work for us. Allow me the next year to liquidate, remake videos, relabel and rework my marketing materials, and I will simply change the product name. This lawsuit can drag on for nearly that time anyway and this will offer a way for us to move forward and remain cordial in this tiny industry. I was a retailer selling your Stamina RX back in the day and admired your story.

I have looked online and spoken with distributors and have seen no evidence that you advertised or sold your product before mine. I showed you proof that I was selling my product since no later than 2006. Even on your own website, your product was not listed until 2008. No matter what, we are going to each spend 200k on this and in by that time, I can have a totally new line designed and updated marketing that would probably do better for me than it already does. If you can give me that time to address all of these issues, that would save us a lot of time and energy. I can have a lot of this done sooner, but I would like to have wiggle room for safety sake, as I have 4 other businesses and am really stretched thin.

I HONESTLY dont think that I am in the wrong here man and I am no stranger to lawsuits. I KNOW TRADEMARK LAW VERY WELL. I have been in many and am very aggressive as you said you were. Neither one of us will really win anything from this and I can use this to motivate me to make changes Ive been wanting to do anyway. ALL of my sales are done online and are ONLY promoted on steroid.com and 2 other sites.

I've tried to be very helpful to you and was very surprised by your email to me, which I found to be fairly disrespectful. I'd like to continue on with a positive relationship. With this compromise, we both win and save money and time in the process. I am a fair guy and never do anything to step on the toes of others. It is others who step on my toes that causes me to react, so I understand your position completely. If you feel like you are right and I feel like I am right, you will have to guys beating each other senseless due to our strong convictions. Again, in that case, none of us win. I've gone out of my way to notify you and help you in the past and I feel that this would be a great way for us to move forward.

FYI, my "Legal Anabolic" product line that goes live next month does NOT have the "D-anabol 25" product in it, thats a non issue.

Does this sound like a fair compromise to you?

Bc


On Fri, Sep 11, 2015 at 8:50 AM, < ████████████████ > wrote:
Since you made not mention of discontinuing the product then I will have to sue you for using the mark D-anabol 25.....I had hoped this would not be the case as we have gotten along well to this point. You can argue the 2005 nonsense all you want in the court setting.





-----Original Message-----
From: Brian Clapp █████████ >
To: █████████ >
Sent: Fri, Sep 11, 2015 8:34 am
Subject: Re: is this you????? WTF

I just realized you were asking me about my product D-anabol 25.
I've been selling that product since 2005, before your product came out.  To be honest, it was your products (Dianabol and Anavar) that you came out with several years after I started my product line, that got me thinking about expired trademarks.
If it were not for you, I would not have gotten Winstrol, Deca-Durabolin, Testoviron, Masteron, Halotestin, and 15 or so more.  Took me 5 years and some fighting with Merk, but we finally prevailed.
The company I started is called "Legal Anabolics" and I start landing into retail stores next week.  It's been a long hard battle but it's going to be exciting.  I had called you about working together on this in the past but you were really tired up with your legal bullshit with FTC.
The website goes live in two weeks and should be interesting to see these products on the shelves, especially now that pro hormones have been removed and supplement stores are dying for something to replace their lost income...These are going to fill that perfectly.
Let me know if you need anything Jared. I've been trying to keep up with things on my end but I'm the only one protecting trademarks and it's exhausting fighting these on my own. By you stepping out, we can shut the guys down that have been staying afloat using your trademarks. I've not had any power to protect those so after my lawsuits (which are all over but crazy mass) they stay in business by continuing to use your marks which give them credibility. I hope to see you shut the door on them as I can do no more.
B
On Sep 10, 2015 9:18 PM, "brian clapp" < █████████ > wrote:
  Yes, Anabolics.com is my site.

  On Thu, Sep 10, 2015 at 8:47 PM, < █████████ > wrote:
    http://www.anabolics.com/products/d-anabol-25#.Vflx4Cv_oSR

--
Brian Clapp
President/ Pro Bodybuilding, LLC

President/ Pro Bodybuilding, LLC
ProBodybuilding.com
DiscountSupplements.com
Brian@Probodybuilding.com
Phone: (903)780-5247

--



**Brian Clapp, CEO**
521 N Sam Houston Parkway E.
Suite 500
Houston, TX 77060
281-513-1665

--



**Brian Clapp, CEO**
521 N Sam Houston Parkway E.
Suite 500
Houston, TX 77060
281-513-1665

--



**Brian Clapp, CEO**
521 N Sam Houston Parkway E.
Suite 500
Houston, TX 77060
281-513-1665

# EXHIBIT C

| To: | Clapp, Brian (bcsteroid@yahoo.com) |
|---|---|
| **Subject:** | TRADEMARK APPLICATION NO. 78764050 - D-ANABOL - N/A |
| **Sent:** | 6/2/2006 9:07:09 AM |
| **Sent As:** | ECOM114@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |

# UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO**:     78/764050

**APPLICANT**:     Clapp, Brian

**\*78764050\***

**CORRESPONDENT ADDRESS**:
    CLAPP, BRIAN
    20703 TAMARRON DR
    HUMBLE, TX 77346-1520

**RETURN ADDRESS**:
Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

**MARK**:     D-ANABOL

**CORRESPONDENT'S REFERENCE/DOCKET NO** :   N/A

**CORRESPONDENT EMAIL ADDRESS**:
    bcsteroid@yahoo.com

Please provide in all correspondence:

1. Filing date, serial number, mark and applicant's name.
2. Date of this Office Action.
3. Examining Attorney's name and Law Office number.
4. Your telephone number and e-mail address.

