# EXHIBIT 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| DYNAMIC SPORTS NUTIRITON, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 4:15-cv-02645 |
| v. | ) | |
| | ) | |
| HI-TECH PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## HI-TECH PHARMACEUTICALS, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR RULE 11 SANCTIONS

This the 14th day of March, 2016.

Respectfully Submitted,

*/s/ Arthur W. Leach*
Arthur W. Leach
Ga. Bar No. 442025
(*admitted pro hac vice*)

The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com

# TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT. . . . . . 1

ISSUES TO BE RULED UPON BY THE COURT. . . . 1

ARGUMENT AND CITATION OF AUTHORITY . . . 2

    **A. The Purpose of Rule 11 Would Be Served Through
The Imposition of Sanctions in this Case.** . . . 2

    **B. DSN's "Background of Events" Is Euphemistic and
Misleading.** . . . . . . . 5

    **C. DSN Does Not Substantively Deny That Its Second
Amended Complaint is Based Upon Inaccurate Facts
And Inferences.** . . . . . . 7

    **D. DSN's Response Reveals That It Has Absolutely No
Evidence That DSN Began Selling its D-anabol 25
Product before Hi-Tech Began Selling Dianabol®.** . 9

    **E. DSN Once Again Seeks to Sidestep the Wording of Its
Complaint as well as Its Knowledge, Information,
and Belief.** . . . . . . . 14

    **F. DSN's Claim for Laches Is Yet Another Example
of DSN Attempting to Make Something Out
of Nothing.** . . . . . . . 18

    **G. DSN Has No Sensical or Reasonable Explanation for Its
Conduct in this Case.** . . . . . 20

CONCLUSION . . . . . . . 25

# TABLE OF AUTHORITIES

**Cases:**

*909 Corp. v. Village of Bolingbrook Police Pension Fund*,
    741 F.Supp. 1290 (S.D.Tex. 1990) . . . . 3

*Bd. of Supervisors for Louisiana State Univ. Agric.*
*and Mech. College v. Smack Apparel Co.*,
    550 F.3d 465 (5th Cir. 2008) . . . . . 16

*Denison Mattress Factory v. Spring-Air Co.*,
    308 F.2d 403 (5th Cir. 1962) . . . . . 6

*Downstream Envtl, L.L.C. v. Gulf Coast Waste Disposal Authority*,
    2006 WL 324634 (S.D.Tex. 2006). . . . . 18

*Elvis Presley Enterprises, Inc. v. Capece*,
    141 F3d 188 (5th Cir. 1998). . . . . 16

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
    270 F.3d 298 (6th Cir. 2001) . . . . . 6

*New Orleans Public Serv. Inc. v. Majoue*,
    802 F.2d 166 (5th Cir. 1986) . . . . . 3

*Serco Services Co. v. Kelley Co., Inc.*,
    1994 WL 715913 (N.D.Tex. 1994). . . . . 3

*Thomas v. Capital Sec. Services, Inc.*,
    836 F.2d 866 (5th Cir. 1988) . . . . . 19

*Whitehead v. Food Max of Mississippi, Inc.*,
    332 F.3d 796 (5th Cir. 2003) . . . . . 19

*Zaldivar v. City of Los Angeles*,
    780 F.2d 823, 830 (9th Cir. 1986) . . . . 20

**Rules:**

Fed. R. Civ. P. 5(a)(1)(B), (b)(2)(i), & (b)(2)(C).          .          .          .          23

Fed. R. Civ. P. 11(b)          .          .          .          .          .          .          .          9, 10

Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment          .          .          4, 18, 29

Fed. R. Civ. P. 12(b)(6)          .          .          .          .          .          .          20

Rule 26(g)          .          .          .          .          .          .          .          .          .          20

Rule 56(g)          .          .          .          .          .          .          .          .          .          2

## SUMMARY OF THE ARGUMENT

DSN's response to Hi-Tech's Motion for Sanctions attempts to compensate for a lack of substance with volume and reliance on the presumption that pleadings are filed in good faith. Indeed, despite the fact that DSN's response contains over 20 pages of argument and 14 exhibits, the response provides absolutely no justification for the way DSN has conducted itself in the current proceedings – no justification for why it should not be punished for abusing the legal process. DSN, rather, attempts to distract from the substance of the issues at bar with long-winded explanations that do not actually explain anything, rendering the sanctionable nature of DSN's conduct even more apparent.

Hi-Tech incorporates the Nature and Stage of Proceedings section from its Motion for Rule 11 Sanctions [Doc. 33, pp. 1-3] as if fully set forth herein. Hi-Tech further discusses the nature and stage of the current proceedings in Section B, *supra*.

## ISSUES TO BE RULED UPON BY THE COURT

1. Whether, to the best of DSN's knowledge, information, and belief, its allegation that the date of the first Dianabol[®] trademark application was 2007 has evidentiary support or is likely to have such support after reasonable investigation or discovery;

2. Whether, to the best of DSN's knowledge, information, and belief, its allegation that DSN was a "prior user" of the subject mark has evidentiary support or is likely to have such support after reasonable investigation or discovery;

3. Whether to the best of DSN's knowledge, information, and belief, its allegation that there is no likelihood of confusion between Dianabol[®] and D-anabol 25 has evidentiary support or is likely to have such support after reasonable investigation or discovery;

4. Whether DSN's claim for Non-Infringement is supported by existing law or a good faith argument of extending existing law;

5.  Whether DSN's claim for Laches is supported by existing law or a good faith argument of extending existing law;

6.  Whether DSN's Second Amended Complaint, in whole or in part, represents another improper attempt to state a claim as part of a sanctionable pattern of conduct;

7.  Whether DSN conducted "an inquiry reasonable under the circumstances" as required by Rule 11, particularly in light of the Court's specific warnings;

8.  Whether DSN's filing of its Second Amended Complaint represents "culpable carelessness", once again, particularly in light of the Court's specific warnings; and

9.  Whether DSN filed its Second Amended Complaint for an "improper purpose."

Hi-Tech incorporates, as if fully set forth herein, its text regarding the Legal Standard and Standard of Review set forth in its Motion for Rule 11 Sanctions.  Doc. 33, pp. 4-5.

