IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HI-TECH PHARMACEUTICALS, INC.,<br>a Georgia corporation,<br><br>    Plaintiff,<br><br>v.<br><br>DYNAMIC SPORTS NUTRITION, LLC<br>d/b/a ANABOLIC RESEARCH,<br>a Texas Limited Liability Company;<br>PBB TRADEMARK HOLDINGS, LLC,<br>a Texas Limited Liability Company; and<br>BRIAN CLAPP, an individual,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION FILE NO.<br>1:16-CV-00949-MLB |

## DEFENDANTS' MOTION IN LIMINE
## AND MEMORANDUM OF LAW IN SUPPORT

**ARNALL GOLDEN GREGORY, LLP**
Aaron M. Danzig
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8504
Facsimile: (404) 873-8505
E-mail:    aaron.danzig@agg.com

**WELLBORN & WALLACE, LLC**
Paul F. Wellborn III
Kelly O. Wallace
Samuel A. Mullman
1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318
Telephone: (404) 352-3990
Facsimile: (404) 352-3995
E-mails:    pete@wellbornlaw.com
               kelly@wellbornlaw.com
               sam@wellbornlaw.com

*Attorneys for Defendants*

Defendants Dynamic Sports Nutrition, LLC ("DSN"), PBB Trademark Holdings, LLC, and Brian Clapp ("Defendants") file this Motion in Limine and show that: (1) the testimony and report of Plaintiff Hi-Tech Pharmaceuticals, Inc.'s ("Hi-Tech's") expert Linda Gilbert should be excluded from evidence at trial; and (2) reports of product testing performed and disclosed by Hi-Tech after the close of discovery should likewise be excluded.

## FACTS

## I. EXPERT REPORT OF LINDA GILBERT

### A. <u>Gilbert's Lack of Credentials</u>

Hi-Tech designated Linda Gilbert as its trademark survey expert and seeks to introduce at trial her December 15, 2016 "Trademark Research Report." *(See Exhibit A, Gilbert Report)*. Gilbert is the CEO of EcoFocus Worldwide, LLC. *(Exhibit B, Gilbert CV at 6)*. She holds a Bachelor of Science degree in Agriculture/Food Science from the University of Arizona. *(Id.)*. Gilbert considers herself an expert in consumer marketing, a field wholly unrelated to the present matter. *(Exhibit C, Gilbert Depo. at 11:3-15)*. Her professional activities focus on health and wellness, including consumer choices and trends regarding wellness and sustainability. *(Exhibit B, Gilbert CV at 2-5)*.

Gilbert is not, however, an expert in the areas to which her report herein

relates. She has no experience in designing or executing trademark-related surveys. *(Exhibit C, Gilbert Depo at 11:3-15 and 12:14-17)*. The confusion survey at issue herein was the first and only time that Gilbert had ever undertaken a project relating in any way to trademarks or consumer confusion. *(Id. at 65:16-21)*. Gilbert has never been published or otherwise written about consumer confusion, consumer surveys, or any other trademark-related topic, nor has she – other than the present matter – ever served as an expert or testified regarding these topics. *(Id. at 11:24-12:10; 15:22-16:3; 12:14-17; 16:4-9)*.

By Gilbert's own admission – and as expressly held by the United States District Court for the Northern District of Georgia – Gilbert is <u>not</u> qualified to testify as an expert in trademark survey design or analytics. Specifically, in an October 2017 order in a separate, recently-concluded case also involving Hi-Tech and its principal Jared Wheat, Judge Charles Pannell excluded Gilbert's survey reports because she expressly admitted that she is not an expert in survey design or analytics. *(Exhibit D, Order, Federal Trade Commission v. National Urological Group, Inc., et al., Civil Action No. 1:04-CV-3294-CAP, 125 (October 10, 2017, N.D. Ga.); Exhibit E, Depo. of Linda Gilbert at 130:5-8, Federal Trade Commission v. Lane Labs, et al., Civil Action No. 2:00-cv-03174 (DMC) (D.N.J. (Question: "[w]ell, do you consider you're an expert—yourself an*

*expert in devising surveys?" Gilbert Answer: "I'm not an expert in survey design*

*or analytics.")))*.

