# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Hi-Tech Pharmaceuticals Inc.,

               Plaintiff,

v.                                 Case No. 1:16-cv-949-MLB

Dynamic Sports Nutrition, LLC, et al.,

               Defendants.

_____/

## **OPINION & ORDER**

Before the Court are motions in limine filed by both parties. (Dkts. 212; 213.) Having considered the record and the parties' arguments at various hearings, the Court grants in part and denies in part each motion.[1]

---

[1] Defendants' motion in limine also includes a motion to exclude Plaintiff's expert, Linda Gilbert, pursuant to the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587 (1992). The Court will address that potion of Defendants' motion in limine in a separate order addressing Plaintiff's Motions to Exclude Expert Testimony (Dkts. 236 and 238).

## I.   Background

Plaintiff Hi-Tech Pharmaceuticals Inc. manufactures and sells dietary supplement products, including DIANABOL® and a number of products designed for muscle and body building, hormone boosters, and weight loss.  (Dkt. 163-2 at 2–3.)  On February 5, 2008, the United States Patent and Trademark Office ("PTO") issued a registration for DIANABOL® as a trademark (Registration No. 3,378,354) for use in the pharmaceutical class of trademarks (Class 5) in connection with certain "dietary supplements, excluding anabolic steroids."  (Dkt. 64-1.)

For more than a decade Defendant Dynamic Sports Nutrition, LLC, ("DSN") has sold and marketed dietary supplement products, including something known as D-Anabol 25.  (Dkt. 160-1 ¶ 22.)  In March 2011, DSN applied to the PTO to register D-Anabol 25 as a trademark for dietary supplements.  (Dkt. 62 ¶ 21.)  On June 28, 2011, the PTO issued an office action refusing the registration because (1) there was a likelihood of confusion with the DIANABOL® trademark; (2) D-Anabol 25 was merely descriptive of a feature of the product; and in the alternative, (3) the product was deceptively misdescriptive.  (Dkt. 62-2 at 2–5.)

On February 5, 2014, Plaintiff filed an affidavit with the PTO certifying that (1) the goods associated with DIANABOL® have been in continuous use for five consecutive years and are still in use in commerce; (2) no final decision exists that is adverse to the owner's claim of ownership of DIANABOL® for such goods, or to the owner's right to register the same or to keep the same on the register; and (3) there is no proceeding involving the trademark rights pending in the PTO or in a court.   (Dkt. 54-17.)   The PTO found Plaintiff's affidavit met the requirements of the Trademark Act, 15 U.S.C. §§ 1058 and 1065, and the DIANABOL® mark was thus incontestable.  (Dkt. 54-18.)

Plaintiff then sued DSN and its owner, Brian Clapp.  (Dkt. 1.)  The Complaint includes claims for trademark infringement (Counts I & II); false designation of origin and unfair competition (Counts III & IV); false advertising (Count V); violation of the Georgia Deceptive Trade Practices Act (Count VI); common law unfair competition (Count VII); and violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("RICO") (Counts VIII through X).  (*Id.*)  Defendants assert several defenses, including that DIANABOL® is generic, that the DIANABOL® trademark was obtained by fraud, and that Plaintiff has

3

unclean hands.  (Dkt. 67.)  As the parties prepared for trial, they filed

motions in limine to control or limit the admission of evidence.  (Dkts.

212; 213).

## II.   Legal Standard

Trial judges may rule on motions in limine under the inherent

authority to manage the course of trials.  *Luce v. United States*, 469 U.S.

38, 41 n.4 (1984).  "The real purpose of a Motion in Limine is to give the

trial judge notice of the movant's position so as to avoid the introduction

of damaging evidence which may irretrievably affect the fairness of the

trial."  *Soto v. Geico Indem. Co.*, No. 6:13-cv-181, 2014 WL 3644247, at *1

(M.D. Fla. July 21, 2014) (citation omitted) (alterations to original).  "The

court will grant a motion in limine to exclude evidence only if the

evidence in question is clearly inadmissible," with the moving party

bearing the "burden of proving that the evidence sought to be excluded is

inadmissible."  *Wilson v. Pepsi Bottling Grp., Inc.*, 609 F. Supp. 2d 1350,

1359 (N.D. Ga. 2009).