# OFFICE ACTION

**RESPONSE TIME LIMIT**: TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE MAILING OR E-

MAILING DATE.

**MAILING/E-MAILING DATE INFORMATION**:  If the mailing or e-mailing date of this Office action does not appear above, this information can be obtained by visiting the USPTO website at http://tarr.uspto.gov/, inserting the application serial number, and viewing the prosecution history for the mailing date of the most recently issued Office communication.

Serial Number  78/764050

The assigned trademark examining attorney has reviewed the referenced application and has determined the following:

Descriptiveness Refusal

Registration is refused because the proposed mark merely describes a characteristic, ingredient or  feature of applicant's goods and/or services.   Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); TMEP §§1209 *et seq.*

A mark is merely descriptive under Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1), if it describes an ingredient, quality, characteristic, function, feature, purpose or use of the relevant goods and/or services.  *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009 (Fed. Cir. 1987);  *In re Bed & Breakfast Registry,* 791 F.2d 157, 229 USPQ 818 (Fed. Cir. 1986); *In re MetPath Inc.*, 223 USPQ 88 (TTAB 1984); *In re Brightâ€'Crest, Ltd* 204 USPQ 591 (TTAB 1979); TMEP §1209.01(b).  A mark that describes an intended user of a product or service is also merely descriptive within the meaning of Section 2(e)(1).  *Hunter Publishing Co. v. Caulfield Publishing Ltd.,* 1 USPQ2d 1996 (TTAB 1986); *In re Camel Mfg. Co., Inc*., 222 USPQ 1031 (TTAB 1984); *In re Gentex Corp*., 151 USPQ 435 (TTAB 1966).

The applicant's mark is D-ANABOL for dietary supplement of nutritional benefit.   DIANABOL is a steroid.  Thus, the applicant's mark indicates the nature of the goods, namely, dietary supplements containing steroids.  The examining attorney attaches excerpted web pages which support the examining attorney's position the term dianabol is a steroid.   Moreover, steroids are used in dietary supplements.  See attached web pages.  Thus, the term indicates an characteristic, ingredient or feature of the applicant's goods. A trademark need not describe all of the purposes, functions, characteristics or features of the goods and/or services to be merely descriptive.  For the purpose of a Section 2(e)(1) analysis, it is sufficient that the trademark describe only one attribute of the goods and/or services to be found merely descriptive.  *In re H.U.D.D.L.E.*, 216 USPQ 358 (TTAB 1982); *In re MBAssociates*, 180 USPQ 338 (TTAB 1973); TMEP §1209.01(b).

The fact that the applicant has misspelled the term DIANABOL as D-ANABOL does not obviate the descriptive nature of the mark.  A novel spelling of a merely descriptive term is also merely descriptive if purchasers would perceive the different spelling as the equivalent of the descriptive term.  *Andrew J. McPartland, Inc. v. Montgomery Ward & Co., Inc*., 164 F.2d 603, 76 USPQ 97 (C.C.P.A. 1947), *cert. denied*, 333 U.S. 875,77 USPQ 676 (S. Ct. 1948) ("KWIXTART," phonetic spelling of "quick start," is descriptive of electric storage batteries); *In re Hercules Fasteners, Inc*., 203 F.2d 753, 97 USPQ 355(C.C.P.A. 1953) ("FASTIE," as phonetic spelling of "fast tie," connotes that which unites or joins quickly, and hence the notation is descriptive of the function and character of tube sealing machines); *C-Thru Ruler Co. v. Needleman*, 190 USPQ 93 (E.D. Pa. 1976) (C-THRU held to be the equivalent of "see-through" and therefore merely descriptive of transparent rulers and drafting aids); *In re Hubbard Milling Co*., 6 USPQ2d 1239 (TTAB 1987) (MINERAL-LYX held generic for mineral licks for feeding

livestock); *In re State Chemical Manufacturing Co*., 225 USPQ 687 (TTAB 1985) ("FOM," equivalent to word "foam," is descriptive for foam rug shampoo);  TMEP §1209.03(j).

Although the trademark examining attorney has refused registration, applicant may respond to the refusal to register by submitting evidence and arguments in support of registration.

Prior Pending Application

Information regarding pending Application Serial No. 78571432 is enclosed.  The filing date of the referenced application precedes applicant's filing date.  There may be a likelihood of confusion between the two marks under Trademark Act Section 2(d), 15 U.S.C. §1052(d).  If the referenced application registers, registration may be refused in this case under Section 2(d).  37 C.F.R. §2.83; TMEP §§1208 *et seq*.  Therefore, upon entry of a response to this Office action, action on this case may be suspended pending final disposition of the earlier-filed application.

If applicant believes there is no potential conflict between this application and the earlier-filed application, then applicant may present arguments relevant to the issue in a response to this Office action. The election not to submit arguments at this time in no way limits applicant's right to address this issue at a later point.