## ARGUMENT AND CITATION OF AUTHORITY

### A.  **The Purpose of Rule 11 Would Be Served Through the Imposition of Sanctions in this Case.**

DSN allots three and one-half pages of text to setting forth general principals and standards under Rule 11 with no evaluation or application of same.  It appears as though DSN intended to establish the difficulty of obtaining Rule 11 sanctions against another party and/or its counsel.  DSN, however, fails to recognize that in setting forth these principals and standards in detail, it becomes even more clear that the sanctions sought by Hi-Tech are both appropriate and necessary.

For instance, DSN cites the central purpose of Rule 11 as being the deterrence of "baseless filings in district court and … [the] streamlin[ing of] the administration and procedure of federal courts."  Doc. 39, p. 3 (citation and punctuation omitted).   DSN further acknowledges that "[t]he goal of Rule 11 is to impose a duty to base claims upon

factually and legally supportable grounds and to punish litigants and lawyers who unreasonably pursue frivolous suits." *Id.*, p. 4 (citation and punctuation omitted). DSN's conduct reveals that such deterrence must be applied in this case, as DSN has shown that absent such deterrence, it will stubbornly proceed in the same abusive manner.

For instance, as for the Original Complaint, DSN cannot, and does not, deny that it raced to the courthouse on Saturday, within hours of being threatened with litigation. *See Id.*, p. 23. While DSN has disingenuously and repeatedly argued in briefing that it was simply exercising its rights and that the law does not require it to "wait around" to see if Hi-Tech will file suit,[1] at the December 22, 2015 hearing in this matter, counsel for DSN finally called a spade a spade: "So, Your Honor, the reason that we filed it here in part was *because we knew that Mr. Wheat was going to pursue us [in Atlanta]* …" Initial Conference Transcript (hereinafter "Transcript"), 42: 11-12 (emphasis added). As set forth in Hi-Tech's previous briefs, the U.S. District Courts of this State have repeatedly and explicitly disapproved of such bad faith forum shopping.[2] Here again, counsel for DSN has missed the central point which is the race to the courthouse demonstrates the absence of good faith and the clear intent to improperly establish venue, and the

---

[1] *See, e.g.,* Doc. 10, pp. 13, 15; Doc. 15, p. 8; Doc. 31, p. 4.

[2] *See, e.g.,* Doc. 29, p. 6, 9 (including references to the following cases:
*909 Corp. v. Village of Bolingbrook Police Pension Fund*, 741 F.Supp. 1290, 1293 (S.D.Tex. 1990) ("Anticipatory suits deprive a potential plaintiff of his choice of forum," and are "not a proper use of the declaratory judgment act as [they] provoke a disorderly race to the courthouse."); *New Orleans Public Serv. Inc. v. Majoue*, 802 F.2d 166, 168 (5th Cir. 1986) ("The wholesome purposes of declaratory acts would be aborted by its use as an instrument of procedural fencing either to secure delay or to choose a forum."); *Serco Services Co. v. Kelley Co., Inc.*, 1994 WL 715913 (N.D.Tex. 1994) ("This false start, so to speak, runs counter to the purpose and spirit of declaratory actions.")

combination of counsel's statements during the hearing on this matter and DSN's written filings does nothing to dispel that central point.

As for the First Amended Complaint, simply put, DSN had to admit that it had absolutely no legal or factual basis for its DASCA-based Lanham Act claims or its false designation of origin claim. It was, however, not until the hearing that DSN decided to do so – after approximately two months, full briefing, and being face-to-face with Hi-Tech and this Court:[3]

> What I'd like to do, Your Honor, is ask for leave [to amend], which frankly I think is the appropriate things to do in a case where the Motion to Dismiss is meritorious -- I'm not saying that it is, but let's assume that it is -- on two points: the DASCA issues, and the false designation of origin issues.

*Id.*, 62:10-14. Then, even after this concession, DSN doggedly attempted to justify its supposed unfair competition and false advertising claims by relying entirely upon unrelated proceedings involving Mr. Wheat. *Id.*, 63:2- 67:9. DSN pursued this argument to the point that the Court flatly asked, "[D]o you have any specific evidence that there's

---

[3]"[A] litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment. DSN defended each of the claims in its first Amended Complaint in its response to Hi-Tech's corresponding motion to dismiss, despite apparent knowledge that, at least its DASCA-based and false designation of origin claims had no merit. *See* Doc. 15, pp. 10-18. In considering this point, the Court should ask itself when was the last time a litigant made an admission like the one that occurred at the hearing in this case which resulted in the amended complaint. Also – the Court should look back at this unusual series of events in relation to the very specific warnings the Court addressed to counsel regarding the potential for sanctions. Finally, the Court should consider the very specific warning the Court conveyed in its ECF Order relating to the prior hearing in which it once again warned about sanctions.

a falsity [in Hi-Tech's advertising]?" *Id*., 67:13-14. To which counsel for DSN responded, "*No … Not that I'm aware of*." *Id*., 67:15, 22. (emphasis added).

As if it were not bad enough to admittedly engage in bad faith forum shopping and then admittedly file multiple statutory claims with no factual or legal basis, DSN filed its Second Amended Complaint, which represents yet another example of sactionable conduct – conduct, not to mention a course of conduct, which is more than sufficient to overcome any presumption that DSN's pleadings are filed in good faith. Moreover, while DSN apparently seeks to defend itself by pointing out that the mere failure of factual or legal arguments does not justify the imposition of Rule 11 sanctions, DSN apparently misses the point: The point is not simply that any of DSN's positions have failed, or almost certainly will fail, as being factually and legally unjustified; the point is that DSN knew or should have known that the positions would or should fail and asserted them anyway. Such an argument might have been enough to avoid sanctions on the first filing, but after the hearing, all of the warnings made by the Court during the hearing, along with the specific warnings after the hearing, there is simply no other conclusion that can be drawn except that sanctions must be imposed.