## B. **Overview of Gilbert Report**

The professed objective of the Gilbert Report was to answer three

questions: "(1) What % of consumers considers DIANABOL a brand name vs. a

common or generic name?; (2) What % of consumers believe D-ANABOL and

DIANABOL are made by, affiliated with, or sponsored or approved by the

same company based on viewing the product packages?; and (3) How does this

level of confusion compare to the control product (MOCKUP)?" *(Exhibit A,*

*Gilbert Report at 1)*. The survey was designed and implemented by Gilbert,

was conducted online from November 9-15, 2016, and the data was

subsequently tabulated and analyzed by Gilbert. (*Id.*).

Five hundred qualifying respondents were surveyed, whom Gilbert

randomly split into three groups:

- GROUP 1: (n=169) viewed Section 1 of the questionnaire testing if
  DIANABOL is viewed as a brand or a generic/common name
  (referred to as the "Teflon Survey")[;]

- GROUP 2: (n=166) was the test group and viewed Section 2 of the
  questionnaire testing likelihood of brand confusion between
  DIANABOL and D-ANABOL *(sic)* [; and]

- GROUP 3: (n=165) was the control group and viewed Section 3 of
  the questionnaire testing likelihood of brand confusion between
  DIANABOL and the MOCKUP [referred to as the "Consumer

Confusion Survey" combined with Section 2 above].

*(Id. at 1-2).*

### 1. <u>Section 1: The Teflon Survey</u>

Group 1 respondents were shown definitions and examples of brand names and common/generic names. *(Id. at 5; 23-24).* Next, the respondents were asked whether each of six terms were brand name or common/generic name: McDonalds, Hamburger, Ford, Pickup Truck, Starbucks, and Cappuccino. *(Id. at 6; 24-25).* Respondents who answered at least four of the six qualifying questions correctly moved on to a second set of six more terms to similarly classify: DIANABOL (in all caps); Protein Powder; Muscle Pharm; Creatine; Kre-Alkalyn; and Glucosamine. *(Id. at 5-6; 26-27).*

### 2. <u>Section 2: The Consumer Confusion Test Group</u>

Section 2 respondents were shown an image of a bottle of Hi-Tech's Dianabol. *(Id. at 7-11).* They were then shown five product containers, one of which was DSN's D-Anabol 25. *(Id.* at 8). The respondents were asked on the following screens whether any of the five products were made by, affiliated with, or sponsored or approved by the same company as the product first shown (Hi-Tech's Dianabol). *(Id. at 8).* On the basis of the results, Gilbert concluded that there exist a likelihood of confusion between the competing marks. *(Id. at 3 (misidentifying DSN's mark as "D-Anabol")).*

3. **Section 3: The Consumer Confusion Control Group**

Section 3 was presented in the same format as Section 2, with the bottle of DSN's D-Anabol 25 replaced with a similarly-shaped mockup bottle labeled with the name TREN 75 instead of D-ANABOL 25. *(Id. at 11)*. The respondents were again asked on the last screen to indicate if any of the five products were made by, affiliated with, or sponsored or approved by the same company as Hi-Tech's Dianabol. (*Id.* at 12).

## II. UNTIMELY ABC PRODUCT TESTS

Discovery in the present matter closed on June 30, 2017.  On November 14, 2017, Defendants filed their Motion for Summary Judgment [DE 160]. On December 18, 2017, Hi-Tech filed its response brief ("Hi-Tech SJ Response [DE 163]"), which included at Exhibit 3 the results of testing performed at Hi-Tech's behest by ABC Testing on the products of various third-party supplement manufacturers not involved in the present litigation (the "Non-Party Test Results"). *(Exhibit F, Non-Party Test Results)*. The Non-Party Test Results were proffered to support Hi-Tech's contention that the DHEA-related supplements of some non-party manufacturers also contain androstenedione. *(Hi-Tech SJ Response [DE 163] at 5 and Exhibit 3)*. Each page of the Non-Party Test Results indicates that ABC received the to-be-tested supplement on July 27, 2017 (referred to as the "received date") and issued its report on that

5

supplement on August 2, 2017 (the "report date"). *(Exhibit F, Non-Party Test Results at 1-13)*. These documents were created a month after discovery ended and first disclosed almost six months after discovery ended.  Hi-Tech later identified these documents as its proposed Trial Exhibit 389.