The Court grants or denies these motions in limine based on the

proffers made and agreed to by the parties, the arguments of counsel, and

the Court's current understanding of the matter and the parties'

respective positions.  If during the trial, either party believes the basis for the Court's decision has changed such that evidence the Court excludes herein has become admissible or evidence the Court finds admissible herein become inadmissible, the party may make a proffer for reconsideration of the Court's order.  Absent extenuating circumstances, this must be done outside the presence of the jury at the start of the day, the end of the day, or at some other time such that the Court may consider the issue without delaying the jury.  This is not intended to allow parties to re-argue issues the Court decides herein, but rather in recognition of the fact that circumstances may change prior to or during the trial of this matter and that such changes may impact the admissibility of evidence discussed herein.

## III.   Discussion

### A.   Plaintiff's Motion in Limine

#### 1.   Presence of Anabolic Steroids in Plaintiff's Products

Defendants retained an expert to conduct chemical testing of Plaintiff Hi-Tech's DIANABOL® product.  That expert found two anabolic steroids in DIANABOL®, androstenedione and dihydrotestosterone (DHT).  (Dkts. 160-9; 160-21 at 89:11–90:3; 163-5–

7.)   Defendants claim this evidence shows Plaintiff knowingly and intentionally "spiked" DIANABOL® with steroids.   (Dkt. 215 at 7.) Defendants further claim the presence of steroids in DIANABOL® is relevant for several purposes, including to show Plaintiff's DIANABOL® mark was obtained through fraudulent filings and that Plaintiff has unclean hands.  (*Id.* at 7, 9, 17.)  More specifically, they say the evidence will show that "Hi-Tech and Wheat have engaged in an on-going, twenty-year scheme of USPTO-related fraud by obtaining marks similar or identical in name to common, illegal muscle-building steroids and then spiking those supposedly legal products with banned anabolic steroids[, that] include[] DIANABOL®."  (*Id.* at 8.)

Plaintiff retained an expert who opined that the presence of androstenedione in DIANABOL® can be explained by its use as a "starting material" in the synthesis of a substance known as dehydroepiandrosterone ("DHEA") that Plaintiff admittedly uses to manufacture DIANABOL®.  (Dkt. 163-3 at 10.)  In other words, the expert claims the first steroid is merely a by-product of the manufacturing process.  (*Id.*)  He claims the levels of both steroids in DIANABOL® are so small—what Plaintiff refers to as "trace amounts"—

that they have no biological effect on the consumer.  (*Id.*; *see also* Dkt. 212 at 11.)   In short, Plaintiff denies any suggestion it intentionally "spiked" its product with illegal steroids.  As to the unclean hands claim, Plaintiff says the presence of "trace amounts" of steroids in DIANABOL® does not affect the "equitable relations between the parties" in the subject of this litigation because Defendants also sell a product that contains at least one of the same steroids.  (Dkt. 212 at 10.)  They say "the equities are, therefore, the same on both sides" or, put differently, their hands are equally dirty.  (*Id.*)  Plaintiff seeks to exclude any evidence of anabolic steroids in DIANABOL® (or any of its other products).

The Court agrees that whether Plaintiff intentionally "spiked" DIANABOL® is a relevant issue in this case.  First, it is relevant to Defendants' claim that Plaintiff's trademark was obtained by fraud and is thus invalid.  "In any action involving a registered mark, a court may order the cancellation of the registration, in whole or in part, when such action is warranted." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (citing 15 U.S.C. § 1119).  "One ground on which a party may petition to cancel a registered service mark is that the registration was obtained fraudulently." *Id.* (citing 15 U.S.C.

§ 1064(3)). "Fraud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Id.* (citing *Metro Traffic Control, Inc. v. Shadow Network Inc.,* 104 F.3d 336, 340 (Fed. Cir. 1997)). "Fraud further requires a purpose or intent to deceive the PTO in the application for the mark." *Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hospitallers of the Sovereign Order of Saint John of Jerusalem, Knights of Malta, The Ecumenical Order*, 702 F.3d 1279, 1289 (11th Cir. 2008) (citing *In re Bose Corp.*, 580 F.3d 1240, 1243, 1245 (Fed. Cir. 2009)).

In this case, Defendants bear the burden of proving the alleged fraud by clear and convincing evidence. *Angel Flight*, 522 F.3d at 1209. Defendants argue Plaintiff represented to the PTO that DIANABOL® would not contain anabolic steroids, but then spiked DIANABOL® to include anabolic steroids. Such conduct could show Plaintiff obtained the trademark through fraud. After all, Plaintiff obtained the mark for a dietary supplement that does not include steroids. (Dkt. 62 at ¶ 15.)