-
Request for Information
-
The applicant must provide the information requested below pursuant to the authority granted the examining attorney by 37 C.F.R. §2.61(b).  The applicant must *directly* answer the following question(s):

  1.  Do the applicant's goods contain dianabol?

  2.  Do the applicant's goods contain steroids?

  2.   Does the term dianabol have any meaning in relation to the applicant's dietary supplements?

In order that the examining attorney to discern the answers to these questions, the applicant should answer the questions in sequential order in a clear and concise manner.

Please note that failure to comply with a request pursuant to 37 C.F.R. §2.61(b) is an independent basis for refusal and may result in the refusal of the entire application.  *In re DTI Partnership, L.L.P.*, Serial No. 76/197,868, slip op. (TTAB 2003); *In re SPX Corporation*, 63 USPQ2d 1592 (TTAB 2002); *In re Babies Beat, Inc.*, 13 USPQ2d 1729 (TTAB 1990).

Please note that the same type of notice and explanation should be given when requesting *any* information from an applicant, e.g., promotional materials, patent applications, etc.

Moreover, the examining attorney should repeatedly warn the applicant of the consequences for failing to comply with the request for information pursuant to 37 C.F.R. §2.61(b) in any subsequent action.  The use of the notice, explanation, and repeated warning should ensure that your information request will receive strict enforcement by the TTAB.

If the applicant makes a good faith attempt to directly respond to the information request, the examining attorney should not make the requirement final.  If the applicant argues that the request is not reasonably

necessary, the examining attorney may make the request for information final, assuming that the request for information clearly aids the examining attorney in the examination of the application.

<u>Search of Office Records</u>

The Office records have been searched and no similar *registered* mark has been found that would bar registration under Trademark Act Section 2(d), 15 U.S.C. §1052(d).  TMEP §704.02.  However, please be advised that a potentially conflicting mark in a prior-filed pending application may present a bar to registration.

<u>Response to this Action</u>

Please note that there is no required format or form for responding to this Office action.  However, applicant should include the following information on all correspondence with the Office:  (1) the name and law office number of the examining attorney; (2) the serial number of this application; (3) the mailing date of this Office action; and, (4) applicant's telephone number.

When responding to this Office action, applicant must make sure to respond in writing to each refusal and requirement raised.  If there is a refusal to register the proposed mark, then applicant may wish to argue against the refusal, i.e., explain why it should be withdrawn and why the mark should register.  If there are other requirements, then applicant should simply set forth in writing the required changes or statements and request that the Office enter them into the application record.  Applicant must also sign and date its response.

Applicant may wish to hire a specialist attorney to assist in prosecuting this application because of the technicalities involved.  The Office cannot aid in the selection of a trademark attorney.  37 C.F.R. §2.11.  Applicant may wish to consult the Yellow Pages for a listing of attorneys specializing in trademark or intellectual property law, or seek guidance from its local Bar Association attorney-referral service.

/Brendan D. McCauley/
Brendan D. McCauley
Law Office 114
571-272-9459

**HOW TO RESPOND TO THIS OFFICE ACTION:**
- ONLINE RESPONSE:  You may respond using the Office's Trademark Electronic Application System (TEAS) Response to Office action form available on our website at http://www.uspto.gov/teas/index.html.  If the Office action issued via e-mail, you must wait 72 hours after receipt of the Office action to respond via TEAS.  **NOTE:  Do not respond by e-mail. THE USPTO WILL NOT ACCEPT AN E-MAILED RESPONSE**.
- REGULAR MAIL RESPONSE:  To respond by regular mail, your response should be sent to the mailing return address above, and include the serial number, law office number, and examining attorney's name.   **NOTE:  The filing date of the response will be the *date of receipt in the Office***, not the postmarked date.  To ensure your response is timely, use a certificate of mailing.  37 C.F.R. §2.197.

**STATUS OF APPLICATION:** To check the status of your application, visit the Office's Trademark

Applications and Registrations Retrieval (TARR) system at http://tarr.uspto.gov.

**VIEW APPLICATION DOCUMENTS ONLINE:** Documents in the electronic file for pending applications can be viewed and downloaded online at http://portal.uspto.gov/external/portal/tow.

**GENERAL TRADEMARK INFORMATION:** For general information about trademarks, please visit the Office's website at  http://www.uspto.gov/main/trademarks.htm

**FOR INQUIRIES OR QUESTIONS ABOUT THIS OFFICE ACTION, PLEASE CONTACT THE ASSIGNED EXAMINING ATTORNEY SPECIFIED ABOVE.**

**Print: Jun 1, 2006**                    **78571432**

**DESIGN MARK**

**Serial Number**
78571432

**Status**
RESPONSE AFTER NON-FINAL ACTION - ENTERED

**Word Mark**
DIANABOL

**Standard Character Mark**
Yes

**Type of Mark**
TRADEMARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Jared R.  Wheat INDIVIDUAL UNITED STATES 5675 Jimmy Carter Blvd.,
Suite 720 Norcross GEORGIA 30071

**Goods/Services**
Class Status -- ACTIVE.  IC 005.  US  006 018 044 046 051 052.  G & S:
Vitamins and dietary supplements.  First Use: 2002/03/04.  First Use
In Commerce: 2002/03/31.