**B. DSN's "Background of Events" Is Euphemistic and Misleading.**

DSN has taken liberties with the facts and the law in its pleadings, and its response at bar has similarly spun what occurred at the December 22, 2015 hearing in this matter. According to DSN's response:

> [T]he Court asked DSN to revisit its claims and facts alleged in regard thereto in its First Amended Complaint [Docket Entry No. 5] for Unfair Competition and False and Misleading Advertising, False Designation of Origin, Declaratory

Judgment of Abandonment, and for Allegations regarding the Designer Anabolic Steroid Control Act of 2014 ("DASCA"), and to provide additional facts and case law to support such claims.

Doc. 39, p. 7. As previously stated, however, this Court did not simply ask DSN to "revisit" its claims related to the DASCA and false designation of origin, DSN abandoned them in acknowledgment of their indefensibility. Transcript, 62:10-20.

Moreover, to say that this Court asked DSN to "revisit" its Unfair Competition, False and Misleading Advertising claims, is to put it lightly. What the Court said was:

> [Y]ou're telling me you have no basis for this except that [Mr. Wheat] committed allegedly [sic.] wrongs in another setting. I'm not happy with that…The point is: You don't have any evidence, I think you've said, that there was a failure somehow of a person to achieve results or any of that. You're just literally transposing the – it's like prior bad acts under the Rules of Evidence is what I'm hearing, 404(d) kind of stuff.

*Id*., 87: 9-11; 69: 4-9. To which counsel for DSN replied, "And I think Mr. Leach has actually made that assertion. *Id*., 69:10-11. Finally, as for DSN's abandonment claim, the Court accurately described it as "really hard … to digest." *Id*., 56:3-4.[4]

---

[4] While DSN, in its response, implies that Hi-Tech does not contest that it "knowingly failed to police its mark" or that DSN "sets forth legal authorities in support of its [abandonment] contentions," nothing could be further from the truth. Hi-Tech is not required to admit or deny DSN's factual contentions at this stage of the proceedings, and Hi-Tech considers DSN's authorities, which are distinguishable and largely from other jurisdictions [Doc. 27, ¶ 19], specious at best. For instance, the only 5th Circuit case cited by DSN in support of its abandonment claim*, Denison Mattress Factory v. Spring-Air Co*., 308 F.2d 403 (5th Cir. 1962), involved alleged infringement by a licensee in stark contrast to this case. Also, in *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc*., 270 F.3d 298 (6th Cir. 2001), another case cited by DSN, the court noted that "it appears unlikely that failure to prosecute, by itself, can establish that trade dress has been abandoned …" Hi-Tech simply deemed the issue more appropriate for the summary judgment stage of proceedings to the extent DSN's Second Amended Complaint could possibly survive dismissal.

While DSN would have this Court forget these exchanges, these exchanges are important because they represent this Court's acknowledgment of the manner in which DSN has prosecuted the current case. These exchanges also serve as context for its improper Second Amended Complaint. As discussed more fully herein, DSN has repeatedly misstated facts and misapplied law in this case, and DSN in bad faith continues this pattern of conduct despite this Court's clear warnings.

### C. DSN Does Not Substantively Deny That Its Second Amended Complaint is Based Upon Inaccurate Facts and Inferences.

In the corresponding section of Hi-Tech's Motion for Sanctions, Hi-Tech laid out the existence of Mr. Wheat's 2002 and 2005 applications to register the Dianabol® trademark. *See* Doc. 33, pp. 5-7. Hi-Tech went on to explain that DSN had knowledge of these applications when it filed its Second Amended Complaint, but nevertheless alleged that Mr. Wheat did not seek to register the Dianabol trademark until 2007. *Id*. Not surprisingly, DSN does not dispute these circumstances in its response. *See* Doc. 39, pp. 9-11. Indeed, nowhere in DSN's response does it dispute that this allegation is untrue or that it knew the allegation to be untrue at the time of filing. *See Id*.

DSN, rather, points out that it used carefully-crafted wording, or omissions of wording, in attempt to state a claim. For instance, DSN admits that it omitted the word "successfully" from its allegation concerning the 2007 application, which would be necessary to make it accurate. *Id*., p. 9, n. 1. DSN also asserts that it (conveniently) omitted "affirmative statements about the date that Hi-Tech began selling its product."

*Id.*, p. 10.   These omissions, however, do not weigh in DSN's favor as it believes.[5]
Unfortunately for DSN, such conscious omissions illustrate its intent with respect to the
Second Amended Complaint: to circumvent facts and circumstances it knew to be true.

Moreover, while DSN misleadingly argues that the 2002 and 2005 trademark
applications "have no legal significance," again, nothing could be further from the truth:
These applications demonstrate, or at least tend to demonstrate, that Hi-Tech acquired
intellectual property rights in the Dianabol® trademark through use in commerce before
DSN's first use of D-anabol 25.   Not only do the applications cite a date of first use in
commerce of March 31, 2002,[6] but the 2005 application, *which predates DSN's asserted
date of first use*,[7] contains a specimen of Hi-Tech's Dianabol® label, bearing Hi-Tech's
name and logo.   Doc. 39-2, pp. 15, 118, 121, 123.   These facts coupled with Hi-Tech's
2005 sales invoices, which are consistent with the applications, *and the utter absence of
evidence of any earlier (or even claimed) use by DSN*,[8] render it more than convenient for
DSN to pretend these applications do not exist and, in turn, make false allegations when
attempting to state a claim.   Indeed, these facts and the absence of any use prior to 2002
(or even 2005) by DSN – all of which were known to DSN – render its conduct plainly
sanctionable.   Rule 11 mandates that pleadings be consistent with the "best" of one's
"knowledge, information, and belief," and DSN has done nothing but attempt to contort

---

[5] DSN apparently made these specific omissions in its Second Amended Complaint, so that it
could assert the (weak and transparent) arguments it is currently making.

[6] DSN concedes that information contained in trademark applications and registrations is *prima
facie* evidence.   Doc. 39, p. 12, n. 12.