## ARGUMENT

## I.   THE EXPERT REPORT OF LINDA GILBERT SHOULD BE EXCLUDED.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It was amended in 2000 to reflect the holdings of *Daubert* and its progeny regarding the gatekeeper-related duties of the trial court. F.R.E. 702, Committee Notes on Rules; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Courts construe Rule 702 as requiring a three-prong analysis of proffered expert testimony: (1) whether the proposed witness has knowledge or experience to give a qualified expert opinion; (2) whether the expert has accurately applied reliable principles and methods to a complete set

of facts; and (3) whether the witness's opinion is adequately suited or "fitted" to the facts of the case. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (distilling these three requirements into the "qualifications," "reliability," and "helpfulness" prongs of Rule 702). The burden of establishing that an expert's testimony satisfies Rule 702 is borne by its proponent by a preponderance of the evidence. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010). In the present matter, the Gilbert Report should be excluded because Linda Gilbert is not qualified to testify as an expert, the methodology of the Gilbert Report is fundamentally flawed, and the Gilbert Report is not helpful to the trier of fact.

### A. Gilbert Lacks The Requisite Qualifications To Offer Trademark Survey-Related Expert Testimony.

#### 1. Gilbert Has No Pertinent Training Or Experience.

"To fulfill its role as a gatekeeper, the trial court must determine whether the expert has the requisite qualifications to offer the opinions [s]he gives." *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1349 (M.D. Ga. 2007). The court must accordingly determine whether the expert's field of expertise is known to reach reliable results for the particular subject matter of her proposed testimony. *Id.* at 1350; *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1175 (1999). As detailed above, Gilbert is not qualified as an expert in

the subject matters of her proposed opinions – trademark-related genericism and consumer confusion-related surveys.  Gilbert lacks any special credentials or training pertinent to her survey or her report and the opinions she offers therein.  *(See Exhibit B, Gilbert CV at 6)*. Her claimed field of expertise and practice focus (health and wellness-related consumer decisions and trends) is unrelated and thus irrelevant to the opinions she seeks to offer herein.  *(Id. at 2-5; Exhibit C, Gilbert Depo. at 11:3-15)*. Moreover, Gilbert has no experience with trademark-related surveys. *(Exhibit C, Gilbert Depo at 11:3-15; 12:14-17)*. The trademark survey at issue herein was the first and only time that Gilbert has ever undertaken a project relating in any way to trademarks or consumer confusion. *(Id. at 65:16-21)*. Gilbert has never been published or otherwise written about consumer confusion, consumer surveys, or any other trademark-related topic, nor has she – other than the present matter – ever served an expert or testified regarding these topics. *(Id. at 11:24-12:10; 15:22-16:3; 12:14-17; 16:4-9)*.

## 2.    Gilbert Has Expressly Admitted That She Is Not An Expert In Survey Design And Execution.

When an expert witness admits that she is not qualified in the pertinent field, the gatekeeper court should exclude her report and testimony. *Bowers v. Norfolk S. Corp*., 300 Fed. Appx. 700, 703 (11th Cir. 2008). This is especially

true in – as here – matters in which the jury (rather than the court in a bench trial setting) is the ultimate trier of fact. *Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.*, 2012 WL 1551709 (D.N.J. Apr. 30, 2012) (copy attached at Exhibit G); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 596 n. 10 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir.2003). In her deposition given in relation to *Federal Trade Commission v. Lane Labs, et al.*, Civil Action No. 2:00-cv-03174 (SDW), when asked if she considered her self a survey expert, she replied, "I'm not an expert in survey design or analytics." *(Exhibit E, Gilbert Deposition from FTC v. Lane Labs at 2 (130:5-8)).*

### 3.   This Court Has Already Ruled That Gilbert Is Not An Expert In Consumer Survey Design And Execution.

Consistent with the discussion in Sections I.A.1 and 2 immediately above, this Court has already ruled that Gilbert's survey-related opinions are inadmissible because she is not an expert in the design and implementation of surveys. *(Exhibit D, National Urological Group, Inc., 2017 WL 6759868 at \*43).*  A little less than a year after Gilbert's submission of her report in the present matter, Judge Charles Pannell of the United States District Court for the Northern District of Georgia had to determine whether to allow Gilbert's expert testimony regarding her execution of a nutritional supplement-related survey on behalf of, among others, Hi-Tech Pharmaceuticals and Jared Wheat.

9

*Id.* Judge Pannell excluded Gilbert's testimony, expressly ruling that Gilbert is

<u>not</u> an expert in survey design or analytics. *Id.* The below-discussed fatal,

fundamental flaws in Gilbert's survey methodology underscore the accuracy of

Judge Pannell's ruling and Gilbert's candid self-assessment.