Second, evidence of "spiking" is relevant to Defendants' argument that the unclean hands doctrine bars Plaintiff from recovering on its false

advertising claims because Plaintiff misled consumers by selling supplements that contain illegal steroids. (Dkt. 160 at 16.) "The defense of unclea[n] hands applies to a Lanham Act claim and is established by a showing that 'the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claim.'" *DS Waters of Am., Inc. v. Fontis Water, Inc.*, No. 1:10-cv-0335-SCJ, 2012 WL 12873771, at *24 (N.D. Ga. Sept. 13, 2012) (applying the unclean hands doctrine in context of a Lanham Act claim) (quoting *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, 258 F.R.D. 663, 665–66 (W.D. Wash. 2009)), *amended by* 2012 WL 12873620 (N.D. Ga. Dec. 4, 2012).

> [W]hen the owner of a trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the public, it is essential that the plaintiff should not in his trade-mark, or in his advertisements and business, be himself guilty of any false or misleading representations; that if the plaintiff makes any material false statement in connection with the property which he seeks to protect, he loses the right to claim the assistance of a court of equity; that where any symbol or label claimed as a trademark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11th Cir. 1983) (quoting *Worden & Co. v. Ca. Fig Syrup Co.*, 187 U.S. 516, 528

(1903)).   While the Court previously denied Defendants' motion for summary judgment on Plaintiff's false advertising claims, it recognized the existence of "a genuine dispute of material fact regarding the androstenedione and DHT allegedly detected in Plaintiff's DIANABOL®® product." (Dkt. 181 at 25.)   In doing so, the Court recognized the relevance of "spiking" evidence.   It reaffirms that determination here.

The Court thus denies Plaintiff's motion in limine regarding reference to the presence of steroids in DIANABOL® or other Hi-Tech products, subject to specific objections as to any particular evidence.

## 2.   Evidence of Prior Crimes and Wrongdoings

Plaintiff and its owner (Jared Wheat) have a long and colorful history of criminal and civil litigation, including (a) Mr. Wheat's 1990 conviction for the sale of MDMA and 1995 violation of supervised release for marijuana possession, (b) Mr. Wheat's and Plaintiff's 2008 convictions for conspiracy to commit mail and wire fraud and to introduce adulterated, misbranded, and unapproved new drugs with the intent to defraud, (c) a 2013 forfeiture action brought by the Federal Food and Drug Administration ("FDA") to seize Plaintiff's products containing a

food additive known as DMAA, (d) a 2017 order in the Northern District of Georgia finding Plaintiff and Mr. Wheat in violation of a 2008 injunction the Federal Trade Commission obtained against them regarding unsubstantiated representations they made related to weight loss products, and (e) a 2017 indictment currently pending against Mr. Wheat and related civil forfeiture case.  Plaintiff seeks to exclude all of this evidence (except Plaintiff concede Mr. Wheat's and its 2008 convictions are admissible to attack their character for truthfulness pursuant to Federal Rule of Evidence 609).  (Dkt. 21 at 2–9.)

Defendants argue this evidence is admissible for the purposes set forth in Federal Rule of Evidence 404(b).  (Dkt. 215 at 14-19.)  The Eleventh Circuit sets out a three-part test for determining whether evidence of a prior bad act is admissible under Rule 404(b).  *See United States v. Miller*, 959 F.2d 1535, 1538 (11th Cir. 1992).  For evidence to be admissible, the party seeking to introduce the evidence must show: (1) the evidence is relevant to an issue other than the defendant's character; (2) there is sufficient proof of the extrinsic act; and (3) the evidence's probative value is not substantially outweighed by the risk of undue

prejudice under Rule 403. *See id.*; *United States v. Ramirez*, 724 F. App'x 704, 716 (11th Cir. 2018).

Evidence of a party's prior bad acts is admissible to prove a party's motive, intent, plan, or absence of mistake of accident. Fed. R. Evid. 404(b). Where extrinsic act evidence is offered to prove a party's intent, "its relevance is determined by comparing the [party's] state of mind in perpetrating both the extrinsic and charged offenses." *United States v. Barrington*, 648 F.3d 1178, 1186 (11th Cir. 2011) (quoting *United States v. Dorsey,* 819 F.2d 1055, 1060 (11th Cir.1987)). The first prong of the Rule 404(b) test is satisfied "when the state of mind required for the charged offense and the extrinsic act is identical." *Id.* So, for example, when a defendant in a fraud case claims he or she did not intend to commit fraud, prior instances in which the defendant defrauded others in a similar manner is admissible to prove the defendant's intent to defraud. *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008). That concept *could* apply here.