**Filing Date**
2005/02/21

**Examining Attorney**
BESCH, JAY

**Attorney of Record**
Joseph P.  Schilleci, Jr.

-1-

# DIANABOL

http://64.233.161.104/search?q=cache:GrGqurj7XkwJ:www.muscletalk.co.uk/article-dianabol.asp+%22dianabol%22&hl=en&gl=us&ct=clnk&cd=3          06/01/2006 07:48:30 PM

This is **G o o g l e**'s cache of http://www.muscletalk.co.uk/article-dianabol.asp as retrieved on May 27, 2006 06:06:39 GMT.
**G o o g l e**'s cache is the snapshot that we took of the page as we crawled the web.
The page may have changed since that time. Click here for the current page without highlighting.
This cached page may reference images which are no longer available. Click here for the cached text only.
To link to or bookmark this page, use the following url: http://www.google.com/search?q=cache:GrGqurj7XkwJ:www.muscletalk.co.uk/article-dianabol.asp+%22dianabol%22&hl=en&gl=us&ct=clnk&cd=3

*Google is neither affiliated with the authors of this page nor responsible for its content.*

These search terms have been highlighted: **dianabol**





Need Healthy Meal Ideas?

☒ Forum    ☒ Forum Registration    ☒ Articles    ☒ Newsletter    ☒ Directory    ☒ Help MT    ☒ Book Reviews    ☒ Poster    ☒ T-Shirts
☒ MuscleTalk Shop    ☒ Pro Help    ☒ Nutrition ebook    ☒ Muscle Menus    ☒ Veggie Recipes    ☒ Shakes, Bars & Smoothies

🔸 Bodybuilding Forums
　🔸 Bodybuilding Articles
　　🔸 The Use of **Dianabol** as a Supplement

## The Use of **Dianabol** as a Supplement
### Article by Bransholme (MuscleTalk Member)

Ads by Google

Advertise on this site



**Hottest Diet in USA**
Lose 20 lbs in 3 weeks! As seen on Oprah & 60 Minutes.
www.WulongforLife.com



**All 2006 Cars on Sale Now**
Find New Cars Below Invoice Price! Free MSRP, Invoice & Actual Quotes
DealersCompeteYouWin.com



This article was originally intended to be a history of the anabolic steroid **dianabol** and it's usage in bodybuilding, but there is little real evidence of how it was used in previous decades. However, in the course of research, I have come to the conclusion that current use of **dianabol** as a supplement is not as efficient as it could be. Most of the modern thoughts on **dianabol** use reflect around myths and irrelevant scientific studies; this article attempts to explain new ways of thinking on **dianabol** usage using scientific evidence and people's experiences.

**Dianabol** (or dbol as it's commonly called) is one of the most commonly used oral steroids. Its chemical name is methanedienone or methandrostenolone and there are many different pharmaceutical and generic varieties including Anabol and Naposim. In this article we look at lower dose usage of **dianabol** as a supplement, as opposed to using pro-hormones or pro-steroids.

**Liver Toxicity of Dianabol**
The 17 alpha-alkylated properties of methanedienone do make it liver toxic, but this, I believe, is overstated as most of the evidence of its toxicity comes from studies on individuals and not from studies on large groups of **dianabol**-using bodybuilders. One study on rats (1) showed that regardless of dose

http://64.233.161.104/search?q=cache:GrGqurj7XkwJ:www.muscletalk.co.uk/article-dianabol.asp+%22dianabol%22&hl=en&gl=us&ct=clnk&cd=3     06/01/2006 07:48:30 PM

studies on individuals and not from studies on large groups of **dianabol**-using bodybuilders. One study on rats (1) showed that regardless of dose or time of administration, **dianabol** produces changes in enzymatic activity, which leads to hypertrophy of hepatocytes; which basically shows that **dianabol** is toxic to the liver. But in another study (2) Nerobol (Russian **Dianabol**) was found to favour a rapid normalisation of functional and metabolic disorders of the liver, which contradicts the earlier evidence. This shows that the whole idea of **dianabol** being dangerous is in no way as bad as some would make out.

### Benefits of Dianabol Use

**Dianabol** has been shown to increase anaerobic glycolysis (3), which increases lactic acid build up in the body. This is beneficial because lactic acid is used by the muscles to form glycogen, which in turn provides energy in anaerobic metabolism. Lactic acid is also a key chemical in the disposal of dietary carbohydrates, which means you are less likely to get fat while using **dianabol**.

A study on osteoporosis (4) showed that at a dosage of just 2.5mg per day for 9 months **dianabol** was more effective than calcium supplementation in reducing osteoporotic activity, it was also shown to increase muscle mass more effectively. Another study on osteoporosis (5) which lasted 24 months, showed just how **dianabol** works on osteoporosis; **dianabol** increased total body calcium, and also total body potassium. This may not mean much to you as a bodybuilder, but the actions of calcium are very important to bodybuilders, as it transports large numbers of amino acids and also creatine and these two things are vital in muscle growth. Potassium is also very important, as it assists in muscle contractions, transmitting nerve signals, and insulin release; so it is also a very anabolic substance.

One very interesting study (6), although not significant in bodybuilding terms, showed that **dianabol** increases the sensitivity of laryngeal tumour cells to radiotherapy, and concluded 'recommending this hormone to be used during radiotherapy of patients with the laryngeal cancer'.