[7] DSN's Second Amended Complaint alleges that its date of first use in commerce with respect
to the D-anabol 25 mark was in 2006.   Doc. 27, ¶¶ 12, 14.

[8] *Id.*   This issue is discussed more fully in Section D, *supra*.

and circumvent the best of its knowledge, information, and belief in attempt to delay litigation and unjustly damage Hi-Tech. *See* Fed. R. Civ. Pro. 11(b).

D. **DSN's Response Reveals That It Has Absolutely No Evidence That DSN Began Selling its D-anabol 25 Product before Hi-Tech Began Selling Dianabol®.**

While DSN admittedly had evidence that Hi-Tech was using the Dianabol® trademark as of 2002 or, at least, 2005, DSN noticeably filed its Complaints in this matter despite with *no* evidence that DSN began using D-anabol 25 prior to either of those dates. Indeed, despite presumably having access to its own business records, Mr. Clapp's email to Mr. Wheat [Doc. 33-2, p. 2],[9] DSN's Second Amended Complaint [Doc. 27, ¶ 12], and Plaintiff counsel's recent Affidavit [Doc. 39-1, ¶ 5] make clear that DSN's only evidence relating to its earliest use of D-anabol 25 reflects a date in 2006. Thus, DSN does not argue that it has evidence that DSN used D-anabol 25 prior to 2002 (or even 2005), as indeed it does not. DSN, rather, simply argues that it does not have to accept the evidence contrary to its selected position and admits, although not explicitly, that its current suit is a fishing expedition:

> That DSN is not yet willing, without further discovery, to concede that the evidence Hi-Tech has offered is conclusive proof of disputed facts does not mandate a Motion for Rule 11 Sanctions or dismissal of DSN's Complaint. Doc. 39, p. 13.

Additionally, in making this argument, DSN misconstrues the standard imposed by Rule 11. The standard does *not* inquire as to whether a party has conclusive proof contrary to its assertions; the standard, rather, inquires as to whether it is "to the best of

---

[9] On September 11, 2015, Mr. Clapp tells Mr. Wheat that he (Mr. Clapp) "was selling [his D-anabol 25] product since no later than 2006."

the [party's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances [that] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. Rule 11(b)(3). As a result, the evidence presented by Hi-Tech does not need to be conclusive, and DSN does not need to consider it conclusive, in order for DSN's conduct to fail Rule 11's standard. *See Worell v. Houston Acad.*, 2008 WL 2753405, *4 (5th Cir. July 16, 2008) (imposing Rule 11 sanctions where the plaintiff's complaint contained "unsupported and factually incorrect allegations"; the plaintiff alone conducted "extremely limited [pre-filing] research"; and the plaintiff did not have any evidence contrary to that presented by the defendant). The point is that all evidence in DSN's possession, custody, and control at the time it filed its current Complaint indicate that Hi-Tech is the senior user. DSN, therefore, could not possibly be the senior user to the best of its knowledge, information and belief, but nevertheless filed its third Complaint making such allegations.

DSN goes on to argue that the 2002 and 2005 trademark applications do not constitute *prima facie* evidence of Hi-Tech's date of first use because the applications do not specifically reference Hi-Tech, and Mr. Wheat owned other companies at the time. Doc. 39, p. 13. While DSN admits that the 2005 application contained an exemplar photograph of the Dianabol® product with Hi-Tech's label on it, DSN again misleadingly contends this application has "no legal significance." Doc. 39, p. 11. DSN, however, again conveniently misses the point. As previously stated, the 2005 application, as the 2002 application, cites a date of first use in commerce of March 31, 2002, and the 2005

application contains a photograph of the *Hi-Tech* product apparently asserted to have been sold since that date. Doc. 39-2, pp. 15, 118, 121, 123. The sheer fact that the applications did not lead to registration is immaterial. The applications are evidence that *Hi-Tech* was, and had been, selling the Dianabol® product at the time of the applications. Mr. Wheat's mere ownership of other entities does not provide a reasonable basis for disputing this evidence, much less tend to prove otherwise.[10]

DSN then proceeds to argue that "DSN conducted a reasonable and independent inquiry … *before filing the Second Amended Complaint*." Doc. 39, p.14 (emphasis added). Notably, DSN had to qualify its assertion concerning its investigation because there is no competent or credible evidence it conducted any investigation prior to filing its Original Complaint or its First Amended Complaint. Of course, this utter absence of investigation is consistent with the fact that it filed its Original Complaint within hours of being threatened with litigation, and the fact that it filed its First Amended Complaint within hours of being served with Hi-Tech's Northern District of Georgia lawsuit. *Compare* Doc. 33-2, pp. 2-3 *with* Doc. 1; *compare* Doc. 11-2 *with* Doc. 5. While Mr. Clapp had previously stated in an email to Mr. Wheat that he "had looked online and spoken with distributors" regarding Hi-Tech's date of first use, DSN and Mr. Clapp suspiciously failed to provide any supporting details in that email, or in their response

---

[10] Not only does this argument fall short on a factual level, it falls short on a sincerity level. DSN did not raise the existence of Mr. Wheat's other companies as an alleged defense in its response to Hi-Tech's Motion to Dismiss its Second Amended Complaint, which addressed the same or similar issue. *See* Doc. 31, p. 21 (making no mention of Mr. Wheat's other companies and acknowledging that the information in the trademark applications is *prima facie* evidence). It appears the existence of Mr. Wheat's other companies was not a consideration until now – many weeks after DSN filed its Second Amended Complaint.

brief at bar, such as where Mr. Clapp supposedly looked online or the identity of the distributors supposedly contacted.  Doc. 33-2, p. 1; Doc. 39, p. 14-15.