### B. <u>Gilbert's Survey Is Fatally And Fundamentally Flawed.</u>

To ground a survey as reliable, its proponent must establish foundation

evidence showing that:

> (1) the 'universe' was properly defined, (2) a representative sample
> of that universe was selected, (3) the questions to be asked of
> interviewees were framed in a clear, precise and non-leading
> manner, (4) sound interview procedures were followed by
> competent interviewers who had no knowledge of the litigation or
> the purpose for which the survey was conducted, (5) the data
> gathered was accurately reported, (6) the data was analyzed in
> accordance with accepted statistical principles and (7) objectivity
> of the entire process was assured.

*Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1322 (N.D. Ga. 2008).

Failure to satisfy any of the listed criteria may seriously compromise the

survey's impact on a court's likelihood of confusion evaluation. *Id.* Even in a

close case where it appears unclear as to whether a survey established the

evidence listed above, a trial court should not consider a survey and its results

as evidence for likelihood of confusion where the presentation of the testing

stimuli is contextually flawed. *Id.* at 1334. Gilbert's surveys are fatally flawed

in implementation, methodology, and analysis and therefore are unreliable.

    **1.**   **Gilbert Changed The Name Of The Pertinent DSN Product In Her Survey Questions To Make It Seem More Similar To The Name Of The Competing Hi-Tech Product.**

The DSN product that is at issue in this litigation and that is the subject of Gilbert's survey and report is D-Anabol 25. At all times pertinent to Hi-Tech's claims, DSN's product was referred to by this name and this name only. DSN has never referred to its product as D-Anabol (sans the "25"). The name of Hi-Tech's pertinent product is simply the generic anabolic steroid name "Dianabol." The "25" in the name of DSN's product is one of the primary ways in which that name is distinct and different from that of Hi-Tech's product (i.e., "D-Anabol 25" vs. "Dianabol"). Incredibly, throughout Gilbert's survey and report – in both the questions and the answers from which the survey participant could choose – all textual references to the pertinent DSN product appeared as "D-Anabol." Gilbert's egregious misidentification of the name of DSN's product renders her report and anticipated testimony worthless.

    **2.**   **Gilbert's Survey Design Was Impermissibly Slanted In Hi-Tech's Favor.**

When survey questions are ambiguous or slanted, they corrupt the results of the survey. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:172 (4th ed. 2010). Suggestive questions necessarily make a survey unreliable by creating "demand effects" or "cues" from which a

respondent can "infer the purpose of the survey and identify the 'correct' answers." *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465 (E.D. Va.), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (excluding the survey evidence as improperly suggestive and therefore unreliable). These suggestive or leading cues "bias the survey by suggesting to respondents, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Id.* (quoting *Simon Prop. Grp. L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1048 (S.D. Ind. 2000) (excluding surveys that "are merely transparent paths to a desired but artificial result . . . driven by leading and suggestive questions")).

### a. <u>Gilbert's Survey Overtly Signaled That The Respondent Should Characterize "Dianabol" As A Trademark By Setting It Off As The Only Term That Appeared In All Capital Letters.</u>

The initial mention in Section 1 (the genericism portion of Gilbert's survey) of the term "dianabol" appears in screening questions intended to rate a given respondent's ability to distinguish between generic words and trademarks. *(Exhibit A, Gilbert Report at 26)*. The initial six questions asked the respondent to characterize as either a "Brand name" or a "Common or generic name" (or to respond "Don't know") the following terms: "McDonalds,"

"Ford," "Starbucks," "Pick-Up Truck," "Hamburger," and "Cappuccino." *(Id. at 23-26)*. Respondents who answered at least four of these questions correctly (ostensibly demonstrating some understanding of the generic words vs. trademark distinction) were asked to perform this same categorization for six additional muscle building/supplement-related terms. *(Id. at 26-27)*. These six terms included the following five, each of which appeared with an initial capital letter for each word in the term: "Protein Powder," "Muscle Pharm," "Creatine," "Kre-Alkalyn," and "Glucosamine." *(Id.)*. The sixth term to be classified was the word/name at the center of Hi-Tech's trademark claims herein, which Hi-Tech claims is an enforceable trademark, and Defendants claim is a generic term. *(Id.)*. Unlike all of the eleven other "mark or generic?" terms, however, this term appeared in all capital letters: "DIANABOL." *(Id.)*. As the only all-caps term in this section of the survey, DIANABOL jumped off the page, giving undue emphasis and otherwise signaling to the respondent that the term is special or unique. Indeed, consistent with the legal and business convention of capitalizing all letters when referencing a trademark, the all-caps format of "DIANABOL" specifically and impermissibly signals "I am a trademark."