At the heart of Defendants' 404(b) argument is their claim that Plaintiff knowingly and intentionally "spiked" DIANABOL® with steroids and falsely advertised it as not containing steroids. (Dkt. 215 at

12

7.)  In response, Plaintiff contends it did not intend to defraud the PTO by spiking DIANABOL® with anabolic steroids or its customers by falsely advertising that its product contained no steroids.  Given Plaintiff's response, Defendants have identified a proper purpose under Rule 404(b).  Evidence of prior spiking or false advertising could show Plaintiff intended to spike DIANABOL® with anabolic steroids (in other words, the presence of such steroids was not an accident or unknowing by-product as Plaintiff contends) and that Plaintiff intended to mislead consumers by advertising DIANABOL® as a nutritional supplement when they knew it contained steroids.

This is simply to say Defendants identified a *theory* under which it *could* introduce evidence of Mr. Wheat's and Plaintiff's other "bad acts." But, upon review of the parties initial briefing, the Court was unconvinced any of Defendants' proffered evidence had probative value as to Defendants' theory of admissibility.  The Court invited Defendants to present additional details as to the prior "bad acts" it sought to introduce in order for the Court to apply the three part test.  Defendants did so.  (Dkt. 249.)  The Court now concludes that, with few exceptions,

13

Defendants' alleged evidence does not satisfy its theory of admissibility and is not admissible under Rule 404(b).

Alternatively, Defendants argue that evidence of prior crimes and wrongdoings is admissible under Rule 405 for the separate purpose of showing that Plaintiff has "an abysmal and well-publicized history of criminal violations and activities that repeatedly endangered the health and well-being of unknowing consumers" and that this reputational evidence is admissible to "counter and offset Plaintiff's damages-related calculations and claims." (Dkt. 215 at 12.)  Plaintiff responds that it does not intend to introduce evidence of its good reputation and that this evidence is thus irrelevant.  (Dkt. 221 at 8.)   The Court finds Defendants have not presented any basis for the admission of this evidence under Rule 405.

### a)   1990 Conviction and 1995 Probation Violation

In 1990, Mr. Wheat pled guilty in the Northern District of Alabama to conspiracy to distribute MDMA.  (*See* Dkt. 160-5; *United States v. Wheat, et al.*, 90PT120S (N.D. Ala.)).  After being released from prison, Mr. Wheat violated the conditions of his supervised release when law enforcement stopped him for driving under the influence and found him

in possession of twenty pounds of marijuana.  (Dkt. 160-5 at 8.)  Not admirable conduct.  But Mr. Wheat's conduct in the 1990s did not involve any claims of "spiking" or false advertising.  As such, it is not probative of any proper purpose under Rule 404(b)—it does not provide any basis to suggest Plaintiff intentionally spiked or falsely advertised DIANABOL®.

Nor is this evidence admissible under Rule 405 as evidence of character or reputation, even assuming Plaintiff introduces evidence of its good character.  The relevant period of damages in this case begins in September 2011, so any effects from the 1990 conviction and the 1995 probation violation were already "baked" into the market.  Any hit to Plaintiff's reputation as a result of Mr. Wheat's conviction occurred long before the alleged damages period in this case and could not be an alternative cause of any difficulties at issue here.  This evidence has no probative value.  And, even if it had some probative value, the prejudicial impact of admitting this evidence would outweigh any value it may have to the jury.  The Court grants Plaintiff's motion to exclude evidence of Mr. Wheat's 1990 conviction and 1995 supervised release violation.

### b)     2008 Conviction for Mail and Wire Fraud

In  2008, Mr. Wheat and Plaintiff pled guilty in *United States v. Wheat, et al.*, 1:06-CR-382-JTC (N.D. Ga.).  Although the indictment charged forty-six offenses, Plaintiff and Mr. Wheat pled guilty to one count—conspiracy to commit mail and wire fraud and to introduce into interstate commerce adulterated, misbranded, and unapproved new drugs with the intent to defraud and mislead.  (Dkt. 160-6 at 107.) Defendants argue that this evidence is admissible because it shows Plaintiff "was selling illegal anabolic steroids and other controlled substances in interstate commerce at the same time it was selling DIANABOL." (Dkt. 215 at 8.)  In support, Defendants cite Plaintiff's and Mr. Wheat's August 15, 2008 guilty plea hearing transcripts, contending that the transcripts "do not exclude the manufacture and sale of anabolic steroids from the factual basis." (Dkt. 249 at 3, 5.)