### How to Cycle Dianabol

To create a cycle for **dianabol** that is based around using it more as a supplement than a steroid, we first need to look at the current trend for cycling **dianabol** and analyse what is wrong with it. An average cycle of **Dianabol** is usually structured as 25-40mg split throughout each day for 4-6 weeks, either alone or stacked with other steroids.

Firstly a dose of 25mg or more commonly causes water retention. It is well known that **dianabol** does aromatise quite easily, and most of the water retention is usually attributed to a build up of excess estrogen. However, it is my belief that initially water retention is caused by the body holding on to water due to the effects of **dianabol** on the body's mineral balance, in particular the potassium/sodium balance. This coupled with the fact that **dianabol** cause estrogenic side effects, leads to a lot of water build-up, and as there is little we can do about the change in the bodies mineral balance, the only other thing we can do is try to reduce aromatisation, usually with Nolvadex (tamoxifen) or other anti-estrogens. This is not the only method though, by reducing the dose, less of the drug will aromatise, which leads to less estrogen and more importantly less water retention. Reducing the drug during a cycle would lead to estrogen levels dropping slowly, so we should start the cycle with a lower dose of 10-20mg each day.

Splitting the dosage when you are using a low dose is virtually pointless, as you will get a much smaller peak of the drug. So in this case it is best to take it in a single dose in the morning (preferably with grapefruit juice). Although this will not prevent suppression of natural testosterone, it may lessen it to a certain degree, as your body will still have lengthy periods later in the day when there is little testosterone circulating, and so it may still produce some.

Now if we look at cycle duration, 4-6 weeks seems too short to have any real effect at a low dose, but how can we use **dianabol** for longer without placing more risk on our liver? The solution is actually quite simple; by taking weekends off from the drug we will give our livers a break from processing the drug. Due to the short half-life any active substances will be out of our system within 24 hours of your last dose, now this may seem like it will cost you gains, but in actual fact it will cost you little or no losses in the long run as even though there is no active drug in the body the effects are still present i.e. extra intramuscular water, and a more anabolic mineral balance. These effects usually taper off over several days. This method is not however, help your natural testosterone to return from its inhibited state, as this process can take considerably longer. If we take weekends off and use a lower dose, we should in theory be able to use **dianabol** for 10 weeks with no problems. A simple bit of mathematics

http://64.233.161.104/search?q=cache:GrGqurj7XkwJ:www.muscletalk.co.uk/article-dianabol.asp+%22dianabol%22&hl=
en&gl=us&ct=clnk&cd=3          06/01/2006 07:48:30 PM

take weekends off and use a lower dose, we should in theory be able to use **dianabol** for 10 weeks with no problems. A simple bit of mathematics can show this point best:

- 6 weeks @25mg each day = 1050mg of **Dianabol** in total
- 10 weeks with weekends off @15mg each day = 750mg of **Dianabol** in total

So as you can see, by using this system your liver will actually process less **dianabol** than in a conventional cycle, add this to the fact that you can make gains for 10 weeks instead of 6, and with fewer side effects, and you get a very solid cycle.

**Summary**

This Cycle Theory can be applied in many different situations, for instance a beginner could use the **dianabol** on it's own for 10 weeks and gain very well. A more experienced steroid user could use this alongside an injectable cycle for very good gains too, getting the benefit of the initial quick gains of the **Dianabol**, with the slower but stronger gains of an injectable.

This cycle may seem to go against many of the current trends of **dianabol** use, but I believe that by using **dianabol** as a supplement to good training and nutrition you can make very good gains.

**References**

- Effects of methandrostenolone on liver morphology and enzymatic activity. Nesterin MF, Budik VM, Narodetskaia RV, Solov'eva GI, Stoianova VG.
- An experimental study of the hepatoprotective properties of phytoecdysteroids and Nerobol in carbon tetrachloride induce liver lesions. Syrov VN, Khushbaktova ZA, Nabiev AN.
- Effects of methanedienone (methandrostenolone) on energy processes and carbohydrate metabolism in rat liver cells. Serakovskii S, Mats'koviak Iu.
- Calcium, vitamin D and anabolic steroid treatment of aged bones: double-blind placebo-controlled long-term clinical trial. Inkovaara J, Gothoni G, Halttula R, Heikinheimo R, Tokola O.
- Changes in body composition following therapy of osteoporosis with methandrostenolone. Mann V, Benko AB, Kocsar LT.
- Radiomodifying effect of methandrostenolone on laryngeal cancer cells. Bordiushkov IuN, Kucherova TI, Kisliakova ND, Vagner VP, Zubkova TV.

**Warning!** Articles related to the use of illegal performance enhancing drugs are for information purposes only and are the sole expressions of the individual authors opinion. We do not promote the use of these substances and the information contained within this publication is not intended to persuade or encourage the use or possession of illegal substances. These substances should be used only under the advice and supervision of a qualified, licensed physician.