Moreover, the screen shot provided by counsel for DSN indicates that he did not search or review USPTO records until October 9, 2015 – almost one month after he filed DSN's Original Complaint and exactly one week after he filed DSN's First Amended Complaint.  *Compare* Doc. 39-2, p. 1 *with* Docs. 1 & 5.  Counsel for DSN also states, cryptically, that he spoke with Mr. Clapp concerning when Mr. Clapp "believed" DSN first began selling D-anabol 25 "at some point before October 9, 2015."  Doc. 39-1, ¶ 5. Not only does this carefully-crafted statement fail to demonstrate that counsel spoke with Mr. Clapp on this issue before filing the first two Complaints, the implication that Mr. Clapp "believed" that DSN was the senior user is entirely contrary to Mr. Clapp's actions in the years preceding this litigation – actions of which counsel for DSN was aware by way of a previous filing in this case.  Exh. 4-7 within Doc. 8-2, filed Oct. 7, 2015.

As previously stated, Mr. Clapp reached out to Mr. Wheat to notify him of alleged infringers of trademarks three days after the USPTO issued its final rejection of DSN's application to register "D-anabol 25" due to its confusing similarity with Dianabol®. *Compare* Exh. 29-6 *with* Exh. 29-7. Mr. Clapp proceeded to email Mr. Wheat regarding various alleged infringers of the Dianabol® mark, and even wrote to one such infringer on Mr. Wheat's behalf. *See, e.g.,* Exh. 29-8; Exh. 29-9. Mr. Clapp also notified Mr. Wheat the Dianabol® trademark would be expiring, although Mr. Wheat had already taken the necessary actions to avoid such expiration. Exh. 29-10. This is, of course, not to mention that Mr. Clapp proposed a business venture with Hi-Tech, which would utilize the

12

Dianabol® trademark.  Doc. 33-9, p. 1. These are hardly the acts of one who "believes" that his company is a senior user of the relevant mark, illustrating that any alleged belief to the contrary is wholly disingenuous and not a proper basis for claims against Hi-Tech.

Counsel for DSN further states that he researched online sales of the subject products using an internet archive site, where he found evidence of D-anabol 25 being offered for sale as early as August 15, 2006.  Doc. 39-1, ¶ 5.  He further states that he searched the archive for Hi-Tech's website, but found that the page was listed as being under construction in the preceding years.  *Id*.  Apparently, information indicating that Hi-Tech's website was under construction led him to the conclusion that Hi-Tech was not selling the Dianabol® in any capacity during those years.  *Id*.  This conclusion, however, is entirely unreasonable in light of (1) the fact that he apparently did *not* search the websites of third-party online retailers which carries or may have carried Hi-Tech products; (2) affirmative evidence, in the form of invoices, showing various 2005 Hi-Tech sales to brick-and-mortar retailers; (3) the fact that he apparently did *not* make any attempt to confirm the authenticity of the 2005 invoices with the buyers listed; and (4) DSN's allegation in its Second Amended Complaint that:

> DSN is an online retailer who sells its products directly to the consumer, whereas [Hi-Tech], upon information and belief, sells its products as a wholesaler to various nutritional supplement retailers.  In fact, as of the state of the filing of this [Second] Amended Complaint, [Hi-Tech's] website does not allow a retail purchase of its products.

Doc. 27, ¶ 13.  Thus, to assume that Hi-Tech was not selling Dianabol® in the years preceding 2006 simply because Hi-Tech's website appeared to be under construction and a vaguely-worded 2007 advertisement is nonsensical, albeit convenient.

In sum, counsel's affidavit leads to the logical conclusion that neither he, nor his client, performed any inquiry, much less "an inquiry reasonable under the circumstances," into the allegations concerning the parties' dates of first use prior to filing the Original or First Amended Complaints. Counsel's affidavit also reveals that while he did perform some minimal inquiry prior to filing the Second Amended Complaint, he geared this inquiry toward a strained conclusion in DSN's favor, ignoring or refusing to investigate inconsistent evidence. Put simply, DSN and its counsel decided they wanted to take a position; they took said position in DSN's first two Complaints; they later "investigated" the position they had twice taken; and they performed and interpreted their "investigation" in an unreasonable and unbalanced manner so as to reach their desired, and twice stated, conclusion. Such actions represent an improper manipulation of the facts and the law and fall far short of Rule 11's obligations.

### E. DSN Once Again Seeks to Sidestep the Wording of Its Complaint as well as Its Knowledge, Information, and Belief.

DSN argues that its claim for non-infringement is not based solely on senior user status. Doc. 39, p. 16. Apparently, DSN is of the belief that even if its allegations concerning DSN's senior user status are found frivolous and improper, it has other non-infringement-related allegations that are not frivolous or improper, such that Rule 11 sanctions are not appropriate. *See Id*., p. 17. What DSN does not appreciate, however, is that its two examples of other non-infringement allegations do not help its cause. As will be explained below, the first allegation it discusses is found nowhere in the Second Amended Complaint and is, in fact, contrary to the allegations DSN actually makes. The

second allegation it discusses is perhaps the best example of DSN proceeding in a manner

contrary to the best of its knowledge, information, and belief.

DSN first argues that its claim for non-infringement is not frivolous because it

could have acquired trademark rights in certain geographical areas by selling D-anabol 25

when it did not have knowledge of Hi-Tech previously using Dianabol® in other

geographic areas. Doc. 39, p. 16. However, DSN's Second Amended Complaint alleges:

> DSN's mark, "D-anabol 25," was used in commerce **before** [Hi-Tech's] President
> sought to register the "Dianabol" mark … DSN or its (predecessor) was selling its
> allegedly infringing product, "D-anabol 25," **on a nationwide basis well before**
> June 2007 … DSN has continually sold that product **on a nationwide basis** since
> then…[F]ederal registration of a trademark or service mark cannot create rights
> and priority over **others who have previously used the mark** in commerce … **DSN
> has the right to use its mark as a prior user** irrespective of [Hi-Tech's]
> registration.

Doc. 27, ¶¶ 12, 25 (emphasis added). The Second Amended Complaint explicitly, and

repeatedly, alleges that DSN was the senior user, and that it was the senior user

"nationwide." This text is inescapable. As a result, DSN's current argument that it could

have attained rights in limited geographic regions, despite being a junior user, is both

disingenuous and unavailing. That is not the claim DSN pleaded, and this new theory

does nothing to excuse the knowingly erroneous theory it did plead.