13

**b.**  **Gilbert's Survey Overtly Signaled That Respondents Should Infer A Relationship Between Hi-Tech's Dianabol And DSN's D-Anabol 25.**

The supplement industry has been replete with muscle-building products other than the two at issue herein whose names are identical to, derived from, or otherwise similar to or suggestive of the term "anabolic" and/or the generic steroid name "dianabol." These include, but are not limited to, iBuy Body, LLC's "Dianabal-DBol"; CrazyMass, LLC's "Dianabal"; Muscle Labs, USA's "Dianabol"; Pharmasterol.com's "Dianabolone;" Zoelabs.com's Dianobol; and LegalSteroids.com's "D-Bol/Dianabol"; and Roid-Shop.com's "Dianabol." *(See Declaration of Brian Clapp [DE 16-1] at ¶ 26 and Ex. B, Hi-Tech v. DSN et al., Civil Action File No. 1:15-cv-03393-MHC (N.D. Ga. 2015) (companion/precursor case to the present matter)).*  Gilbert, however, performed no research whatsoever to familiarize herself with these third-party products and no research whatsoever to familiarize herself with the two products at issue (Hi-Tech's Dianabol and DSN's D-Anabol 25). *(Exhibit C, Gilbert Depo. at 23:15-19).*  She made no effort whatsoever to determine the frequency in the supplement industry of similarly named products and was unable to state whether the existence of similarly named products would impact her confusion-related conclusions.  *(Id. at 24:5-25:17).*  Indeed, at all pertinent times, Gilbert was unaware of the evolution of the term "dianabol"

14

(i.e., that it was originally a brand name for a particular anabolic steroid; fell into use as a generic steroid-related term; and was later adopted by Hi-Tech as the name of its supplement). *(Id. at 23:20-24:3).*

The pivotal confusion-related survey questions first displayed a bottle of Hi-Tech's Dianabol and then asked whether the respondent believed any of five other supplement-related products were made by, affiliated with, or approved by the company that made the initially-displayed supplement (Hi-Tech Dianabol). *(Exhibit A, Gilbert Report at 27-29).* The five products from which the respondent was asked to choose were D-Anabol 25 (misidentified by Gilbert as "D-Anabol"); Trenorol; Muscle Juice; Decacor; and T-250). *(Id.).* Other than DSN's product (D-Anabol 25), the products listed by Gilbert in the potential responses were not even remotely similar in name to Hi-Tech's Dianabol. Whether (at best) due to Gilbert's lack of knowledge regarding the supplement industry and competing third-party products, or (at worst) in an intentional effort, the survey impermissibly signaled that the respondent should choose the only name that was remotely similar: D-Anabol 25.

### 3. In Relation To A Term That Was Used Generically Prior To Its Adoption As A Trademark, Survey Evidence Of Respondents' Beliefs Regarding The "Trademark or Generic?" Issue Are Irrelevant And Inadmissible.

Generic terms cannot be trademarked in relation to their common

meaning. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (holding "no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification," it cannot deprive others from calling their product the same generic name). There are two distinct pathways by which terms may deemed generic: (1) where the term began life as a "coined term" and was later genericized; and (2) where the term was generically used in the pertinent context prior to its association with the products at issue. *Hunt Masters, Inc. v. Landry's Seafood Rest., Inc.*, 240 F.3d 251, 255 (4th Cir. 2001) (excluding the use of survey evidence in the second scenario). When a user is not the first to use the name (i.e., as here where the mark holders adopts a generic term, as opposed to coining a term that is later genericized), "it is not necessary to determine whether the term has become generic through common use, rendering [the genericism portion of the] customer survey irrelevant." *Id; see also Schwan's IP, LLC v. Kraft Pizza Co.*, 460 F.3d 971, 976 (8th Cir. 2006) (finding Brick Oven was commonly used before either party began labeling their frozen pizzas with the term and therefore deeming survey evidence irrelevant and properly excluded); *Miller Brewing Co. v. Joseph Schlitz Brewing Co.*, 605 F.2d 990, 995 (7th Cir. 1979) (finding the survey irrelevant to the genericness inquiry because "LITE" was a

common word when applied to beer since before Miller Brewing Company's use). Because "dianabol" was a commonly used, generic term when it was adopted by Hi-Tech as its product name, the genericism portion of Gilbert's survey is inadmissible.