Plaintiff   and   Mr.   Wheat   pled   guilty   to   manufacturing pharmaceuticals and other drugs in Belize in a manner that violated United States law and then subsequently sold those unauthorized drugs into the United States. (Dkt. 249-3 at 17–19.)  For sure, their  conduct involved the illegal manufacturing and sale of steroids.  But that does not

satisfy the first prong of the Rule 404(b) test.  There was no suggestion Plaintiff or Mr. Wheat were misrepresenting or mislabeling any of the ingredients in the drugs they illegally manufactured and sold.  (*Id.* at 21.) They were making properly identified generics, but without authorization to do so and through an unauthorized manufacturing process, as required by United States law for sale to United States customers.  (*Id.*)  The steroids at issue in that case were properly identified as steroids—there were no allegations of spiking or mislabeling.  There also was no allegation of false advertising or the intention to deceive customers.

Defendants nonetheless contend that evidence Plaintiff sold illegal steroids in the United States establishes Plaintiff's plan or motive to spike its product in this case—that a jury could find the presence of steroids in DIANABOL® was intentional because Plaintiff had previously sold steroids in the United States and thus had motive to do so again.  In other words, Defendants say Plaintiff wanted to sell steroids before and such evidence is relevant to show it has the intent to sell steroids now.  But the Court is unpersuaded that evidence relating to Plaintiff's 2008 conviction involving the sale of illegally manufactured,

but properly identified, steroids is relevant to the "spiking" and false advertising allegations at issue in this case.  The 2008 conduct is not even remotely analogous to the conduct alleged in this case such that proof of the former is probative of intent for the latter.  Moreover, the prejudicial impact of admitting the 2008 convictions far outweighs any trace of relevance.  Evidence of the 2008 convictions is admissible only for the limited purpose identified in Rule 609(a)(1)(A).[2]

### c) DMAA Case

In 2013, Plaintiff sold weight loss products containing Dimethylamylamine, commonly known as DMAA.  The FDA seized a large amount of Plaintiff's product, claiming they were subject to seizure because DMAA was a food additive that was not generally recognized as safe.  Plaintiff filed a claim in the subsequent forfeiture action to challenge the FDA's classification of DMAA.  *See United States v. Quantities of Finished & In-process Foods, et al.*, 1:13-CV-3675 (N.D. Ga.).  (Dkt. 249-8.)  In its claim, Plaintiff argued DMAA was a botanical

---

[2] The Court concludes evidence of the 2008 convictions is also not admissible under Rule 405 for the same reasons the 1990 conviction is not admissible—Plaintiff's reputation at the start of the relevant period already reflected the impact of the 2008 convictions.

rather than a food additive and its products were thus not subject to seizure. That was an issue of first impression. After considering arguments by the parties and experts' opinions, the district court ruled against Plaintiff, and the Eleventh Circuit affirmed.

Defendants argue this evidence is relevant to show Plaintiff has sold another product containing an illegal ingredient, making it probative under Rule 404(b) to show opportunity and absence of mistake as to the presence of steroids in DIANABOL®. (Dkt. 215 at 17.) The Court disagrees. There was no evidence in the DMAA case that Plaintiff "spiked" or intentional misrepresented its weight loss product to hide the presence of DMAA. Indeed, DMAA was included on the label. Absent evidence that Plaintiff intentionally misbranded the product containing DMAA or continued selling the product *after* the court ruled that it was illegal to do so, the Court concludes evidence of the DMAA case fails to satisfy the first prong of the Rule 404(b) analysis.

Additionally, Defendants have not demonstrated the DMAA case had any impact on Plaintiff's reputation to render it admissible pursuant to Rule 405. And any potential relevancy for that purpose is outweighed by the prejudicial impact of the evidence. Accordingly, the Court grants

this motion subject to reconsideration upon the introduction of additional evidence.[3]

### d)   2017 Finding of Civil Contempt and Sanctions

In 2004, the Federal Trade Commission ("FTC") sued Plaintiff, Mr. Wheat, and others claiming they had made unsubstantiated representations about the efficacy of two weight loss products— Thermalean and Lipodrene.  (Dkts. 160-7 at 3; 240-6 at 129.)   After lengthy litigation, the court concluded the defendants violated the Trade Commission Act, granted summary judgment in favor of the FTC, and imposed a permanent injunction against Plaintiff, Mr. Wheat, and the others precluding them from making representations about the efficacy of weight loss products unless the representations were based upon "competent and reliable scientific evidence that substantiates the representations."  (Dkts. 160-7 at 15; 240-6 at 142.)  The court entered that injunction in 2008, and the Eleventh circuit affirmed.