( En Español )

Google

○ Web ○ www.MuscleTalk.co.uk

Search

© All content is copyright of MuscleTalk.co.uk and its use elsewhere is prohibited.

http://64.233.161.104/search?q=cache:AUWp61rwGiQJ:en.wikipedia.org/wiki/Dianabol+%22dianabol%22&hl=en&gl=us&ct=clnk&cd=4    06/01/2006 07:49:25 PM



# Methandrostenolone

From Wikipedia, the free encyclopedia

(Redirected from **Dianabol**)

**Methandrostenolone** (**Dianabol**) is an anabolic steroid originally developed by John Ziegler and released in the US in 1956 by Ciba. It was used as an aid to muscle growth by bodybuilders until its ban by the FDA under the Controlled Substances Act. Despite this, methandrostenolone continues to be produced in countries such as Mexico under the trade name Reforvit-b, and is being manufactured in Russia, as well as Thailand, and subsequently is still seen on the United States black market. Production in most of Western Europe and the United States has ceased.

Several successful athletes and professional bodybuilders have

http://64.233.161.104/search?q=cache:AUWp61rwGiQJ:en.wikipedia.org/wiki/Dianabol+%22dianabol%22&hl=en&gl=us&ct=clnk&cd=4      06/01/2006 07:49:25 PM

- Cite this article

in other languages

- Polski

come forward and admitted long-term methandrostenolone use, including Arnold Schwarzenegger [1] and Sergio Oliva [2]. Despite its illegality many athletes continue to use the drug for the muscle mass gains it can cause.

Methandrostenolone does not react strongly with the androgen receptor, instead relying on activity not mediated by the receptor for its effects. These include dramatic increases in protein synthesis, glycogenolysis, and muscle strength over a short space of time. However, due to its mode of action, it decreases the rate of cell respiration and decreases production of red blood cells. In high doses (30 mg or more per day), side effects such as gynaecomastia, high blood pressure, acne and male pattern baldness may begin to occur. The drug causes severe masculinising effects in women even at low doses. In addition, it is metabolised into estradiol by aromatase. This means that without the administration of aromatase inhibitors such as Anastrozole or Aminoglutethimide, estrogenic effects will appear over time in men. Many users will combat the estrogenic side effects with Nolvadex or Clomid. In addition, as with other 17α-alkylated steroids, the use of methandrostenolone over extended periods of time can result in liver damage without appropriate care.

In the early 1960s, doctors commonly prescribed a tablet per day for women as a tonic. This use was quickly discontinued upon discovery of the heavily masculinising effects of methandrostenolone. However, despite the lack of any known therapeutic applications, the drug remained legal until the early 1990s. The ban by the FDA was not completely successful in eliminating its use by bodybuilders, and methandrostenolone continues to be used illegally to this day, typically being stacked (combined) with drugs that react strongly with the androgen receptor, such as Oxandrolone, in order to increase the overall effectiveness of steroid use.

The 17α-methylation of the steroid does allow it to pass through the liver without being broken down

| 17β-hydroxy-17α-methyl-1,4-androstadien-3-one | |
|---|---|
| **CAS number** | **ATC code** |
| 72-63-9 | A14AA03 |
| Chemical formula | $C_{20}H_{28}O_2$ |
| Molecular weight | 300.44112 |
| Bioavailability | ?% |
| Metabolism | Hepatic |
| Elimination half-life | 6 hours |
| Excretion | Renal |
| Pregnancy category | X |
| Legal status | Schedule II (US) |
| Routes of administration | Oral |

http://64.233.161.104/search?q=cache:AUWp61rwGiQJ:en.wikipedia.org/wiki/Dianabol+%22dianabol%22&hl=en&gl=us&ct
=clnk&cd=4          06/01/2006 07:49:25 PM

The 17α-methylation of the steroid does allow it to pass through the liver without being broken down (hence causing the aforementioned damage to the liver) allowing it to be taken orally. It also has the effect of decreasing the steroid's affinity for sex hormone binding globulin, a protein that de-activates steroid molecules and prevents them from further reactions with the body. As a result, methandrostenolone is significantly more active than an equivalent quantity of testosterone, resulting in rapid growth of muscle tissue. However, the concomitant elevation in estrogen levels - a result of the aromatization of methandrostenolone - results in significant water retention. This gives the appearance of great gains in mass and strength, which prove to be temporary once the steroid is discontinued and water weight drops. Because of this, it is often used by bodybuilders only at the start of a "steroid cycle", to facilitate rapid strength increases and the appearance of great size, while compounds such as testosterone or nandrolone with long acting esters build up in the body to an appreciable amount capable of supporting anabolic function on their own.

## External links     [edit]

* **Dianabol** Users Profile ⧉
* **Dianabol** (Methandrostenolone) Profile ⧉
* **Dianabol** Anabolic Steroid Profile ⧉

Categories: Anabolic steroids

 This page was last modified 16:40, 21 May 2006.     All text is available under the terms of the GNU Free Documentation License (see Copyrights for details). Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc.