DSN then points out that it alleged an absence of actual confusion among

consumers and (speculated) that there will not be sufficient evidence of a likelihood of

confusion. In support of these allegations, DSN states that it is unaware of any actual

confusion and that Hi-Tech and DSN "sell through different marketing channels." Doc.

27, ¶ 13. However, even if there is no evidence of actual confusion, which Hi-Tech

believes will not be the case after discovery, this alone would not be enough to support a claim non-infringement. *See Elvis Presley Enter., Inc. v. Capece*, 141 F3d 188, 203 (5th Cir. 1998) (evidence of actual confusion not necessary to demonstrate a likelihood of confusion); *Bd. of Supervisors for Louisiana State Univ. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 483 (5th Cir. 2008) (same). Any absence of actual confusion coupled with differences in advertising media alone would also likely be insufficient in light of the multiple factors courts use to evaluate a likelihood of confusion and facts known to DSN.[11] This is, of course, not to mention that while DSN's Second Amended Complaint alleges entirely separate "marketing channels," DSN is fully aware that Hi-Tech, as DSN, advertises its products, including Dianabol®, online. *Compare* Doc. 27, ¶ 13 *with* Doc. 5, ¶ 14; Doc. 5-1.

The insufficient and bad faith nature of DSN's "likelihood of confusion" allegations aside, Mr. Clapp's actions prior to the current litigation make it all to clear that to the "best" of his "knowledge, information, and belief," there is, in fact, a likelihood of confusion between Dianabol® and D-anabol 25. As discussed, in Section D, *supra*, in the years preceding the current litigation, Mr. Clapp plainly knew and believed that Dianabol® is a valid and valuable trademark, the ownership of which could (and would) be used to prosecute infringers. Such knowledge and belief is consistent with the

---

[11] When assessing a likelihood of confusion, courts consider the following factors: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identify of the advertising media used; (6) the defendant's intent; (7) any evidence of actual confusion; and (8) the degree of care exercised by potential purchasers. *Bd. of Supervisors,* 550 F.3d at 478. Hi-Tech notes that DSN's Second Amended Complaint appears to confuse or meld factors 4 and 5 in its allegation concerning sales "through marketing channels." *See* Doc. 27, ¶ 13.

fact the Mr. Clapp reached out to Mr. Wheat to prosecute those using Dianabol®-esque marks instead of doing so himself, and Mr. Clapp's assertion to Mr. Wheat that "I have been impressed by you and your company for many years." Doc. 33-9, p. 2. This is, of course, not to mention that the PTO rejected DSN's application to register D-anabol 25 on two occasions due to a finding of confusing similarity. According to the PTO:

> Online literature and/or advertisements for applicant's product [DSN's D-anabol 25] demonstrate that applicant's and registrant's [Hi-Tech's] goods are: (1) marketed through the same channels; (2) directed to the same potential customers; and (3) even promoted as comparable competing products wherein they provide, in part, 'If you are looking to buy Dianabol …online, our D-adabol 25 is exactly what you need… [Moreover,] the goods of the respective parties are nearly identical…The dominant feature of the applicant's mark [D-anabol 25] is nearly identical in appearance to registrant's mark [Dianabol®]. The letter I is merely replaced with a hyphen.

Doc. 33-6, pp. 3-4. The PTO further found that the term D-anabol 25 was "phonetiacally identical" to Dianabol®, and that the term "25" would be (incorrectly) perceived as the milligram dosage of DSN's goods. *Id.*; *see also* Exh. 2 to Doc. 8-2. Thus, the PTO made clear to DSN, on two occasions, and in great detail, that there was a likelihood of confusion between the marks.[12]

Three days later, Mr. Clapp reached out to Mr. Wheat, not to contest the Dianabol® trademark, but rather to gain Mr. Wheat's trust as an industry ally. *See* Doc.

---

[12] This is, of course, not to mention that Mr. Clapp's conduct and the PTO's (explicit) findings aside, DSN's Second Amended Complaint evidences DSN's true belief that there is or would be a likelihood of confusion between Dianabol® and D-anabol 25. Indeed, according to the emails cited in DSN's Second Amended Complaint, Mr. Clapp believes the marks "Dianabal-Dbol" and "Dianobol," which are along the very same lines as "D-anabol 25," are confusingly similar to Dianabol®. Doc. 27, ¶¶ 15, 17.

29-7. And, while doing so, Mr. Clapp concealed his association with www.anabolics.com (the infringing website discovered by Mr. Wheat on September 10, 2015), and the D-anabol 25 product. *See Id*. While Mr. Clapp did, apparently inadvertently, include Mr. Wheat on a chain of emails in which Mr. Clapp mentions his ownership of DSN, this reference is inconspicuous in the scheme of years of correspondence and makes no mention of his association with www.anabolics.com or D-anabol 25. Doc. 33-9.

While DSN cites *Downstream Envtl., L.L.C. v. Gulf Coast Waste Disposal Auth.*, 2006 WL 3246348, at *2 (S.D.Tex. 2006) for the proposition that Rule 11 sanctions are not appropriate where at least one of the plaintiff's claims are not "wholly frivolous," that case is inapposite. In *Downstream*, the plaintiff's one claim in question was a RICO claim, which was not precluded at the time of filing, but later invalidated by a Supreme Court ruling. *Id*. Unlike the RICO claim in *Downstream*, however, one of DSN's supposed other non-infringement claim does not truly exist in the pleadings, and the other was improper at the time it was filed. DSN is simply, but unsuccessfully, trying to make its Second Amended Complaint a moving target.