### 4. The Universe Of Respondents In Gilbert's Survey Was Vastly Overinclusive.

#### a. Gilbert's Survey Universe Included Consumers Who Were Not Potential Purchasers of DSN's Product.

The appropriate universe of respondents in a trademark-related survey are those consumers "most likely to purchase" the competing products. *Wal-Mart Stores,* 537 F. Supp. 2d at 1325 (where allegedly infringing anti-Wal-Mart products were sold exclusively via the Internet, survey universe was overbroad because it was not limited to Internet purchasers with a possible interest in the anti-Wal-Mart products). The inclusion of respondents who are not potential purchasers of the allegedly infringing product impermissibly skews the results of a confusion-related survey because they are less likely to be aware and to make crucial distinctions between the competing products. *Id.; see also Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990) (in infringement case involving frozen diet entrees, survey universe was overbroad because it included women who tried to lose weight through exercise only, rather than being limited to women who tried to lose

weight through dieting); *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 84 U.S.P.Q. 2d 1225 (6th Cir. 2007) (in infringement case between two wine producers where the plaintiff's product was sold through mass retail channels and the defendant's product was sold only online and at its winery tasting room, survey was overbroad where it was not limited to wine purchasers who planned to make wine purchases via the Internet or at a winery tasting room).

Selection of the proper universe is one of the most important factors in assessing the validity of a survey. *Wal-Mart Stores*, 537 F. Supp. 2d at 1323. The selection of a proper universe is "so critical" that "even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003).

The present matter is conceptually identical to *Wal-Mart Stores* and the other cases cited above. Hi-Tech's Dianabol product is sold at brick-and-mortar mass retailers and at numerous online websites.  DSN's allegedly infringing product (D-Anabol 25) is sold only via the Internet through DSN's website. *(Clapp Dec. [DE 57-1] ¶ 4; Clapp Deposition [DE 164] at 112:12-19).* Gilbert's survey universe, however, included anyone over 18 years of age who purchased or used within the past year or planned in the next two months to purchase or

18

use "nutritional supplements, amino acids, herbal supplements or anabolic steroids for building muscle mass, size, and strength." *(Exhibit A, Gilbert Report at 2)*. Gilbert's survey universe is accordingly grossly overinclusive because it includes respondents who are not potential purchasers of DSN's D-Anabol 25 (i.e., consumers who otherwise satisfied Gilbert's survey criteria, but who did not use or do intend to use the Internet to make their qualifying purchase). Consumers who shop for supplements only at brick-and-mortar establishments cannot possibly encounter or purchase D-Anabol 25.

### b.   Almost 40% Of Gilbert's Survey Universe Were Women.

Both of the competing products (Dianabol and D-Anabol 25) are characterized as "anabolic." Hi-Tech specifically advertises that Dianabol "boost[s] testosterone levels." The universe of likely purchasers/users is accordingly and necessarily predominately, if not all, male. Some online resellers of Hi-Tech's Dianabol include an express "not for women" warning for that product. *(See, e.g., Exhibit H, Same Day Supplements Warning; Exhibit I, Stinger Supplements Warning)*. Gilbert's survey universe failed to account for the substantial gender-based disparity in the purchasers and potential purchasers of the two competing products. Instead, almost forty percent of the survey respondents were women, rendering the survey grossly overinclusive

and not reflective of the true demographic universe of likely purchasers.

**5.   The Universe Of Respondents In Gilbert's Survey Intentionally And Impermissibly Excluded Otherwise-Qualified Consumers Especially Likely To Have Knowledge Or Awareness Regarding The Term "dianabol" And The Competing Products At Issue.**

In the screening portion of Gilbert's survey, potential participants were shown a list of business categories and asked whether they or any immediate family members were employed by any business in the list. *(Exhibit A, Gilbert Report at 21)*. Potential participants who responded affirmatively to certain of the listed business were "terminated" and not allowed to participate in the survey. *(Id.)*. The employer-related responses that triggered this immediate expulsion from survey participation included advertising firms, marketing firms, marketing research firms, public relations firms, fitness centers, gyms, vitamin manufacturers, vitamin distributors, vitamin retailers, supplement manufacturers, supplement distributors, supplement retailers, physician offices, and/or nutritionist offices. *(Id.)*. This worse-than-arbitrary exclusion of broad swaths of potential survey participants prohibited from participation those consumers most likely to understand the concepts of trademarks and generic terms (i.e., the advertising, marketing, and public relations respondents) and those consumers most likely to have informed knowledge about steroids, dianabol, and muscle building supplements (i.e., fitness

centers, gyms, vitamin/supplement manufacturers, distributors, and retailers, physician's offices, and nutritionist's offices). These exclusions served no legitimate or permissible survey-related purpose and instead served only to skew the confusion-related results of the survey in Hi-Tech's favor.