---

[3] The Court recognizes that Defendants have filed additional evidence they seek to admit in relation to the DMAA matter.  (Dkt. 255.)  The Court will consider this evidence after Plaintiff responds.

In 2011, the FTC brought a sanctions case claiming Plaintiff, Mr. Wheat, and others had violated the injunction by making representations about four weight loss products—Fastin, Stimerex-ES, Benzedrine, and a reformulated version of Lipodrene—that lacked the requisite substantiation. (Dkt. 160-7 at 5.) The FTC also claimed Plaintiff failed to include the required yohimbine warning on each of the four products, in violation of Section VI of the injunction. (*Id.*) After lengthy litigation that lasted until 2017, the court found Plaintiff, Mr. Wheat, and the others understood the requirements of the injunction, knew the company's representations violated those requirements, intentionally violated the terms of the injunction by not possessing competent and reliable scientific evidence to substantiate the representations they made about the weight loss products, and misled consumers. (Dkt. 160-7 at 32–41, 63–78, 117–18, 127.)

While this matter does not appear to have involved "spiking" of products with steroids or other substances, it did involve the accuracy of Plaintiff's advertisements in regard to the prior injunction. The court concluded that Plaintiff knew the requisite standard for its advertisements and intentionally did not abide the standard. In other

words, the company intentionally misled consumers about the efficacy of its products.  Here, Plaintiff argues that Defendants have engaged in false advertising by intentionally representing that their products contain steroids when they in fact do not.  In response, Defendants assert an unclean hands defense, claiming that Plaintiff cannot recover on a false advertising claim because Plaintiff has engaged in false advertising for its own products, including DIANABOL®.  Plaintiff responds that any failure to identify anabolic steroids in DIANABOL® was an error (because it did not know the steroids were there) or irrelevant (because the steroids are only present in trace amounts).

The accuracy of Plaintiff's advertisements and whether Plaintiff knew they were inaccurate is at issue here.  From evidence Plaintiff intended to misrepresent its products in the injunction case, a jury could conclude it intended to do so in this case.  A jury could conclude from the prior event that Plaintiff did not act innocently and mistakenly in failing to disclose anabolic steroids in DIANABOL®.  The evidence is relevant to an issue other than the defendant's character.  The contempt order also provides sufficient proof of the extrinsic act and the evidence's probative value is not substantially outweighed by the risk of undue

22

prejudice.  The Court thus denies Plaintiff's motion to exclude evidence of Plaintiff's violation of the 2008 injunction.

### e)   2017 Indictment and Related Forfeiture Case

Plaintiffs seek to exclude all evidence relating to a criminal case currently pending against Plaintiff and Mr. Wheat, *United States v. Wheat, et al.*, 1:17-cr-00229-ATCMS (N.D. Ga.), and a related civil forfeiture proceeding.  (Dkt. 212 at 7.)  These matters involve claims that Plaintiff, Mr. Wheat, and others provided false Good Manufacturing Practice certificates upon the export of their products.  (Dkt. 160-8.)  It includes a charge for conspiracy to introduce misbranded drugs into interstate commerce, claiming Plaintiff, Mr. Wheat and their co-defendant sold a dietary supplement called Choledrene without disclosing that it included lovastatin, making it a "drug" rather than a "dietary supplement" under the FDCA.  (*Id.* at 8.)  While this may be relevant to Defendants' unclean hands defense, neither Plaintiff nor Mr. Wheat has entered a plea in that case.  Mere evidence of the indictment is insufficient to satisfy the first prong of the Rule 404(b) test.

Defendants argue that, while the indictment itself may not be admissible, other evidence relating to the pending criminal matter might

23

be. (Dkt. 215 at 20.)  The Court agrees that, if Defendants have proof of some extrinsic act related to this pending matter (like alleged spiking of Choledrene), that evidence could be relevant and admissible pursuant to Rule 404(b).  But Defendants have provided no such evidence.  Nor have Defendants made a showing that this matter impacted Plaintiff's reputation so as to be admissible pursuant to Rule 405.  Based on the evidence presented so far, the Court grants Plaintiff's motion in limine to exclude evidence of the pending criminal case and the related forfeiture action.