Privacy policy     About Wikipedia     Disclaimers

http://www.google.com/search?hl=en&sa=X&oi=spell&resnum=0&ct=result&cd=1&q=%22steroid+dietary+supplements%22&s
pell=1      06/02/2006 09:01:18 AM

http://www.google.com/search?hl=en&sa=X&oi=spell&resnum=0&ct=result&cd=1&q=%22steroid+dietary+supplements%22&spell=1     06/02/2006 09:01:18 AM

Cached - Similar pages

**NPIcenter.com : Industry Blogs - Marc Ullman FYI Blog**
**STEROID DIETARY SUPPLEMENTS**. By marc on 3/9/2006 12:38 PM. Yesterday, FDA
issued four Warning Letters to companies selling anabolic steroids masquerading as ...
www.npicommunity.com/Blogs/ tabid/53/BlogID/1/Default.aspx - 79k - Cached - Similar pages

[PDF] **RESTORING FAITH IN AMERICA'S PASTIME: EVALU- ATING MAJOR LEAGUE ...**
File Format: PDF/Adobe Acrobat
**steroid dietary supplements** like Android, were regulated as con- trolled substances by
legislation that Congress passed last year. ...
a257.g.akamaitech.net/7/257/2422/01sep20051200/
www.access.gpo.gov/congress/house/pdf/109hrg/23038.pdf - Similar pages

*In order to show you the most relevant results, we have omitted some entries very similar to the 8 already displayed.
If you like, you can repeat the search with the omitted results included.*

Try your search again on Google Book Search

Info when you want it, right on your desktop
Free! Download Google Desktop

**Buying Steroids Online**
Don't Violate The Law, Learn About
Drug Importation Restrictions
www.customs.gov

More Sponsored Links »

"steroid dietary supplements" [ Search ]

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve

Google Home - Advertising Programs - Business Solutions - About Google

©2006 Google

# **EXHIBIT D**

# Invoice

**Hi-Tech Pharmaceuticals, Inc.**
6015-B Unity Dr.
Norcross, GA 30071
USA
Voice:  888-855-7919
Fax:  770-797-9960

Invoice Number:
24056
Invoice Date:
Jul 18, 2005
Page:
1

Duplicate

Sold To:
  Gold's Gym
  4805 Lawrenceville Highway
  Lilburn, GA  30047

Ship to:
  Gold's Gym
  4805 Lawrenceville Highway
  Lilburn, GA  30047

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| GOLD'S GYM/ 30047 | | C.O.D. | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| OLEN | UPS Ground | | 7/18/05 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 4 | ESTROGENEX | Estrogenex 90-ct. Btl. ($49.95 SRP) | 18.75 | 75.00 |
| 3 | Dianabol 60-ct Btl | DIANABOL | 26.25 | 78.75 |
| 2 | Anavar Jug | ANAVAR JUG ($69.95 SRP) | 24.46 | 48.92 |
| 2 | Ideal Meal- Oran. | IDEAL MEAL- ORANGE ($49.95 SRP) | 24.75 | 49.50 |
| 1 | Ideal Meal- Choc. | IDEAL MEAL- CHOC. ($49.95 SRP) | 24.75 | 24.75 |
| 1 | Ideal Meal- Straw. | IDEAL MEAL- STRAW ($49.95 SRP) | 24.75 | 24.75 |
| 1 | JOINT-RX | Joint-Rx 90 ct. Btl. ($34.95 SRP) | 14.95 | 14.95 |
| 1 | MULTI-VIT/ MIN | Hi-Tech Multi-Vitamin/ Mineral ($24.95 SRP) | 10.75 | 10.75 |

|  |  |
|---|---|
| Subtotal | 327.37 |
| Sales Tax | |
| Freight | |
| Total Invoice Amount | 327.37 |
| Payment Received | 327.37 |
| **TOTAL** | 0.00 |

Check No:   24056

Case 1:15-cv-06293-JMB Document 640-21 Filed 04/09/15 Page 80 of 85

# Invoice

Hi-Tech Pharmaceuticals, Inc.
6015-B Unity Dr.
Norcross, GA  30071
USA
Voice:   888-855-7919
Fax:      770-797-9960

Invoice Number:
24057
Invoice Date:
Jul 18, 2005
Page:
1

Duplicate

Sold To:
Nutrition Depot/ Lawrenceville
965 Duluth Hwy.
Suite 102
Lawrenceville, GA  30043

Ship to:
Nutrition Depot/ Lawrenceville
965 Duluth Hwy.
Suite 102
Lawrenceville, GA  30043

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| NUTRITION DEPOT/ LAW | | Net 30 Days | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| OLEN | UPS Ground | | 7/18/05 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 48 | Lipodrene 100 ct. | LIPODRENE BOTTLE ($39.95 SRP) | 15.95 | 765.60 |
| 1 | 30-ct Stamina/Btl.Cs | MEN'S BOTTLE CASE ($479.40 SRP) | 191.40 | 191.40 |
| 12 | METANABOL | Metanabol 60-ct. Btl. ($79.95 SRP) | 26.25 | 315.00 |
| 12 | CHOLEDRENE | Choledrene 90 ct. Btl. ($39.95 SRP) | 15.95 | 191.40 |
| 12 | ESTROGENEX | Estrogenex 90-ct. Btl. ($49.95 SRP) | 18.75 | 225.00 |
| 8 | Anavar Jug | ANAVAR JUG ($69.95 SRP) | 24.46 | 195.68 |
| 8 | Dianabol 60-ct Btl | DIANABOL | 26.25 | 210.00 |
| 8 | Ideal Meal- Choc. | IDEAL MEAL- CHOC. ($49.95 SRP) | 24.75 | 198.00 |
| 8 | Ideal Meal- Oran. | IDEAL MEAL- ORANGE ($49.95 SRP) | 24.75 | 198.00 |
| 8 | Ideal Meal- Straw. | IDEAL MEAL- STRAW ($49.95 SRP) | 24.75 | 198.00 |
| 8 | Ideal Meal- Van. | IDEAL MEAL- VANILLA ($49.95 SRP) | 24.75 | 198.00 |