**F. DSN's Claim for Laches Is Yet Another Example of DSN Attempting to Make Something Out of Nothing.**

Not surprisingly, DSN seeks to have this Court evaluate its Second Amended Complaint in a vacuum. This is, however, is inconsistent with the legislative intent of Rule 11 and how courts apply the Rule. Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment (stating that when deciding whether to impose a sanction, courts should consider, *inter alia*, "whether it was part of a pattern of activity, or an isolated

event"); *Whitehead v. Food Max of Mississippi, Inc.*, 332 F.3d 796, 806 (5th Cir. 2003) ("[W]hether sanctionable conduct was part of a pattern of activity, or an isolated event is a proper consideration.") quoting Fed. R. Civ. P. 11 Advisory Committee's Note; *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866, 874 (5th Cir. 1988) ("[A] series of filings may indicate a pattern of attorney conduct of some consequence.") When DSN's failure to properly plead a claim for laches is viewed in context, it is apparent that this failure is part of a sanctionable pattern of conduct. *See* Doc. 33, p. 13.

When viewed as part of this pattern of conduct, as required by Rule 11, DSN's failure to properly plead laches is more than simple negligence. It is indicative that this wilful course of conduct will continue unless this Court deters same through the imposition of sanctions. Hi-Tech further notes that while Hi-Tech discussed this pattern of conduct, including the majority of the bullet points above, in its Motion for Sanctions, DSN noticeably failed to even attempt to explain these circumstances in its response. Doc. 33, p. 13; Doc. 39, p. 24 (simply stating that "the Court already dealt with such complaints at the Initial Conference on December 22, 2015, when it ordered that DSN amend its Complaint and submit a Second Amended Complaint"). Again, DSN selectively ignored the point that its Second Amended Complaint is to be evaluated in the context of its pattern of behavior in this case. *See* Fed. R. Civ. P. 11, Adv. Comm. Notes, 1993 Amendment; *Whitehead*, 332 F.3d at 806 (5th Cir. 2003); *Thomas*, 836 F.2d at 874.

Additionally, DSN's arguments that it did, in fact, sufficiently plead laches are unavailing and insincere as set forth in Hi-Tech's Motion to Dismiss DSN's Second Amended Complaint, which Hi-Tech incorporates in its entirety. Doc. 29, pp. 21-24.

DSN goes on to cite an almost 30 year-old Eastern District of Louisiana case for the proposition that it cannot be sanctioned for its Laches claim under Rule 11 because Rule 12(b)(6) more directly applies. Doc. 39, p. 18. This argument is, however, nonsensical and inconsistent with the law relied upon. Indeed, under DSN's strained reasoning, a party can bring a claim that is wholly baseless, knowingly illegitimate, and in bad faith, and avoid sanction as long as the claim is subject to dismissal under Rule 12(b)(6). This is, of course, ridiculous, which is why the Ninth Circuit case relied upon by the Eastern District of Louisianna 30 years ago simply notes that some filings are subject to special rules that should apply before Rule 11. For instance, the court notes that "excessive discovery requests should be dealt with under Rule 26(g) rather than Rule 11, and the filing of inappropriate affidavits in support of, or in opposition to, motions for summary judgment should be considered under Rule 56(g), rather than Rule 11." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830 (9th Cir. 1986). Of course, these scenarios are in stark contrast to the filing of DSN's third Complaint in this matter.

## G. **DSN Has No Sensical or Reasonable Explanation for Its Conduct in this Case.**

DSN provides "explanations" for *5 of the 12* instances of dilatory conduct outlined by Hi-Tech in its Motion. *Compare* Doc. 33, pp. 12-13 with Doc. 39, pp. 20-25.[13] However, not only does DSN's response indicate its acknowledgement that 7 of 12 instances are indefensible, the "explanations" it provides further Hi-Tech's argument.

---

[13] As previously stated, DSN made no attempt to explain Hi-Tech's examples of dilatory pleading or briefing in this case, simply stating that the Court addressed these issues at the Initial Conference in this matter. Section F, *supra*.

First, DSN argues that it did not file its Second Amended Complaint for the purpose of imposing delay because it simply "followed the Court's order to do so." Doc. 39, pp. 20-21. This Court's leave to file a second amended complaint, however, was not a license to file yet another baseless complaint. In fact, the Court specifically and repeatedly instructed counsel both in a filed ECF Order and repeatedly during the hearing before the Court that any filing was going to be considered under Rule 11. Yes, DSN removed several of its previous claims, and yes, DSN made additional allegations. The result, however, was to simply substitute old problems for new ones, further prolonging the motion to dismiss stage of this case, further delaying Hi-Tech's ability to proceed with its Northern District of Georgia case and Application for Temporary Restraining Order, and further prolonging the time during which DSN can profit through the infringement of Hi-Tech's trademark. If DSN cannot state a grounded claim in good faith against Hi-Tech (which it has demonstrated it cannot), it needs to stop filing complaints against Hi-Tech altogether. The fact this Court granted DSN leave to amend does not change this fact – DSN should have taken the opportunity to voluntarily dismiss.

As for Mr. Clapp's pre-suit communications with Mr. Wheat, first, they are not irrelevant to this Rule 11 Motion because they are part of DSN's course of conduct, they led to DSN's race to the courthouse to file its Original Complaint and initiate this baseless litigation, and they evidence DSN's dilatory motive in doing so. Second, DSN would have this Court take Mr. Clapp's emails at face value. Doc. 39, p 22 ("Exhibit H to Hi-Tech's Motion merely shows that DSN's Brian Clapp was alerting Jared Wheat to potential violations of Hi-Tech marks.") DSN would have this Court believe precisely

what Mr. Clapp and DSN wanted Mr. Wheat and Hi-Tech to believe at the time:  That Mr. Clapp and DSN were simply industry allies – allies who respect, honor, and value Hi-Tech's trademark rights, and allies who could not possibly be infringers themselves.