**6.   Gilbert's Survey Failed To Replicate The Market Conditions In Which A Consumer Might Encounter D-Anabol 25.**

Courts routinely reject or give little weight to surveys that do not replicate how consumers interact with products in the marketplace. *See, e.g., Wal-Mart Stores* 537 F. Supp. 2d at 1327  ("To be valid for the purposes of demonstrating actual confusion in a trademark infringement suit, it is necessary for a survey's protocol to take into account marketplace conditions . . . ."); *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 WL 1833877, at *6 (M.D. Ga. May 18, 2012) ("survey must resemble the way consumers would view the products in the marketplace"); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 738-39 (S.D.N.Y. 2011) (failure of a survey to approximate actual marketplace conditions can provide grounds for inadmissibility). To be admissible, the survey must replicate actual market conditions in which consumers might encounter the parties' marks. *Valador, Inc.,* 242 F. Supp. 3d at 462.

As noted above, unlike Hi-Tech's Dianabol, D-Anabol 25 is not available

for purchase at any brick-and-mortar outlets and is instead sold only through

DSN's "anabolics.com" website.  A purchaser or potential purchaser could

therefore encounter D-Anabol 25, if at all, <u>only</u> online and <u>only</u> at DSN's

website. Nonetheless, in designing and executing her survey, Gilbert did not

review or even look at the DSN website through which D-Anabol 25 is

exclusively sold. *(Exhibit C, Gilbert Depo. at 26:4-14)*. Gilbert's abject failure

even to attempt to replicate the actual marketplace conditions renders her

survey inadmissible.

> **7.    <u>The Nonsensical Results of Gilbert's Survey Indicate That
> Either The Respondents Did Not Understand What They
> Were Being Asked Or That Her Conclusions Grossly
> Misstate The Actual Results.</u>**

The questions to be asked of interviewees must be framed in a clear and

precise manner. *Wal-Mart Stores*, 537 F.Supp.2d at 1322. The results of the

confusion portion 9Section 2) of Gilbert's survey show that either the

respondents did not understand what they were being asked or that Gilbert's

conclusions grossly misstate the actual results. According to Gilbert's Report,

significantly more of the overall Section 2 respondents believed CrazyBulk's

Trenorol to be "made by the same company" as Hi-Tech's Dianabol (38%) than

believed D-Anabol 25 (misidentified by Gilbert as D-Anabol) to be made by the

same company (31%). *(Exhibit A, Gilbert Report at 16 (Appendix C – Brand*

*Confusion Results, Top Chart, Red Bars)).* Likewise, significantly more of the overall Section 2 respondents believed Trenorol to be "affiliated with the same company" as Hi-Tech's Dianabol (44%) than believed D-Anabol 25 (misidentified by Gilbert as D-Anabol) to be affiliated with the same company (36%). *(Id. at 16 (Appendix C – Brand Confusion Results, Bottom Chart, Red Bars)).* Finally, significantly more of the overall Section 2 respondents believed Trenorol to be "sponsored or approved by the same company" as Hi-Tech's Dianabol (42%) than believed D-Anabol 25 (misidentified by Gilbert as D-Anabol) to be sponsored or approved by the same company (36%). *(Exhibit A, Gilbert Report at 17 (Appendix C – Brand Confusion Results, Top Chart, Red Bars)).* These nonsensical results necessarily reveal either a fatal flaw in the survey methodology or a fatal flaw in Gilbert's interpretation of the results. In either case, these results underscore the fact that Gilbert is <u>not</u> a survey expert and require that Gilbert's testimony and report should be excluded.

## II.  HI-TECH'S REPORTS OF ITS TESTING OF THIRD-PARTY PRODUCTS FIRST CONDUCTED AND PRODUCED AFTER THE CLOSE OF DISCOVERY SHOULD BE EXCLUDED.

Discovery in the present matter closed on June 30, 2017. As detailed above, the test results attached at Exhibit 3 to Hi-Tech's December 18, 2017 Summary Judgment Response Brief [DE 163] and later identified as Hi-Tech Trial Exhibit 389 were prepared and produced <u>after</u> the close of discovery.