### 3.    Evidence and Testimony from Oliver Catlin

Plaintiff seeks to exclude evidence and testimony from Oliver Catlin, the president of a company known as Banned Substances Control Group ("BSCG") that Defendants retained to test DIANABOL®.  (Dkt. 212 at 12.)  BSCG did not conduct the testing itself but rather hired Trudasil Laboratories Inc. ("Trudasil") to do so.  (*Id.*)  Dr. Anthony Fontana, the Technical Director of Trudasil, issued an expert report about that testing.  (*Id.*)

Plaintiff argues Catlin was not involved with the testing or the creation of the Fontana report, so any testimony he could offer would be

hearsay and needlessly cumulative of that provided by Dr. Fontana.  (*Id.* at 13.)  Plaintiff further argues that Catlin was not properly identified as an expert and should not be permitted to give expert testimony.  (Dkts. 212 at 12; 221 at 11.)  At a May 19, 2021 pretrial conference, Defendants stipulated that Catlin will not give expert testimony and that his testimony is primarily needed to establish chain of custody.  The Court finds such testimony relevant and admissible for that purpose.  He may testify as a fact witness as to what (if anything) he did but may offer no expert testimony about Trudasil's analysis.

### 4.   Evidence of Plaintiff Making False or Misleading Product Claims and All Plaintiff Advertising Outside the Relevant Time Period

Plaintiff seeks to exclude all evidence relating to allegations that it has made false product claims, as well as all evidence of its advertising outside the relevant time period.  (Dkt. 212 at 17–19.)   The Court finds evidence relating to Plaintiff's alleged false advertising relevant to Defendants' unclean hands defense for the reasons already explained.  Evidence of this nature may also be probative as to whether the presence of anabolic steroids in DIANABOL® resulted from Plaintiff's intentional conduct rather or from its innocent mistake or accident during the

25

manufacturing process.  Such evidence may be probative regardless of whether the advertising occurred outside the relevant time period.  The Court denies Plaintiff's request to exclude this evidence categorically subject to specific objections by Plaintiff as to any specific evidence.

### 5.   Evidence that DIANABOL® is Generic

Plaintiff also seeks to exclude all evidence relating to DIANABOL® being generic for anything other than "dietary supplements, excluding anabolic steroids." (*Id.* at 20.)  Defendants have asserted, among other defenses, that Plaintiff's DIANABOL® trademark is invalid because it is a generic for an anabolic steroid. (Dkt. 215 at 4–5.)  Plaintiffs argue this evidence should be excluded because anabolic steroids are outside the class of goods identified in the DIANABOL® registration and thus this evidence has no relevance to the genericness inquiry.  (Dkt. 212 at 20–21.)  The Court asked the parties at a pretrial conference to file a letter brief regarding the issue of genericism, which the parties filed on April 28, 2021.  (Dkts. 247; 248.)

The Court finds evidence related to whether DIANABOL® is generic for an anabolic steroid to be relevant and admissible.  And whether a given term is generic is a question of fact for the jury. *Pods*

*Enters., Inc. v. U-Haul Int'l, Inc.*, No. 8:12-cv-01479, 2015 WL 1097374, at \*5 (M.D. Fla. Mar. 11, 2015) (explaining that U-Haul introduced several items of evidence suggesting that storage containers placed on top of vehicles were generically called "pods," but "the jury did not have to accept that the use of the term 'pod' to refer to a roof-mounted container on RVs described the same kind of product as the PODS-branded containers"). The jury is entitled to know the market and the conditions in which the product existed. Accordingly, the Court denies this motion.

### 6. Evidence that the DIANABOL® Ingredient List is False or Misleading

Plaintiff seeks to exclude all evidence relating to DIANABOL®'s ingredient list being false or misleading, specifically arguing that Defendants should not be permitted to introduce evidence that Plaintiff failed to properly identify DHEA on the DIANABOL® ingredient list. (Dkt. 212 at 21.) The DIANABOL® label identifies the ingredient "dehydroepiandosterone acetate." (*Id.*) Defendants seek to admit two excerpts from the official website of the Environmental Protection Agency ("EPA")—one describing the chemical characteristics of DHEA and the other describing the chemical characteristics of

"dehydroepiandrosterone acetate" ("DHEA Acetate").  (Dkt. 215 at 20.)
Defendants intend to offer the EPA documents at trial to show DHEA
and DHEA Acetate are not the same compound and thus Plaintiff failed
to identify DHEA as an ingredient in DIANABOL®.  (*Id.* at 21.)  Plaintiff
contends this evidence is inadmissible because the evidence related to
chemical properties and molecular formulas requires expert testimony
and because it is irrelevant to Defendants' false advertising and unclean
hands defenses.  (Dkt. 212 at 21–22.)