Check No:  Multiple
Payments
Received

| | |
|---|---|
| Subtotal | 2,886.08 |
| Sales Tax | |
| Freight | |
| Total Invoice Amount | 2,886.08 |
| Payment Received | 2,886.08 |
| **TOTAL** | 0.00 |

# Invoice

**Hi-Tech Pharmaceuticals, Inc.**
6015-B Unity Dr.
Norcross, GA  30071
USA
Voice:    888-855-7919
Fax:       770-797-9960

Invoice Number:
24058
Invoice Date:
Jul 18, 2005
Page:
1

Duplicate

Sold To:
Rain Country Nutrition
625 Mission St.
Ketchikan, AK  99901

Ship to:
Rain Country Nutrition
625 Mission St.
Ketchikan, AK  99901

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| RAIN COUNTRY | | Prepaid | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| CHAD | UPS 2-Day Small | | 7/18/05 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 24 | Lipodrene 100 ct. | LIPODRENE BOTTLE ($39.95 SRP) | 19.95 | 478.80 |
| 6 | 30-ct Stamina Rx | MEN'S BOTTLE ($39.95 SRP) | 19.76 | 118.56 |
| 3 | Anavar Jug | ANAVAR JUG ($69.95 SRP) | 32.30 | 96.90 |
| 3 | Dianabol 60-ct Btl | DIANABOL | 29.95 | 89.85 |

Check No:    24058

| | |
|---|---|
| Subtotal | 784.11 |
| Sales Tax | |
| Freight | 15.00 |
| Total Invoice Amount | 799.11 |
| Payment Received | 799.11 |
| **TOTAL** | 0.00 |

# Invoice

Hi-Tech Pharmaceuticals, Inc.
6015-B Unity Dr.
Norcross, GA  30071
USA
Voice:  888-855-7919
Fax:  770-797-9960

Invoice Number:
24067
Invoice Date:
Jul 19, 2005
Page:
1

Duplicate

Sold To:
Fitness Authority
500 Russell St.
Suite 14
Starksville, MS  39759

Ship to:
Fitness Authority
500 Russell St.
Suite 14
Starksville, MS  39759

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| FITNESS AUTHORITY | | Prepaid | |
| Sales Rep ID | Shipping Method | Ship Date | Due Date |
| CHAD | UPS Ground | | 7/19/05 |

| Quantity | Item | Description | Unit Price | Extension |
|---|---|---|---|---|
| 6 | Lipodrene 100 ct. | LIPODRENE BOTTLE ($39.95 SRP) | 19.95 | 119.70 |
| 1 | Dianabol 60-ct Btl | DIANABOL | 29.95 | 29.95 |

|  |  |
|---|---|
| Subtotal | 149.65 |
| Sales Tax | |
| Freight | 4.00 |
| Total Invoice Amount | 153.65 |
| Payment Received | 153.65 |
| **TOTAL** | 0.00 |

Check No:   24067

# EXHIBIT E



# United States Patent and Trademark Office

**Home** | **Site Index** | **Search** | **FAQ** | **Glossary** | **Guides** | **Contacts** | **eBusiness** | **eBiz alerts** | **News** | **Help**



# United States Patent and Trademark Office

**Home** | **Site Index** | **Search** | **FAQ** | **Glossary** | **Guides** | **Contacts** | **eBusiness** | **eBiz alerts** | **News** | **Help**

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Sun Sep 27 03:21:02 EDT 2015*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

Logout  Please logout when you are done to release system resources allocated for you.

Start  List At: ____ OR Jump to record: ____ **Record 4 out of 5**

---

TSDR | ASSIGN Status | TTAB Status *( Use the "Back" button of the Internet Browser to return to TESS)*

# DIANABOL

| | |
|---|---|
| **Word Mark** | **DIANABOL** |
| **Goods and Services** | IC 005. US 006 018 044 046 051 052. G & S: Dietary supplements, excluding anobolic steroids. FIRST USE: 20020304. FIRST USE IN COMMERCE: 20020331 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77215242 |
| **Filing Date** | June 26, 2007 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | November 20, 2007 |
| **Registration Number** | 3378354 |
| **Registration Date** | February 5, 2008 |
| **Owner** | (REGISTRANT) Wheat, Jared R. INDIVIDUAL UNITED STATES 6015-B Unity Drive Norcross GEORGIA 30071 |

**Exhibit 1**

Case 1:16-cv-05699-AKH Document 41-2 Filed 09/19/16 Page 85 of 85

| | |
|---|---|
| **Attorney of Record** | Anthony F. Bennett |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST | NEXT LIST

FIRST DOC | PREV DOC | NEXT DOC | LAST DOC

| **HOME** | **SITE INDEX**| **SEARCH** | *e*BUSINESS | **HELP** | **PRIVACY POLICY**