This Court, however, unlike Mr. Wheat and Hi-Tech has the benefit of hindsight. This Court has the benefit of knowing how these communications played out and what Mr. Clapp and DSN were doing while purportedly good industry citizens." This Court, therefore, can appreciate that, in the course of several years, Mr. Clapp's one and only reference to DSN was relatively inconspicuous and part of an email chain forwarded to Mr. Wheat (*i.e.* not originally addressed to Mr. Wheat), such that the reference appears accidental. This Court can also appreciate that Mr. Clapp never mentioned his D-anabol 25 product to Mr. Wheat, despite the passage of several years and multiple communications on the very issue of infringement upon the Dianabol® trademark. As a result, this Court can see exactly what Mr. Clapp was trying to do, starting three days after the PTO issued its final rejection of DSN's D-anabol 25 trademark application:  He was trying to distract Mr. Wheat, trying to feel out whether Mr. Wheat was "onto" him, and trying to keep his friends close and his enemies closer. DSN's deceitful and underhanded ways have infected the current litigation, leading to multiple improper filings including, but not limited to, DSN's third Complaint. As a result, DSN's Second Amended Complaint is nothing but yet another means to the same end that DSN has been pursuing ever since Mr. Clapp reached out to Mr. Wheat in 2012: the sale of infringing product as long as Hi-Tech, albeit through unawareness, and/or the law will allow.

DSN's response then proceeds with an apparent attempt to explain how Mr. Clapp's request for permission to sell D-anabol 25 for an additional year after being confronted with the infringement does not reflect an attempt at delay. Doc. 39, p. 23. In making this argument, however, DSN is making Hi-Tech's argument for it. Indeed, in making this argument, DSN confirms that the facts and sequence of events are precisely as Hi-Tech has repeatedly stated: (1) Mr. Wheat confronted Mr. Clapp with the infringement; (2) Mr. Clapp attempted to placate Mr. Wheat and buy DSN, and himself, additional time to continue selling the product; (3) Mr. Wheat immediately rejected this supposed compromise; and (4) DSN, *as soon as it became apparent that Mr. Wheat was not going to voluntarily give up this extra time*, raced to the courthouse to improperly take it by the successive filing of a series of complaints each one of which violates Rule 11. Thus, Mr. Wheat's immediate rejection of Mr. Clapp's proposal that he and DSN continue selling the product for another year represents the impetus of this frivolous litigation and does not weigh in DSN's favor as it apparently believes.

Lastly, DSN attempts to explain why it did not serve Hi-Tech with its First Amended Complaint. This "explanation," however, make no legal or factual sense. Federal Rule of Civil Procedure 5 addresses "pleading[s] filed after the original complaint [such as amended complaints]," and provides that service of such pleadings can be made by "leaving it at the person's office with a clerk or other person in charge" or by "mailing it to the person's last known address." Fed. R. Civ. P. 5(a)(1)(B), (b)(2)(i), & (b)(2)(C). DSN's response makes clear that it made absolutely no attempt to serve Hi-Tech by either of these means, despite the fact that it knew the address of Mr. Wheat's

office, where it had served Hi-Tech with the Original Complaint. Doc. 9. However, not only did DSN make no attempt to serve Hi-Tech in the manner required by Rule 5, DSN made no attempt to provide Hi-Tech with any notice of the pleading. Because DSN was served with Hi-Tech's Complaint on the day it filed its First Amended Compliant, DSN had, on that date, the identity and contact information of counsel who represent Hi-Tech. DSN, however, made no attempt to notify Hi-Tech's counsel. Additionally, as has been well established, DSN also had Mr. Wheat's email address, such that DSN could have communicated the First Amended Complaint to Mr. Wheat almost instantaneously. Nevertheless, despite these multiple avenues of service and communication, DSN made absolutely no attempt to serve Hi-Tech with its First Amended Complaint.

According to DSN, given that Hi-Tech's deadline to answer the Original Complaint, October 6, 2015, was only four days after DSN filed its First Amended Complaint, "DSN decided to wait until an appearance was made so it could serve the First Amended Complaint on October 6, 2015." Doc. 39, p. 24. DSN, however, despite this supposed intent did *not* serve Hi-Tech with its First Amended Complaint on October 6, 2015. In fact, DSN never "served" Hi-Tech with it First Amended Complaint until DSN filed it as an exhibit in the Northern District of Georgia case. Doc. 10-3. Simply put, in light of DSN's ridiculous argument on this issue, its failure to serve Hi-Tech can only be viewed as not just intentional, but intentionally dilatory, delaying Hi-Tech's response to the First Amended Complaint, and thereby lengthening the overall proceedings.

## CONCLUSION

DSN has repeatedly made false and misleading statements of fact, and argued false and misleading applications of the law. In doing so, DSN has already delayed the progress of Hi-Tech's case by six months – half the time Mr. Clapp wanted to sell through his D-anabol 25 inventory and change the product's marketing materials [Doc. 33-2, p. 4] - thereby benefiting from its wrongful and abusive conduct. Delay, however, is not the only consequence suffered by Hi-Tech. As a result of DSN's filing of three baseless and legally improper Complaints, Hi-Tech has been forced to file a multitude of lengthy and detailed briefs, and appear for oral argument, to lay out why DSN's claims, which it knows are baseless, are baseless and to dispel the utter confusion DSN has tried so desperately to create. Hi-Tech should not bear the burden of this expense, and DSN should be punished for its abuse of the legal process.

Wherefore, Hi-Tech respectfully requests that this Court impose Rule 11 sanctions against DSN and its counsel in the amount of Hi-Tech's attorney fees and costs associated with the current litigation including, but not limited to, those associated with oral argument and travel costs, and the attorney fees and costs associated with the filing of the current Motion and repeated motions to dismiss. Finally, and assuming the Court agrees that the motive for this delay and obstructive behavior has been the sale of the violative product, the Court should order disgorgement of the gross sales proceeds from the date of the Original Complaint to the date of the order on the motion to dismiss and sanctions.

Respectfully submitted this 14th day of March, 2016.

*/s/ Arthur W. Leach*
Arthur W. Leach
Ga. Bar No. 442025
C.L. Parker
Ga. Bar No. 722011
(*admitted pro hac vice*)
Counsel for Hi-Tech
Pharmaceuticals, Inc.

The Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Telephone: (404) 786-6443
Facsimile: (678) 624-9852
Art@ArthurWLeach.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered parties.

/s/ Arthur W. Leach
Arthur W. Leach