Rule 37 of the Federal Rules of Civil Procedure states, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Cunningham v. Fulton Cty., Georgia*, 785 F. App'x 798, 803–04 (11th Cir. 2019) (affirming exclusion of evidence where defendants "didn't list these documents as part of their initial disclosures or supplement their disclosures thereafter"). These documents must accordingly be excluded from use at trial.

## CONCLUSION

For the foregoing reasons, Gilbert's testimony and Survey Report and the untimely test results produced by Hi-Tech six months after the close of discovery should be excluded from evidence at trial.

Respectfully submitted this 23rd day of November, 2020.

**ARNALL GOLDEN GREGORY LLP**
  s/ Aaron Danzig
Aaron M. Danzig
Ga. Bar No. 205151

171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Telephone:  (404) 873-8504
Facsimile:  (404) 873-8505
E-mail: aaron.danzig@agg.com

**WELLBORN & WALLACE, LLC**
  s/ Paul F. Wellborn III
Paul F. Wellborn III
Georgia Bar No. 746720

1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318

24

Telephone:  (404) 352-3990

Facsimile:   (404) 352-3995

E-mails: pete@wellbornlaw.com

        kelly@wellbornlaw.com

        sam@wellbornlaw.com

Kelly O. Wallace

Georgia Bar No. 734166

Samuel A. Mullman

Georgia Bar No. 456630

*Attorneys for Defendants*

# INDEX TO EXHIBITS

A      "Trademark Research Report" of Linda Gilbert

B      Linda Gilbert CV

C      Gilbert Deposition Excerpts (Present Matter)

D      Order, FTC v. National Urological Group, Inc.

E      Gilbert Deposition Excerpts (Lane Labs)

F      Hi-Tech Test Results of Non-Party Products

G      Warner Chilcott Labs. Ir., Ltd. v. Impax Labs., Inc.,

H      SamedaySupplements.com (Not-for-Women Website Warning)
       (https://www.samedaysupplements.com/dianabol-by-hi-tech-
       pharmaceuticals-60-tabs.html)

I      Stinger Supplements Warning (Not-for-Women Website Warning)
       (https://stingersupplements.com/products/hi-tech-pharmaceuticals-
       dianabol-60-tabs)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| HI-TECH PHARMACEUTICALS, INC., a Georgia corporation, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | 1:16-CV-00949-MLB |
| DYNAMIC SPORTS NUTRITION, LLC et al., | ) ) ) ) | |
| Defendants. | ) | |

## **RULE 7.1 CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1**

This certifies that the foregoing DEFENDANTS' MOTION IN LIMINE

AND MEMORANDUM OF LAW IN SUPPORT was prepared using 13-point

Century Schoolbook font and complies with Local Rule 5.1. This certificate is

given pursuant to Local Rule 7.1(D).

Respectfully submitted this 23rd day of November, 2020.

1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318
Telephone: (404) 352-3990
Facsimile: (404) 352-3995
E-mail: sam@wellbornlaw.com

**WELLBORN & WALLACE, LLC**

 s/ Samuel A. Mullman
Samuel A. Mullman
Georgia Bar No. 456630

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HI-TECH PHARMACEUTICALS, INC.,       )
a Georgia corporation,               )
                                     )
        Plaintiff,                   )
                                     )   CIVIL ACTION FILE NO.
v.                                   )   1:16-CV-00949-MLB
                                     )
DYNAMIC SPORTS NUTRITION, LLC        )
et al.,                              )
                                     )
        Defendants.                  )

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 23, 2020, I caused to be electronically

filed the foregoing MOTION AND MEMORANDUM with the Clerk of Court

using the CM/ECF system which will automatically send e-mail notification

or other sufficient notice to the following attorneys of record:

| Counsel For | Attorneys | E-mail Address/Other Means |
|---|---|---|
| Hi-Tech Pharmaceuticals, Inc. | Art Leach<br>C.L. Parker<br>Russell Blythe | art@arthurwleach.com<br>cl@clparkerllc.com<br>rblythe@kslaw.com |

**WELLBORN & WALLACE, LLC**

1218 Menlo Dr. NW, Suite E
Atlanta, Georgia 30318            s/ Samuel A. Mullman
Telephone: (404) 352-3990       Samuel A. Mullman
Facsimile: (404) 352-3995       Georgia Bar No. 456630
E-mail: sam@wellbornlaw.com

*Attorneys for Defendants*