The Court finds evidence relating to whether the DIANABOL®
ingredient list is false or misleading relevant to Defendants' false
advertising and unclean hands defenses.   Whether there is an
undisclosed ingredient present in DIANABOL® is clearly at issue in this
case, and this evidence is directly relevant to that issue.  But evidence
relating to the distinguishable chemical properties of DHEA and DHEA
Acetate, while relevant, is sufficiently complex to fall beyond the grasp of
an ordinary layperson.  *See* Fed. R. Evid. 701; *Burkhart v. R.J. Reynolds
Tobacco Co.*, No. 3:09-cv-10727, 2014 WL 12617550, at *8 (M.D. Fla. Apr.
30, 2014) (excluding layperson testimony as to the comparative addictive
properties of nicotine and other substances because such evidence "is not

within the common experience of a layperson but is scientific or specialized knowledge").

Defendants may not use a website excerpt to establish facts that require testimony from a qualified expert absent some foundation. Accordingly, the Court will exclude the excerpts from the EPA website. The Court will not exclude, however, testimony from a properly disclosed and qualified expert relating to whether the ingredients listed on the DIANABOL® product label are false or misleading, including as to the difference (if any) between DHEA and DHEA Acetate. Alternatively, Defendants can seek to admit this testimony from a lay witness, provided they can provide the proper foundation. Two printouts from a website with no explanation, however, is not permitted.

### 7. References to Derege Lucas Rais Holdings, LLC's Trademark Applications

Plaintiff seeks to exclude all evidence relating to Derege Lucas Rais Holdings, LLC's ("DLRH's") application for the trademark "Dianabol" and "Anavar" for "dietary and nutritional supplements," both of which the PTO denied, inter alia, based upon a likelihood of confusion with Plaintiff's DIANABOL® and ANAVAR® trademarks. (Dkt. 212 at 23.) Defendants seek to admit this evidence to show that the Plaintiff's

DIANABOL® trademark is generic.  (Dkt. 215 at 5–6.)  Plaintiff argues that the evidence lacks probative value and is irrelevant and confusing. (Dkt. 212 at 23–24.)

The Court finds evidence regarding the DLRH trademark relevant to Defendants' genericism defense and the jury is entitled to consider it, as previously addressed herein.  The Court denies this motion.

### 8.   A Picture of Mr. Wheat with Cash

Plaintiff seeks to exclude a photo of Mr. Wheat posing with cash. Defendants consented to this exclusion at a pretrial conference on April 21, 2021.  Accordingly, the Court grants this motion.

### B.   Defendants' Motion in Limine

Defendants seek to exclude reports of non-party product testing performed by ABC Testing and disclosed by Plaintiff after the close of discovery.  (Dkt. 213 at 5.)  Plaintiff intends to use the testing reports to refute Defendants' claim that Plaintiff intentionally spiked DIANABOL® with steroids, as the reports reflect trace amounts of androstenedione in twelve third-party products which also contain DHEA.  (Dkt. 214 at 24–25.)  Discovery in this matter closed on June 30, 2017.  On December 18, 2017, Plaintiff filed its response to Defendants' summary judgment motion, which included ABC Testing's results.  (Dkt. 163-3.)  The report

indicates that ABC Testing received the supplements to be tested on July 27, 2017 and issued its report on August 2, 2017.  (*Id.*)   All of this after discovery ended.

"If a party fails to provide information[,] . . . the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  Here, the testing of the products and subsequent issuing of the report occurred a month after the close of discovery.  The report was then not disclosed until almost six months after discovery ended.  Plaintiff argues that its delayed disclosure is justified because the testing was not completed until the close of discovery, and thus there were no test results to disclose until after the discovery period had ended. (Dkt. 214 at 24–25.)   The Court is unpersuaded that Plaintiff's own failure to conduct testing before the close of discovery renders its untimely disclosure of the test results justified.   To hold otherwise would render discovery deadlines meaningless.  And Plaintiff provides no explanation whatsoever for why it waited until December 18, 2017 to disclose the report created on August 2, 2017.  Moreover, to permit Plaintiff now to introduce the report at trial would not be "harmless" to Defendants.  Accordingly, the Court

grants this motion and precludes Plaintiff from presenting evidence of ABC Testing's analysis.

## IV.   Conclusion

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion in Limine (Dkt. 212) and **GRANTS** Defendants' Motion in Limine (Dkt. 213) regarding ABC Testing. The Court will address the portion of Defendants' Motion in Limine seeking to exclude testimony from Linda Gilbert in a separate order.

**SO ORDERED** this 24th day of May, 2021.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE